1  Joshua P. Davis (SBN 193254)
2  **BERGER MONTAGUE PC**
   505 Montgomery St., Ste. 625
3  San Francisco, California 94111
   Telephone: (800) 424-6690
4  jdavis@bm.net

5
   Kyla J. Gibboney (SBN 301441)
6  **GIBBS LAW GROUP LLP**
   1111 Broadway, Suite 2100
7  Oakland, California 94607
   Telephone: (510) 350-9700
8  kjg@classlawgroup.com

9
   Matthew S. Weiler (SBN 236052)
10 **SCHNEIDER WALLACE**
   **COTTRELL KONECKY LLP**
11 2000 Powell Street, Suite 1400
   Emeryville, CA 94608
12 Telephone: (415) 421-7100
   mweiler@schneiderwallace.com
13
   *Counsel for Plaintiffs Portable Power, Inc.,*
14 *Kimberly Schuman, Kyle Kelley, and the*
   *Proposed Direct Purchaser Classes*
15
   [Additional Counsel on Signature Page]
16

Daniel H. Silverman (*pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL**
**PLLC**
769 Centre Street, Suite 207
Boston, MA 02130
Tel: (202) 408-4600
dsilverman@cohenmilstein.com

Sarah Grossman-Swenson (SBN 259792)
**MCCRACKEN STEMERMAN &**
**HOLSBERRY LLP**
475 14th Street, Suite 1200
Oakland, CA 94612
(415) 597-7200
sgs@msh.law

*Counsel for Plaintiffs Don Copeland, Joseph*
*Murray, Carol Smith, Patrick Whitney, Philip*
*Hague, Denise Fotis, Roxann Doriott, Bruce*
*Mims, Lori Ably, Timothy Brown, Peter*
*Costas, and Mike Ballard and Proposed Lead*
*Counsel for Indirect Purchaser Class*

17 **UNITED STATES DISTRICT COURT FOR THE**
   **NORTHERN DISTRICT OF CALIFORNIA**
18 **SAN JOSE DIVISION**

19
   DON COPELAND, *et al.*,          Case No. 5:23-cv-02087-PCP
20
            Plaintiffs,             **PLAINTIFFS' OPPOSITION TO**
21                                  **DEFENDANTS' MOTION TO DISMISS**
      v.
22
   ENERGIZER HOLDINGS, INC., *et al.*,
23
            Defendants.
24

25 [Caption continues below]

26

27

28

| | |
|---|---|
| 1 | PORTABLE POWER, INC., | Case No. 5:23-cv-02091-PCP |
| 2 | Plaintiff, |
| 3 | v. |
| 4 | ENERGIZER HOLDINGS, INC., *et al.*, |
| 5 | Defendants. |
| 6 | KIMBERLY SCHUMAN, *et al.*, | Case No. 5:23-cv-02093-PCP |
| 7 | Plaintiffs, |
| 8 | v. |
| 9 | ENERGIZER HOLDINGS, INC., *et al.*, |
| 10 | |
| 11 | Defendants. |

# TABLE OF CONTENTS

I. Introduction ........................................................................................................... 1

II. Factual Background ............................................................................................. 8

III. Argument............................................................................................................ 10

    A.  Legal Standard.............................................................................................. 10

    B.  Plaintiffs Plausibly Allege an Agreement. ................................................. 10

    C.  Plaintiffs plausibly allege injury to competition. ...................................... 20

        1.  Plaintiffs plead a per se violation of California's antitrust law.................. 20

        2.  Plaintiffs allege anticompetitive effects directly and indirectly................. 22

            a.  Plaintiffs' allegations directly establish anticompetitive effects........ 22

            b.  Plaintiffs' allegations indirectly establish anticompetitive effects...... 26

                i.  Plaintiffs adequately plead power in a relevant market. ................. 26

                ii.  Plaintiffs adequately plead harm to competition............................. 30

    D.  Defendants' justifications are premature and fail. ........................................ 31

    E.  All plaintiffs have standing to bring their claims. ....................................... 34

        1.  The *Schuman* Plaintiffs have antitrust standing........................................ 34

        2.  The *Copeland* Plaintiffs have Article III standing for all their claims....................... 36

    F.  Defendants' other arguments for dismissing Plaintiffs' state-law claims are wrong. ...... 42

IV. Conclusion ........................................................................................................... 49

i

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case Nos. 5:23-cv-02087-PCP; 5:23-cv-02091-PCP; 5:23-cv-02093-PCP

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*Ablaza v. Sanofi-Aventis U.S. LLC*,
  No. 21-cv-1942, 2022 WL 19517298 (N.D. Cal. July 12, 2022) ............................. 37

*Alan Darush MD APC v. Revision LP*,
  No. 12-cv-1210296, 2013 WL 12142621 (C.D. Cal. Aug. 28, 2013)...................................... 21

*al-Kidd v. Ashcroft*,
  580 F.3d 949 (9th Cir. 2009)................................................................ 10

*Alsheikh v. Superior Court*,
  No. B249822, 2013 WL 5530508 (Cal. Ct. App. Oct. 7, 2013) ............................. 21

*Alvord-Polk v. F. Schumacher & Co.*,
  37 F.3d 996 (3d Cir. 1994)................................................................ 19

*Am. Express Anti-Steering Rules Antitrust Litig.*,
  361 F. Supp. 3d 324 (E.D.N.Y. 2019) ................................................... 28

*Amchem Prods, Inc. v. Windsor*,
  521 U.S. 591 (1997)......................................................................... 40

*Arista Networks Inc. v. Cisco Sys., Inc.*,
  No. 16-cv-00923, 2017 WL 6102804 (N.D. Cal. Oct. 10, 2017) ........................... 30

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................. 10, 30

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983) ................................................................. 34, 36

*Auto Equity Sales, Inc. v. Superior Court*,
  57 Cal. 2d 450 (1962) ..................................................................... 21

*Bell Atl. Co. v. Twombly*,
  550 U.S. 544 (2007)................................................................... 10, 17

*Big Apple BMW, Inc. v. BMW of N. Am., Inc.*,
  974 F.2d 1358 (3d Cir. 1992)........................................................... 16

*Bio-Rad Labs, Inc. v. 10X Genomics, Inc.*,
  483 F. Supp. 3d 38 (D. Mass. 2020) ................................................. 23

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
  65 F.3d 1406 (7th Cir. 1995)........................................................ 18, 34

ii

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case Nos. 5:23-cv-02087-PCP; 5:23-cv-02091-PCP; 5:23-cv-02093-PCP

Page(s)

*Bostick Oil Co. v. Michelin Tire Corp., Com. Div.*,
   702 F.2d 1207 (4th Cir. 1983) ................................................................................................. 12

*Brantley v. NBC Universal, Inc.*,
   675 F.3d 1192 (9th Cir. 2012) .......................................................................................... 24, 25

*Brown v. Amazon.com, Inc.*,
   No. 22-cv-00965, 2023 WL 5793303 (W.D. Wash. Sep. 7, 2023) .................................... *passim*

*Bus. Elecs. Corp. v. Shaper Elecs. Corp.*,
   485 U.S. 717 (1988) ................................................................................................................ 22

*Caccuri v. Sony Interactive Entm't LLC*,
   No. 21-cv-03361, 2022 WL 2789554 (N.D. Cal. July 15, 2022) ............................................ 23

*California Crane Sch., Inc. v. Google LLC*,
   No. 21-cv-10001, 2023 WL 2769096 (N.D. Cal. Mar. 31, 2023) .................................... 14, 17

*City of Oakland v. Oakland Raiders*,
   20 F.4th 441 (9th Cir. 2021) ................................................................................................... 35

*Cnty. of San Mateo v. CSL, Ltd.*,
   No. 10-cv-05686, 2014 WL 4100602 (N.D. Cal. Aug. 20, 2014) .......................................... 35

*Costco Wholesale Corp. v. AU Optronics Corp.*,
   No. 13-cv-1207, 2014 WL 4723880 (W.D. Wash. Sep. 23, 2014) ........................................ 36

*Costco Wholesale Corp. v. Johnson & Johnson Vision Care, Inc.*,
   No. 15-cv-734, 2015 WL 9987969 (M.D. Fla. Nov. 4, 2015) ............................................... 28

*Cnty. of Tuolumne v. Sonora Cmty. Hosp.*,
   236 F.3d 1148 (9th Cir. 2001) ................................................................................................ 21

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) ................................................................................................................ 41

*De Coster v. Amazon, Inc.*,
   No. 21-cv-693, 2023 WL 372377 (W.D. Wash. Jan. 24, 2023) ....................................... 33, 34

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*,
   472 F.3d 23 (2d Cir. 2006) ..................................................................................................... 32

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992) ................................................................................................................ 27

*Elkins v. Microsoft Corp.*,
   174 Vt. 328 (2002) ........................................................................................................... 44, 45

**Page(s)**

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023)...................................................................................*passim*

*ERI Max Ent., Inc. v. Streisand*,
  690 A.2d 1351 (R.I. 1997) ............................................................................................ 45

*Estate of Saunders v. C.I.R.*,
  745 F.3d 953 (9th Cir. 2014)......................................................................................... 43

*Fallick v. Nationwide Mut. Ins. Co.*,
  162 F.3d 410 (6th Cir. 1998).......................................................................................... 38

*Fonseca v. Hewlett-Packard Co.*,
  No. 19-cv-1748, 2020 WL 6083448 (S.D. Cal. Feb. 3, 2020) ...................................... 17

*Frame-Wilson v. Amazon.com, Inc.*,
  591 F. Supp. 3d 975 (W.D. Wash. 2022).................................................................21, 34

*Frame-Wilson v. Amazon.com, Inc.*,
  No. 20-cv-00424, 2023 WL 2632513 (W.D. Wash. Mar. 24, 2023) .........................28, 33

*Frost v. LG Elecs. Inc.*,
  No. 16-cv-05206, 2018 WL 6256790 (N.D. Cal. July 9, 2018).................................14, 17

*FTC v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020)......................................................................................... 31

*George v. George F. Berkander, Inc.*,
  169 A.2d 370 (R.I. 1961) .............................................................................................. 45

*Gibbons v. J. Nuckolls, Inc.*,
  216 S.W.3d 667 (Mo. 2007).......................................................................................... 47

*Gratz v. Bollinger*,
  539 U.S. 244 (2003) ................................................................................................37, 40

*GTE Sylvania Inc. v. Cont'l T.V., Inc.*,
  537 F.2d 980 (9th Cir. 1976)......................................................................................... 22

*Haro v. Sebelius*,
  747 F.3d 1099 (9th Cir. 2014)...................................................................................40, 41

*Hawecker v. Sorensen*,
  No. 10-cv-00085, 2011 WL 98757 (E.D. Cal. Jan. 12, 2011) ...................................... 42

*Hrapoff v. Hisamitsu Am., Inc.*,
  No. 21-cv-01943, 2022 WL 2168076 (N.D. Cal. June 16, 2022)................................... 37

iv

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case Nos. 5:23-cv-02087-PCP; 5:23-cv-02091-PCP; 5:23-cv-02093-PCP

**Page(s)**

*In re Aggrenox Antitrust Litig.*,
  No. 14-md-2516, 2016 WL 4204478 (D. Conn. Aug. 9, 2016)........................................43, 45

*In re Apple Processor Litig.*,
  No. 18-cv-00147, 2019 WL 3533876 (N.D. Cal. Aug. 2, 2019) ............................................42

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018) ...................................................................... 7, 38, 39, 41

*In re Broiler Chicken Antitrust Litig.*,
  290 F. Supp. 3d 772 (N.D. Ill. 2017) ...............................................................................48

*In re Broiler Chicken Antitrust Litig.*,
  No. 16-cv-08637, 2020 WL 4032932 (N.D. Ill. July 25, 2020)..........................................47

*In re California Gasoline Spot Mkt. Antitrust Litig.*,
  No. 20-cv-3215002, 2022 WL 3215002 (N.D. Cal. Aug. 9, 2022) ....................................35

*In re Chocolate Confectionary Antitrust Litig.*,
  602 F. Supp. 2d 538 (M.D. Pa. 2009) ........................................................................44, 45

*In re Chocolate Confectionary Antitrust Litig.*,
  749 F. Supp. 2d 224 (M.D. Penn. 2010) .....................................................................48, 49

*In re Chrysler-Dodge- Jeep EcoDiesel Mktg., Sales Practices & Prods. Liability Litig.*,
  295 F. Supp. 3d 927 (N.D. Cal. 2018) ..............................................................................37

*In re Cipro Cases I & II*,
  61 Cal. 4th 116 (2015) .......................................................................................................21

*In re Citric Acid Litig.*,
  996 F. Supp. 951 (N.D. Cal. 1998) ...................................................................................23

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
  691 F.2d 1335 (9th Cir. 1982)......................................................................................35, 36

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
  No. 18-cv-864, 2023 WL 4305901 (N.D. Ill. June 29, 2023)............................................46

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
  362 F. Supp. 3d 510 (N.D. Ill. 2019) ...............................................................................48

*In re Ditropan XL Antitrust Litig.*,
  529 F. Supp. 2d 1098 (N.D. Cal. 2007) ............................................................................41

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
  516 F. Supp. 2d 1072 (N.D. Cal. 2007) ......................................................................45, 46

v

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case Nos. 5:23-cv-02087-PCP; 5:23-cv-02091-PCP; 5:23-cv-02093-PCP

**Page(s)**

*In re Generic Pharms. Pricing Antitrust Litig.,*
    368 F. Supp. 3d 814 (E.D. Pa. 2019) .................................................................. 46, 48

*In re Graphics Processing Units Antitrust Litig.,*
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ....................................................................... 44

*In re Hard Disk Drive Suspension Assemblies Antitrust Litig.,*
    No. 19-md-02918, 2021 WL 4306018 (N.D. Cal. Sept. 22, 2021) ............................ 44, 46, 48

*In re Lidoderm Antitrust Litig.,*
    103 F. Supp. 3d 1155 (N.D. Cal. 2015) ....................................................................... 49

*In re Liquid Aluminum Sulfate Antitrust Litig.,*
    No. 16-md-2867, 2017 WL 3131977 (D.N.J. July 20, 2017) ......................................... 48

*In re Loestrin 24 FE Antitrust Litig.,*
    410 F. Supp. 3d 352 (D.R.I. 2019) ............................................................................. 49

*In re Musical Instruments & Equip. Antitrust Litig.,*
    798 F.3d 1186 (9th Cir. 2015) ............................................................................. *passim*

*In re Natera Prenatal Testing Litig.,*
    No. 22-cv-00985, 2023 WL 3370737 (N.D. Cal. Mar. 28, 2023) .................................. 37

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.,*
    933 F.3d 1136 (9th Cir. 2019) ................................................................................. 34

*In re New Motor Vehicles,*
    350 F. Supp. 2d 160 (D. Me. 2004) ........................................................................... 46

*In re Online DVD Rental Antitrust Litig.,*
    No. M 09-2029, 2009 WL 4572070 (N.D. Cal. 2009) .................................................. 36

*In re Packaged Seafood Prods. Antitrust Litig.,*
    242 F. Supp. 3d 1033 (S.D. Cal. 2017) ................................................................ *passim*

*In re Propranolol Antitrust Litig.,*
    249 F. Supp. 3d 712 (S.D.N.Y. 2017) ......................................................................... 45

*In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions,*
    148 F.3d 283 (3d Cir. 1998) ...................................................................................... 38

*In re Refrigerant Compressors Antitrust Litig.,*
    No. 2:09-md-02042, 2013 WL 1431756 (E.D. Mich. Apr. 9, 2013) ............................... 49

*In re Restasis Antitrust Litig.,*
    355 F. Supp. 3d 145 (E.D.N.Y. 2018) ......................................................................... 45

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case Nos. 5:23-cv-02087-PCP; 5:23-cv-02091-PCP; 5:23-cv-02093-PCP

**Page(s)**

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
   580 F. Supp. 2d 896 (N.D. Cal. 2008) ................................................................. 47

*In re Target Corp. Data Sec. Breach Litig.*,
   66 F. Supp. 3d 1154 (D. Minn. 2014) ................................................................. 48

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   No. M 07-1821, 2012 WL 6708866 (N.D. Cal. 2012) .......................................... 35

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   599 F. Supp. 2d 1179 (N.D. Cal. 2009) ............................................................... 47

*In re Xyrem (Sodium Oxybate) Antitrust Litig.*,
   No. 20-md-02966, 2023 WL 3440399 (N.D. Cal. May 12, 2023) ............... 38, 39, 40

*In re Zetia (Ezetimibe) Antitrust Litig.*,
   18-md-2836, 2019 WL 1397228 (E.D. Va. Feb. 6, 2019) ...................................... 46

*In re McCormick & Co., Pepper Prods. Mktg. & Sales Practices Litig.*,
   217 F. Supp. 3d 124 (D.D.C. 2016) ..................................................................... 37

*Jones v. Micron Tech. Inc.*,
   400 F. Supp. 3d 897 (N.D. Cal. 2019) ................................................................. 39

*Kelsey K. v. NFL Enters., LLC*,
   254 F. Supp. 3d 1140 (N.D. Cal. 2017) .......................................................... 14, 17

*Kendall v. Visa U.S.A, Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ........................................................................ 14, 17

*Kolling v. Dow Jones & Co.*,
   137 Cal. App. 3d 709 (1982) ......................................................................... 19, 21

*Langan v. Johnson & Johnson Consumer Cos., Inc.*,
   897 F.3d 88 (2d Cir. 2018) ............................................................................ 38, 41

*Lee v. State of Or.*,
   107 F.3d 1382 (9th Cir. 1997) ............................................................................. 42

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) ................................................................................... *passim*

*Lewis v. Casey*,
   518 U.S. 343 (1996) ............................................................................................ 39

*Lisk v. Lumber One Wood Preserving, LLC*,
   792 F.3d 1331 (11th Cir. 2015) ........................................................................... 48

vii

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case Nos. 5:23-cv-02087-PCP; 5:23-cv-02091-PCP; 5:23-cv-02093-PCP

**Page(s)**

*Lopez v. Zarbee's, Inc.*,
No. 22-cv-04465, 2023 WL 210878 (N.D. Cal. Jan. 17, 2023) ........................... 37

*Lubic v. Fid. Nat'l Fin., Inc.*,
No. 08-cv-0401, 2009 WL 2160777 (W.D. Wash. July 20, 2009) ......................... 17

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ....................................................................................... 36

*Mailand v. Burckle*,
20 Cal.3d 367 (1978) ............................................................................. 6, 20, 21

*Martinez v. Newsom*,
46 F.4th 965 (9th Cir. 2022) ..................................................................... 41, 42

*Mayor of Baltimore v. Actelion Pharms Ltd.*,
995 F.3d 123 (4th Cir. 2021) ............................................................... 38, 40, 41

*Melendres v. Arpaio*,
784 F.3d 1254 (9th Cir. 2015) ............................................................... *passim*

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984) ................................................................................ *passim*

*Morrison v. YTB Int'l, Inc.*,
649 F.3d 533 (7th Cir. 2011) ......................................................................... 38

*Murphy v. Olly Pub. Benefit Corp.*,
No. 22-cv-03760, 2023 WL 210838 (N.D. Cal. Jan. 17, 2023) ....................... 37, 40

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
883 F.3d 32 (2d Cir. 2018) ............................................................................ 30

*Name.Space, Inc. v. Internet Corp. for Assigned Names and Numbers*,
795 F.3d 1124 (9th Cir. 2015) ....................................................................... 21

*Nat'l Recycling, Inc. v. Waste Mgmt. of Mass., Inc.*,
No. 03-cv-12174, 2007 WL 9797531 (D. Mass. July 2, 2007) ........................... 33

*Neale v. Volvo Cars of N. Am., LLC*,
794 F.3d 353 (3d Cir. 2015) .......................................................................... 38

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
513 F.3d 1038 (9th Cir. 2008) ................................................................... 26, 27

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
802 F.3d 1049 (9th Cir. 2015) ....................................................................... 34

viii

**Page(s)**

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018) ................................................................................*passim*

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999) ........................................................................................ 40

*Pac. Steel Grp. v. Com. Metals Co.*,
   600 F. Supp. 3d 1056 (N.D. Cal. 2022) ...................................... 20, 25, 31

*Pac. Steel Grp v. Com. Metals Co.*,
   No. 20-cv-07683, 2021 WL 2037961 (N.D. Cal. May 21, 2021)........................... 25

*Paper Sys. Inc. v. Nippon Paper Ind.*,
   281 F.3d 629 (7th Cir. 2002)........................................................................ 34

*Patterson v. RW Direct, Inc.*,
   No. 18-cv-00055, 2018 WL 6106379 (N.D. Cal. Nov. 21, 2018) ................ 37, 39, 41

*Pecanha v. The Hain Celestial Grp., Inc.*,
   No. 17-cv-04517, 2018 WL 534299 (N.D. Cal. Jan. 24, 2018) ......................... 37, 39

*Persian Gulf Inc. v. BP W. Coast Prods. LLC*,
   324 F. Supp. 3d 1142 (S.D. Cal. 2018) ................................................... 11

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*,
   32 F.4th 824 (9th Cir. 2022)..................................................... 11, 20, 22, 31

*Pressure Vessels P.R. v. Empire Gas P.R.*,
   137 D.P.R. 497 (1994) ............................................................................ 46, 47

*Real Selling Grp. LLC v. ESN Grp., Inc.*,
   No. 20-cv-1468, 2021 WL 535748 (S.D.N.Y. Feb. 12, 2021).................................. 32

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995)..................................................................... 26, 27

*Reilly v. Apple Inc.*,
   578 F. Supp. 3d 1098 (N.D. Cal. 2022) ................................................ 28

*Rivera-Muniz v. Horizon Lines Inc.*,
   737 F. Supp. 3d 57 (D.P.R. 2010).............................................................. 46

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, plc*,
   No. 15-cv-6549, 2018 WL 7197233 (S.D.N.Y. Dec. 26, 2018) .................... 44, 45, 46, 47

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
   559 U.S. 393 (2010)................................................................ 45, 47, 48

ix

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case Nos. 5:23-cv-02087-PCP; 5:23-cv-02091-PCP; 5:23-cv-02093-PCP

**Page(s)**

*Simon v. E. Ky. Welfare Rights Org.*,
426 U.S. 26 (1976) ....................................................................................................... 41

*SmithKline Beecham Corp. v. Abbott Labs.*,
No. 07-cv-5702, 2014 WL 6664226 (N.D. Cal. Nov. 24, 2014) ............................... 27

*Staley v. Gilead Scis., Inc.*,
446 F. Supp. 3d 578 (N.D. Cal. 2020) ................................................................. 33, 37

*State ex rel. Wasden v. Daicel Chemical Industries, Ltd.*,
141 Idaho 102 (2005) ................................................................................................. 47

*State v. Biolements, Inc.*,
No. 10011659, 2011 WL 486328 (Cal. Super. Jan. 11, 2011) .................................. 21

*State v. Dermaquest, Inc.*,
No. 10497526, 2010 WL 4633565 (Cal. Super. Feb. 23, 2010) ............................... 21

*Stearns v. Select Comfort Retail Corp.*,
No. 08-cv-2746, 2009 WL 1635931 (N.D. Cal. June 5, 2009) ................................. 24

*Stiles v. Wal-Mart Stores, Inc.*,
No. 14-cv-2234, 2019 WL 1429651 (E.D. Cal. Mar. 29, 2019) ............................... 29

*Stubhub, Inc. v. Golden State Warriors, LLC*,
No. 15-cv-1436, 2015 WL 6755594 (N.D. Cal. Nov. 5, 2015) ................................ 32

*Sultanis v. Champion Petfoods USA Inc.*,
No. 21-cv-00162, 2021 WL 3373934 (N.D. Cal. Aug. 3, 2021) .............................. 37

*The Jeanery, Inc. v. James Jeans, Inc.*,
849 F.2d 1148 (9th Cir. 1988) ............................................................................ 15, 19

*Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*,
530 F.3d 204 (3d Cir. 2008) ...................................................................................... 28

*Top Rank, Inc. v. Haymon*,
No. 15-cv-4961, 2015 WL 9948936 (C.D. Cal. Oct. 16, 2015) ............................... 23

*Toscano v. PGA Tour, Inc.*,
70 F. Supp. 2d 1109 (E.D. Cal. 1999) ................................................................. 18, 19

*Toys "R" Us, Inc. v. F.T.C.*,
221 F.3d 928 (7th Cir. 2000) ............................................................................... 25, 29

*Trixler Brokerage Co. v. Ralston Purina Co.*,
505 F.2d 1045 (9th Cir. 1974) ................................................................................... 32

x

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case Nos. 5:23-cv-02087-PCP; 5:23-cv-02091-PCP; 5:23-cv-02093-PCP

**Page(s)**

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
  676 F.2d 1291 (9th Cir. 1982) ................................................................... 27

*United States v. Blue Cross Blue Shield of Michigan*,
  809 F. Supp. 2d 665 (E.D. Mich. 2011) .................................................... 33

*United States v. Delta Dental of Rhode Island*,
  943 F. Supp. 172 (D.R.I. 1996) ................................................................. 34

*United States v. Parke, Davis and Co.*,
  362 U.S. 29 (1960) ..................................................................................... 32

*United States v. Visa U.S.A., Inc.*,
  344 F.3d 229 (2d Cir. 2003) ...................................................................... 29

*William O. Gilly Enters., Inc. v. Atl. Richfield Co.*,
  588 F.3d 659 (9th Cir. 2009) .............................................................. 14, 17

*Williamson Oil Co. v. Philip Morris USA*,
  346 F.3d 1287 (11th Cir. 2003) ................................................................. 23

*Wolfire Games, LLC v. Valve Corp.*,
  No. 21-cv-0563, 2022 WL 1443744 (W.D. Wash. May 6, 2022) .............. 33

**Statutes**

15 U.S.C. § 45(a)(1) ........................................................................................ 43

Cal. Bus. & Prof. Code § 16720 .................................................................... 20

D.C. Code Ann. § 28-3904 ............................................................................. 43

Md. Code Ann., Com. Law § 11-204(b) .......................................... 6, 20, 42

Mont. Code Ann. 30-14-133(1)(a) ................................................................ 46

R.I. Gen. Laws Ann. § 6-36-11(a) (2013) ..................................................... 46

R.I. Gen. Laws Ann. § 6-13.1-2 ..................................................................... 44

S.C. Code Ann. § 39-5-20 .............................................................................. 44

Utah Code Ann. § 13-11-5 ............................................................................. 44

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
  Principles and Their Application* (2023) ................................................... 16

xi

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case Nos. 5:23-cv-02087-PCP; 5:23-cv-02091-PCP; 5:23-cv-02093-PCP

**Page(s)**

Paul Dobson, *British Grocery Trade Lessons*, 72 Antitrust L.J. 529 (2005)................................. 29

Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 1785.1 (3d ed. 1998)............... 37

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case Nos. 5:23-cv-02087-PCP; 5:23-cv-02091-PCP; 5:23-cv-02093-PCP

## I.  Introduction

Plaintiffs are direct and indirect purchasers of disposable battery products from Energizer Holdings, Inc., and Walmart Inc. ("Defendants"). Plaintiffs filed three complaints alleging Defendants formed a secret vertical price-fixing agreement (the "Agreement") in violation of federal and state antitrust laws.

Plaintiffs discovered the secret Agreement by chance. One of the Plaintiffs, Portable Power, Inc. ("Portable Power"), bought Energizer products at wholesale and sold large volumes of them at retail at low prices. Ordinarily, that would make for a prized customer. Manufacturers generally want their distributors to sell at the lowest possible retail prices—with the smallest possible mark-ups—as that drives volume and profits.

But strangely Energizer acted otherwise. Its representatives on multiple occasions demanded that Portable Power *increase* its retail prices so as not to undercut Walmart. That was contrary to Energizer's financial interests.

Energizer justified its actions to Portable Power in part by claiming it was enforcing a unilateral minimum advertised pricing ("MAP") policy—one that forbids retailers from advertising a supplier's product for less than the minimum price. MAP policies, and minimum retail price policies more generally, are typically justified as ensuring that retailers have sufficient incentive to provide sales services on goods that require explanation and support. The notion is that without a MAP policy—or another check on price-cutting—customers may learn about goods from one retailer but buy them more cheaply from another. Such "free riding" can make it difficult for retailers to provide high-end sales services.

But that justification makes no sense here. Disposable batteries do not require explanation. Even if they did, Walmart is a low-price seller with low-quality sales services. So Energizer's independent interest was to encourage Portable Power and other retail sellers to undercut Walmart's prices. That gave rise to a riddle: why would Energizer act against its self-interest?

Portable Power lucked into the answer when an Energizer representative leaked internal communications. Portable Power learned that Energizer did not have a MAP policy. That was just a pretext. In reality, Energizer and Walmart were working together: the minimum retail

1

prices Energizer was asking Portable Power to meet were Walmart's. Indeed, Portable Power discovered that Energizer had even set up a special team—"Project Atlas"—to monitor its customers' retail prices and ensure they did not undercut Walmart's. In other words, as Plaintiffs allege, Energizer and Walmart had formed a secret anticompetitive Agreement.

Under the Agreement, Energizer inflated its wholesale prices for disposable batteries and related products like headlamps ("Energizer Batteries" or "Energizer Products") to Walmart's rivals. It also agreed to deter its customers from undercutting Walmart on price. Energizer monitored its customers' retail prices and further increased its prices to them if they undercut Walmart's prices, as it did with Portable Power. If that did not suffice, Energizer cut them off entirely, as it also did with Portable Power. That inflated wholesale prices for Energizer Batteries.

Energizer agreed to these measures under pressure from Walmart, having been hurt significantly by losing a contract with Walmart in the past. But Energizer also got something in return. Walmart agreed to protect Energizer from its only significant competitor: Duracell. To accomplish this, Walmart gave Energizer preferential treatment in its stores. It promoted Energizer batteries over Duracell's. Walmart also did not allow its prices for Duracell batteries to undermine Energizer Battery sales.

Walmart's actions not only protected Energizer's retail sales from competition by Duracell at Walmart. They also discouraged Duracell from engaging in *wholesale* price competition at *other retailers*. Energizer and Duracell together control approximately 85% of the disposable battery market (the "Relevant Market"). Energizer itself controls over 50% of the Relevant Market. In highly concentrated markets like this, when one dominant firm—here, Duracell—sees price increases by the other, even more dominant firm—here, Energizer—it does a cost-benefit analysis. On one hand, Duracell could compete with Energizer by charging lower wholesale prices to gain market share. On the other hand, by doing so, Duracell would risk triggering intense price competition that would decrease both companies' profits (although it would benefit consumers).

The Agreement shifted the way Duracell approached this analysis. It blocked off Duracell

from gaining sales in the single biggest retail forum and a significant share of the market—Walmart. It thereby limited Duracell's potential upside from competing with Energizer on price. In addition, Energizer could respond to Duracell by cutting its own prices across the entire market, *including at Walmart.*

The Agreement between Energizer and Walmart thus incentivized Duracell to match Energizer's artificially inflated wholesale prices rather than undercut them. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 892 (2007). Indeed, by forcing all retailers to charge the same minimum prices—Walmart's prices—the Agreement made it easier for Duracell to monitor and match Energizer's prices. *Id.*; *see also id.* at 911 (Breyer, J., dissenting).

In other words, the Agreement between Walmart and Energizer facilitated conduct that often infects concentrated markets: conscious parallelism. Conscious parallelism involves horizontal competitors mirroring each other's conduct to their mutual benefit and the detriment of competition. The Agreement facilitated conscious parallelism between Energizer and Duracell.

The Agreement also insulated Walmart from price competition from more efficient retailers who attempted to undercut Walmart's prices on Energizer Batteries, like Portable Power. *See id.* at 893. It did this by (1) driving up the wholesale costs of Walmart's rivals and (2) forcing them to match or exceed Walmart's retail prices on pain of facing additional wholesale price inflation and even the loss of access to Energizer Batteries entirely. Consumers suffered from a loss of choice and inflated retail prices as a result.

This economic account solves another riddle. As Plaintiffs allege, Energizer was able to repeatedly raise its prices at a rate that far outpaced inflation. That was so even though the costs of inputs to make disposable batteries were stable or decreasing. And it was so even though demand for disposable batteries was waning, as consumers and products shifted to reusable batteries. Defendants offer no plausible explanation based on the allegations in the complaints as to how that was possible. The only plausible explanation is the secret Agreement that Portable Power discovered.

Plaintiffs filed three complaints against Energizer and Walmart challenging the Agreement. Portable Power filed its complaint based on purchases of Energizer Products directly from

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case Nos. 5:23-cv-02087-PCP; 5:23-cv-02091-PCP; 5:23-cv-02093-PCP

Defendant Energizer. Complaint, *Portable Power, Inc. v. Energizer Holdings, Inc.*, No. 23-cv-02091, ECF No. 1 ("DPP"), ¶ 13. Plaintiffs Kimberly Schuman and Kyle Kelley (the "*Schuman* Plaintiffs*," and with Portable Power, "Direct Purchaser Plaintiffs") filed a complaint based on their purchases of Energizer and Duracell Battery Products (or "Battery Products"), directly from Defendant Walmart. Complaint, *Schuman v. Energizer Holdings, Inc.*, No. 23-cv-02093, ECF No. 1 ("WDPP"), ¶¶ 12-13, 42. The Direct Purchaser Plaintiffs' claims arise under the Sherman Act, § 1, and California's Cartwright Act, and they seek to represent nationwide and California classes of direct purchasers. DPP ¶¶ 16, 113-61; WDPP ¶¶ 16, 114-61.

The *Copeland* Plaintiffs,[1] or Indirect Purchaser Plaintiffs, filed a complaint based on their purchases of Energizer Products from Defendants indirectly, e.g., from retailers other than Walmart. Complaint, *Copeland v. Energizer Holdings, Inc.*, No. 23-cv-02087, ECF No. 1 ("IPP"), ¶¶ 13-25 (with DPP and WDPP, the "Complaints"). The *Copeland* Plaintiffs' claims arise under the laws of 35 states and territories that have repealed the federal bar on indirect-purchaser damages ("Repealer Jurisdictions"), and they seek to represent indirect purchasers from those states. *Id.* ¶¶ 13, 130-38, 162-517. Plaintiffs all challenge the same conduct.

Defendants move to dismiss, claiming that the Complaints fail to plausibly allege (1) the existence of the agreement; (2) anticompetitive effects; (3) antitrust standing (for the *Schuman* Plaintiffs); (4) Article III standing (for the *Copeland* Plaintiffs under certain state laws); and (5) violations of other state laws (for the *Copeland* Plaintiffs). All of these arguments fail.

*Plaintiffs plausibly allege the existence of an agreement.* In order to survive *summary judgment* on the agreement element, Plaintiffs would need to present evidence that "tends to exclude the possibility" that Energizer and Walmart acted independently. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). Plaintiffs satisfy that standard here—which exceeds the standard to survive a *motion to dismiss*.

Plaintiffs' allegations giving rise to a plausible inference that Energizer and Walmart acted

---

[1] The *Copeland* Plaintiffs are Don Copeland, Joseph Murray, Carol Smith, Patrick Whitney, Philip Hague, Denise Fotis, Roxann Doriott, Bruce Mims, Lori Ably, Timothy Brown, Peter Costas, and Mike Ballard.

by agreement rather than independently include:

1. Energizer acted against its self-interest by requiring Portable Power and other retailers to set their prices at or above "Walmart['s] selling prices," and threatened and imposed price increases and termination unless the retailers did so (DPP ¶ 70; IPP ¶ 85; WDPP ¶ 71);

2. Energizer set up a group called Project Atlas to ensure its customers did not undercut Walmart's retail prices (DPP ¶¶ 5, 38, 41-46, 61-66; IPP ¶¶ 7, 52, 55-61, 76-81; WDPP ¶¶ 5, 38, 41-47, 62-67);

3. Energizer offered its MAP policy as a pretext for fixing minimum retail prices, and then admitted that it did not really have a formal MAP policy at all (DPP ¶¶ 107-11; IPP ¶¶ 122-26; WDPP ¶¶ 108-12 );

4. Energizer admitted that its actions were "1000% about Walmart" (DPP ¶ 70; IPP ¶ 85; WDPP ¶ 71); and

5. Energizer raised its prices *and* gained market share (DPP ¶ 80; IPP ¶ 96; WDPP ¶ 81) while costs were declining and demand for its products was decreasing, leaving no plausible economic explanation for its conduct absent the Agreement with Walmart (DPP ¶¶ 72-75; IPP ¶¶ 87-91; WDPP ¶¶ 73-76).

These allegations are more detailed and extensive than those *Monsanto* held are sufficient *to get to a jury. See Monsanto*, 465 U.S. at 765-68.

Defendants nevertheless claim that Plaintiffs have failed to plausibly allege an agreement, implying three implausible alternative explanations for their behavior.

First, Defendants cite cases where the plaintiffs alleged that *horizontal* competitors engaged in unlawful conduct by taking parallel actions, and courts dismissed the claims because the plaintiffs failed to make allegations plausibly excluding the possibility that the defendants merely engaged in "conscious parallelism," mirroring each other's behavior. But Defendants do not even argue that conscious parallelism could explain their actions here. It cannot. Conscious parallelism is the tendency of horizontally competing firms in highly concentrated markets to mirror each other's prices without colluding or communicating with each other. Plaintiffs here allege that Energizer and Walmart's Agreement facilitated conscious parallelism between *Energizer and Duracell*. But conscious parallelism cannot explain why Energizer forced retailers to charge Walmart's retail prices. Walmart and Energizer are not horizontal competitors. They did not mirror each other's behavior. Rather, they implemented a multi-part vertical price-fixing scheme. Mirroring can be achieved independently by horizontal competitors. Intricate schemes

5

involving vertical supply arrangements cannot be. Defendants cite no cases suggesting otherwise.

Second, Defendants suggest that the Complaints plausibly allege only a "most-favored nation" ("MFN") agreement. That is not true. Plaintiffs allege vertical price fixing. But even if that were true, an MFN agreement *is* an agreement, one that supports a plausible antitrust claim.

Third, Defendants suggest that Energizer's actions can be explained as enforcing a *unilateral* retail pricing policy. But Energizer's internal emails admit it had no such policy; it conceded its actions were "1000% about Walmart." Moreover, Energizer inflating its retailers' prices would have been against its interest in the absence of the Agreement.

*Plaintiffs plausibly allege anticompetitive effects.* Under some state laws, including those of California and Maryland, vertical price fixing is per se illegal. *Mailand v. Burckle*, 20 Cal.3d 367, 377 (1978); Md. Code Ann., Com. Law § 11-204(b). Those states *presume* that it has the anticompetitive effects that Plaintiffs allege here. Plaintiffs' allegations establish a per se antitrust violation under those state laws, which Defendants ignore.

Under federal law, vertical price fixing—sometimes called resale price maintenance or RPM—is assessed under the Rule of Reason. That is because the U.S. Supreme Court in *Leegin* concluded that while RPM can have anticompetitive effects, it can also have procompetitive effects *if* a manufacturer uses it to prevent free riding on retailers who provide high-quality sales services. *Leegin*, 551 U.S. at 890.

But *Leegin* does not support Defendants' motion to dismiss for two reasons. First, the Rule of Reason is a burden-shifting test and Plaintiffs have met their burden at this stage: Plaintiffs plausibly allege anticompetitive effects, including that Defendants' Agreement weakened wholesale competition between Energizer and other brands like Duracell (interbrand competition) and retail competition between different retailers of Energizer Batteries (intrabrand competition), resulting in artificially inflated prices for Battery Products. That is enough to state a claim under the Rule of Reason. Whether the Agreement has offsetting procompetitive effects is not properly addressed until after discovery.

Second, as *Leegin* explains, RPM is particularly likely to have purely anticompetitive effects

6

if the product at issue does not benefit from high-quality sales services, or if it is initiated by a retailer, particularly one that offers low-quality sales services, rather than by a manufacturer. All that is true here. Customers do not seek guidance on buying disposable batteries, a simple and mature product that they buy frequently. And Walmart—which Plaintiffs allege initiated the RPM here—is notorious for no-frills service. *Id.* at 882. Under these circumstances, the only plausible goal or effect of the Agreement is to artificially inflate prices by limiting competition. *See id.* at 897-98.

*The* Schuman *Plaintiffs have standing based on Battery Product purchases at Walmart.* Defendants assert the *Schuman* Plaintiffs lack standing to bring claims for purchases of batteries from Walmart because their injuries are indirect and speculative. But Plaintiffs allege the Agreement enabled Walmart to artificially inflate its prices for Energizer *and* Duracell batteries. Buyers of those batteries at inflated prices directly from Walmart, a conspirator, suffered direct and certain harm. They have standing. Defendants cite no cases to the contrary.

*The* Copeland *Plaintiffs have Article III Standing.* Defendants concede that the *Copeland* Plaintiffs have Article III standing to pursue claims under the laws of states in which they reside or purchased Energizer Battery Products. They can also appropriately bring nearly identical other state-law claims on behalf of members of the proposed Indirect Purchaser Class because they maintain a "direct and substantial interest" and a "[]sufficient personal stake" in the adjudication of those claims. *Melendres v. Arpaio*, 784 F.3d 1254, 1258, 1261-62 (9th Cir. 2015); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 49-51 (1st Cir. 2018). The test is whether both sets of claims will rise and fall based on the same allegations. They do. In fact, Defendants never deny that the *Copeland* Plaintiffs have a sufficient personal stake in the Indirect Purchaser Class's claims. Instead, they suggest Article III prevents named plaintiffs from *ever* bringing claims on behalf of absent class members in states where they do not reside and have not made purchases. That purported rule is unsupported by the case law and confuses the requirements of Article III standing with the elements necessary to state a claim for relief.

*The* Copeland *Plaintiffs' state-law claims are adequately alleged.* Defendants also challenge the *Copeland* Plaintiffs' state-law claims. The parties agree that the Sherman Act and the

7

relevant state laws are uniform in all important respects, except that (1) the federal bar on indirect-purchaser damages does not apply to the state-law claims and (2) vertical price fixing is per se illegal in California and Maryland. Because Defendants are wrong that Plaintiffs have not adequately stated a Sherman Act claim, they are also wrong that the *Copeland* Plaintiffs' state-law antitrust and consumer protection claims should fail. Moreover, Defendants' alternative arguments to dismiss certain of the *Copeland* Plaintiffs' state-law consumer protection claims are raised solely in Defendants' appendices, and often solely in a parenthetical within those appendices. They are therefore forfeited. In any event, Plaintiffs adequately plead all their consumer-protection claims, and none is barred for the miscellaneous reasons Defendants half-heartedly suggest.

## II.  Factual Background

Plaintiffs allege that Defendants' conduct affects the market for disposable batteries, *i.e.*, that the disposable battery market is the Relevant Market. DPP ¶ 85; WDPP ¶ 86; IPP ¶ 100. Disposable batteries are ubiquitous single-use power sources that come in standard sizes (*e.g.*, AA). DPP ¶ 20; WDPP ¶ 20; IPP ¶ 34. Disposable batteries are not readily substitutable with other products, such as higher cost rechargeable batteries that do not hold a charge as long. DPP ¶ 85; WDPP ¶ 86; IPP ¶ 100.

The disposable battery market is highly concentrated. Two manufacturers, Energizer and Duracell, together account for about 85% percent of total U.S. disposable battery sales. Energizer by itself accounts for over 50% of those sales. DPP ¶ 23; WDPP ¶ 23; IPP ¶ 37. High barriers to entry—raw materials are difficult to source and dangerous to dispose—protect Energizer and Duracell's dominant positions from new market entrants. DPP ¶¶ 21-22; WDPP ¶¶ 21-22; IPP ¶¶ 35-36. These circumstances establish each company's market power indirectly. DPP ¶ 23; WDPP ¶ 23; IPP ¶ 37. Directly establishing Energizer's market power is its ability to raise prices without losing market share. As described below, Energizer did just that. DPP ¶89; WDPP ¶ 90; IPP ¶ 104.

On the retail side of the disposable battery market, a single firm, Walmart, dominates. DPP ¶ 28; WDPP ¶ 28; IPP ¶ 42. Walmart is the largest retailer in the United States, known for its

8

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case Nos. 5:23-cv-02087-PCP; 5:23-cv-02091-PCP; 5:23-cv-02093-PCP

discount warehouse business model of offering low prices and little-to-no customer service. DPP ¶ 137; WDPP ¶ 138; IPP ¶ 152. Walmart is Energizer's largest customer and has been for the last decade-plus, typically comprising over 10% of Energizer's sales. DPP ¶29; WDPP ¶ 29; IPP ¶ 43. Energizer's ability to meet its earnings and profit targets has been dependent upon its sales to Walmart. Walmart's position as the single dominant firm in disposable battery retail sales gives it market power. DPP ¶¶ 28-29, 138; WDPP ¶¶ 28-29, 139; IPP ¶¶ 42-43, 153.

The recent market outlook for disposable batteries has been grim. DPP ¶¶24-27; WDPP ¶¶ 24-27; IPP ¶¶ 38-41. Improved rechargeable battery technology has prompted increasingly environmentally conscious consumers to switch from disposable batteries. DPP ¶ 26; WDPP ¶ 26; IPP ¶ 40. New and ever-smaller consumer products, like smartphones and watches, contain their own rechargeable or renewable power sources, further dampening disposable battery use. DPP ¶ 25; WDPP ¶ 25; IPP ¶ 39. The conventional wisdom is that consumer demand for disposable batteries will continue to decline, "squeezing what used to be a lucrative market." DPP ¶¶ 24, 27; WDPP ¶¶ 24, 27; IPP ¶¶ 38, 41.

The disposable battery market is mature; no major innovation has taken place in the last 10 years or more. DPP ¶ 20; WDPP ¶ 20; IPP ¶ 34. Consumers require no special services when they buy disposable batteries. DPP ¶140; WDPP ¶ 141 IPP ¶ 156.

Until 2012, Energizer had an exclusive contract with Walmart to supply disposable batteries for Walmart's discount chain, Sam's Club. DPP ¶ 31; WDPP ¶ 31; IPP ¶ 45. That year, 20% of Energizer's sales were to Walmart. DPP ¶ 33; WDPP ¶ 33; IPP ¶ 47. Walmart terminated the contract the next year. DPP ¶ 31; IPP ¶ 45; WDPP ¶ 31. The result was disastrous for Energizer. Its sales to Walmart dropped by nearly 40%, and it missed its earnings and profit estimates the next two years. DPP ¶¶ 33-34; WDPP ¶¶ 33-34; IPP ¶¶ 47-48.

Energizer's sales to Walmart rebounded in 2019. DPP ¶¶ 33; WDPP ¶ 33, IPP ¶ 47. That was because Walmart, using its position as the single dominant firm in disposable battery retail sales, and as Energizer's largest customer, pressured Energizer into the Agreement. DPP ¶¶ 1-9, 28-29; WDPP ¶¶ 1-10; 28, 29; IPP ¶¶ 3-12, 42-43.

Since then, Energizer increased its prices at a rate that normal market forces cannot explain.

9

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case Nos. 5:23-cv-02087-PCP; 5:23-cv-02091-PCP; 5:23-cv-02093-PCP

Input costs were flat or declining before and after it announced price increases. DPP ¶ 72; WDPP ¶ 73; IPP ¶¶ 87-88. The same is true for demand for disposable batteries; it has been waning because of competition from disruptive technologies like rechargeable batteries. DPP ¶ 73; WDPP ¶ 74; IPP ¶ 89. Nor are Energizer's prices attributable to general inflation, which was under 2% when Energizer announced its 2019 and 2020 price increases, 2.6% in March 2021 when it announced its 10% price increase, and 5% in May 2021 when it announced its 11% price increase. DPP ¶ 75; WDPP ¶ 76; IPP 90.

Energizer successfully implemented these price increases *without losing market share to Duracell*. DPP ¶ 80; WDPP ¶ 81; IPP ¶ 96. That is because the Agreement made it profitable for Duracell to match Energizer's prices instead of undercutting them to gain market share. DPP ¶ 74; WDPP ¶ 75; IPP ¶ 91. At the start of 2018, Energizer and Duracell each controlled about 45% of the Relevant Market. DPP ¶ 80; WDPP ¶ 81; IPP ¶ 96. By February 2022, despite Energizer's artificially inflated prices, it had decisively pulled ahead, with a 52.4% market share to Duracell's 33.9%. DPP ¶ 80; WDPP ¶ 81; IPP ¶ 96.

## III. Argument

### A. Legal Standard

Under Rule 8(a)(2), plaintiffs need only set forth a "short and plain statement of the claim showing that the pleader is entitled to relief," and "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Co. v. Twombly*, 550 U.S. 544, 555 (2007). In reviewing a Rule 12(b)(6) motion, the Court accepts all nonconclusory allegations in the complaint as true, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and draws all reasonable inferences in favor of plaintiffs. *al-Kidd v. Ashcroft*, 580 F.3d 949, 956 (9th Cir. 2009). Plaintiffs' nonconclusory allegations must satisfy each element of Plaintiffs' claim directly or give rise to a plausible inference that the element is satisfied. *Iqbal*, 566 U.S. at 678; *Twombly*, 550 U.S. at 556.

### B. Plaintiffs Plausibly Allege an Agreement.

To survive a motion to dismiss here, Plaintiffs' allegations must give rise to a plausible inference of an agreement. *See Iqbal*, 556 U.S. at 678 ("The plausibility standard is not akin to a

10

'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." (citation omitted)). The agreement need not be formal; it is enough if Defendants had "a conscious commitment to a common scheme designed to achieve an unlawful objective" or a "meeting of the minds." *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 842 (9th Cir. 2022); *Monsanto*, 465 U.S. at 764.

To get to a jury *after discovery*, Plaintiffs would need to present evidence that "tends to exclude the possibility" that Energizer and Walmart were acting independently. *Monsanto*, 465 U.S. at 764. It follows that Plaintiffs claims should survive Defendants' *motion to dismiss* if they make allegations to that effect.

Plaintiffs make multiple allegations that tend to exclude the possibility that Energizer acted independently.

*Energizer took actions against its self-interest absent the Agreement.* The heart of Plaintiffs' Complaints is that Energizer threatened Portable Power and other retailers with price increases and termination unless they raised their retail prices to match Walmart's. These actions were against Energizer's economic self-interest in the absence of an agreement and thus "support a reasonable inference of conspiracy." *Persian Gulf Inc. v. BP W. Coast Prods. LLC*, 324 F. Supp. 3d 1142, 1155 (S.D. Cal. 2018).

The Complaints contain detailed allegations of this happening. First, Plaintiffs allege that in November 2018, Portable Power's Energizer sales representative, Stephanie Rice, told Portable Power to raise its prices for Energizer headlamps. DPP ¶¶ 42-43; IPP ¶¶ 57-58, 65; WDPP ¶¶ 43-44, 51. This itself is suggestive of an agreement, but Plaintiffs allege more. Ms. Rice disclosed internal Energizer emails revealing that Energizer had contacted Portable Power because of Walmart's complaints about its "disruptive pricing"—i.e., that Portable Power was charging too low prices at retail. DPP ¶¶ 42-45; IPP ¶¶ 57-60; WDPP ¶¶ 43-46. Energizer then raised Portable Power's prices for headlamps by ~50-85% for certain models, forcing Portable Power to raise its retail prices. DPP ¶¶ 42-50; IPP ¶¶ 57-65; WDPP ¶¶ 43-51.

In January 2021, Ms. Rice again contacted Portable Power about its pricing. This time, she told Portable Power to raise its prices for certain Energizer Products to match Walmart's or risk

not just wholesale price increases but termination of sales. DPP ¶ 66; IPP ¶ 81; WDPP ¶ 67.
Energizer then increased Portable Power's wholesale prices for those products. DPP ¶ 66; IPP ¶
81; WDPP ¶ 67. When Portable Power still did not raise its retail prices to Walmart's level,
Energizer retaliated by cutting Portable Power off from those products altogether, as threatened.
DPP ¶ 68; IPP ¶ 83; WDPP ¶ 69.

The next month, Energizer again asked Portable Power to raise its prices to meet Walmart's,
this time for Ray-O-Vac hearing aid batteries. DPP ¶ 70; IPP ¶ 85; WDPP ¶ 71. In an email dated
February 16, 2021, Ms. Rice offered to sell Portable Power the batteries at 20% below Walmart's
retail prices if Portable Power would in turn charge its customers at least Walmart's retail prices,
asking, "If the items are priced to match the Walmart selling price minus 20% would that work
for you?" DPP ¶¶ 70-71; IPP ¶¶ 85-86; WDPP ¶¶ 71-72. Her email included a price chart,
excerpted below, specifically listing the target price as "**Walmart selling price**." *Id.*

| Rayovac Part | Description | List | Case Qty | Matrix cost | Walmart selling price | Seller | 20% | Walmart selling price minus 20% |
|---|---|---|---|---|---|---|---|---|
| 10-16 | RAYOVAC RETAIL SIZE 10 16PK | | 24 | $8.80 | $10.81 | Walmart direct | $2.16 | $8.65 |

These actions make no sense in the absence of the Agreement. It would ordinarily be in
Energizer's interest to *minimize* retailers' prices so they sell more batteries. *See Leegin*, 551 U.S.
at 896 (difference between wholesale and retail cost "represents part of the manufacturer's cost
of distribution, which, like any other cost, the manufacturer usually desires to minimize").
Requiring retailers to *raise* their prices—particularly to *Walmart's* prices—like Energizer did
here, would be expected to drive down sales; a rational actor would not do that unless it was
getting something in return. Indeed, terminating an "effective intrabrand competitor" like
Portable Power is exactly the type of action against self-interest that courts find sufficient to get
to a jury. *See Bostick Oil Co. v. Michelin Tire Corp., Com. Div.*, 702 F.2d 1207, 1218 n.21 (4th
Cir. 1983), *cert. denied*, 464 U.S. 894 (1983).[2] Thus, Energizer's alleged actions "tend[ ] to
exclude the possibility of independent action." *Monsanto*, 465 U.S. at 768.

---

[2] Defendants might argue that it is in Energizer's unilateral interest to impose minimum resale
prices to promote enhanced retail services. But as discussed *infra* § III.B, this justification is
implausible here.

*Project Atlas.* Plaintiffs allege that Energizer created a team known internally as Project Atlas to police Energizer's customers' retail prices pursuant to the Agreement. Project Atlas was responsible for monitoring Walmart's competitors' prices, and warning retailers that priced below Walmart. DPP ¶ 5, 38; IPP ¶ 7, 52; WDPP ¶ 5, 38. If retailers did not heed those warnings, Project Atlas made sure that Energizer further inflated their wholesale prices until it was no longer economically feasible for them to charge less than Walmart. DPP ¶¶ 5, 38; IPP ¶¶ 7, 52; WDPP ¶¶ 5, 38. These allegations—that Project Atlas not only existed but undertook escalating enforcement actions against retailers that undercut Walmart—tend to exclude the possibility that Energizer was acting unilaterally. DPP ¶¶ 60-65; IPP ¶¶ 75-80; WDPP ¶¶ 61-66.

*The pretextual MAP policy.* When Energizer began raising Portable Power's wholesale prices in 2018, Ms. Rice told Portable Power it was because Energizer had a new pricing policy, which Energizer later claimed was a MAP policy. DPP ¶¶ 50-51; IPP ¶¶ 65-66; WDPP ¶¶ 51-52. Manufacturers do sometimes adopt MAP policies unilaterally, particularly to ensure retailers can charge enough to support high-quality sales services. DPP ¶ 140; IPP ¶ 156; WDPP ¶ 141. But a unilateral MAP policy cannot explain why Energizer set minimum retail prices for batteries by reference to *Walmart's* prices. In addition, as noted above, battery sales do not benefit from high-quality sales services, and Walmart does not provide those services. Regardless, Energizer admitted in internal emails *that it did not have a MAP policy.* DPP ¶ 110; IPP ¶ 125; WDPP ¶ 111. In those emails, which Portable Power obtained in September 2020, an Energizer senior manager told an Energizer sales manager to enforce Energizer's MAP policy with Portable Power.  DPP ¶ 110; IPP ¶ 125; WDPP ¶ 111. The sales manager responded that it had been difficult to implement the MAP policy with other customers in the past, because Energizer did not consistently enforce it.  DPP ¶ 110; IPP ¶ 125; WDPP ¶ 111. The senior manager then apologized for potentially being misleading and acknowledged that Energizer did not really have a formal MAP policy in place. DPP ¶ 110; IPP ¶ 125; WDPP ¶ 111. This admission tends to exclude—indeed forecloses—the possibility that Energizer was acting pursuant to its own unilateral pricing policy.

*"This is 1000% about Walmart."* Plaintiffs' allegations do more than foreclose the

13

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case Nos. 5:23-cv-02087-PCP; 5:23-cv-02091-PCP; 5:23-cv-02093-PCP

possibility that Energizer was acting pursuant to a unilateral pricing policy. Plaintiffs also allege that Energizer admitted that Walmart was the source of its otherwise inexplicable pricing decisions.

In early February 2021, after Project Atlas chastised Portable Power for undercutting Walmart's prices, Ms. Rice told Portable Power that Energizer was cutting it off from access to certain Energizer Battery Products. By way of explanation, Ms. Rice told Portable Power's CEO "This is 1000% about Walmart and wanting the best price." DPP ¶¶ 60-69; IPP ¶¶ 75-84; WDPP ¶¶ 61-70.[3] This admission supports a plausible inference that Energizer's actions were in fact in furtherance of an agreement with Walmart.

*The only plausible economic explanation for Energizer's pricing is the Agreement.* As a matter of standard economics, some explanation is necessary for why Energizer could raise its prices dramatically while simultaneously increasing its market share. One possibility might be if Energizer and Duracell both faced increasing costs. But Plaintiffs allege input costs were stable or declining. DPP ¶ 72; IPP ¶ 87-88; WDPP ¶ 73. Another possibility might be if demand for disposable batteries was increasing. But Plaintiffs allege demand was waning, in part because of competition from rechargeable batteries. DPP ¶ 73; IPP ¶ 89; WDPP ¶ 74. Yet another possibility might be based on inflation. But Plaintiffs allege Energizer's price increases far outpaced inflation. DPP ¶ 75; IPP ¶ 90; WDPP 76. The only plausible explanation based on the Complaints is Energizer and Walmart's Agreement. Defendants have not presented a credible alternative.

Defendants nevertheless claim that Plaintiffs' allegations do not address who, what, when,

---

[3] Defendants assert that "the only allegations relating to Walmart's role in the so-called 'scheme' is a vague allegation that Walmart agreed to 'give Energizer battery products preferential treatment in Walmart stores.'" But that ignores these and other specific allegations from identified witnesses implicating Walmart. MTD at 9. These allegations plausibly suggest a "meeting of the minds" between Energizer and Walmart and distinguish this case from *William O. Gilley Enterprises, Inc. v. Atlantic Richfield Co.*, 588 F.3d 659, 665 (9th Cir. 2009); *Kelsey K. v. NFL Enterprises, LLC*, 254 F. Supp. 3d 1140, 1147-48 (N.D. Cal. 2017), *aff'd*, 757 F. App'x 524 (9th. Cir. 2018); *Kendall v. Visa U.S.A, Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008); *California Crane School, Inc. v. Google LLC*, No. 21-cv-10001, 2023 WL 2769096, at *5 (N.D. Cal. Mar. 31, 2023); and *Frost v. LG Electronics Inc.*, No. 16-cv-05206, 2018 WL 6256790, at *4 (N.D. Cal. July 9, 2018).

and where. MTD at 8-9. They are wrong. Plaintiffs' allegations described above set forth who said what, when they said it, and whether they did so in an email or a direct conversation. Those allegations show Energizer acting in a manner tending to establish a "meeting of [the] minds." *Monsanto*, 465 U.S. at 764. Under *Monsanto*, those allegations are sufficient "*direct* evidence" of an agreement to survive summary judgment. *Id.* at 765.

Defendants also argue that "allegations that a manufacturer took actions in response to 'pressure' or 'demands' from customers… are insufficient to plead a conspiracy." MTD at 10. But the law is to the contrary.[4] In the years before *Leegin*, when vertical price fixing was per se illegal under federal antitrust law, some federal courts were hesitant to infer an agreement if a supplier might be acting to ensure its retailers had incentive to provide high-quality sales services. *Leegin*, 551 U.S. at 913-15. Thus, when a manufacturer had announced such a policy in advance, *Monsanto* stated (in dicta) that evidence of full-service retailer complaints about discount retailers violating that policy does not, *on its own*, "tend[] to exclude" the possibility that the manufacturer was acting independently in enforcing its own policy. *Monsanto*, 465 U.S. at 762-64. Other federal courts that have dismissed conspiracy allegations based solely on dealer complaints have done so only where the manufacturer announced its pricing policy independently in advance, and the alleged dealer complaints were merely bringing violations of that policy to the manufacturer's attention. *E.g.*, *The Jeanery, Inc. v. James Jeans, Inc.*, 849 F.2d 1148, 1157-58 (9th Cir. 1988).

However, those cases do not support Defendants here because: (1) the Rule of Reason applies to Plaintiffs' federal claims; (2) Energizer never publicly announced a resale price policy; (3) Energizer admitted privately it had no such policy; (4) Walmart does not provide high-end sales services that could potentially be procompetitive; and (5) Walmart was the source of the

---

[4] Defendants cite no support beyond *In re Musical Instruments & Equipment Antitrust Litigation*, 798 F.3d 1186 (9th Cir. 2015), which, as explained below, *supports* rather than undermines the inference of a vertical agreement under these facts, where Plaintiffs have explicitly alleged that Energizer had no unilateral retail pricing policy. DPP ¶¶ 110-11; WDPP ¶¶ 111-12; IPP ¶¶ 125-26.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case Nos. 5:23-cv-02087-PCP; 5:23-cv-02091-PCP; 5:23-cv-02093-PCP

vertical price-fixing agreement, not Energizer.[5] Courts regularly deny *summary judgment* based on evidence of this sort. *See, e.g.*, *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1377 (3d Cir. 1992) (denying summary judgment on agreement where plaintiffs alleged that BMW of North America, Inc. had refused to grant automobile dealerships to them because other dealers had complained about plaintiffs' high-volume, deep-discount business methods); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (2023) at ¶ 1457a ("*Monsanto* does not rule out the possibility of agreements arising from coercion of the manufacturer by dealers."). Allegations of vertical price fixing in this context thus suffice to state a claim.

Further, Plaintiffs allege more than that Energizer took actions against Portable Power in response to complaints from Walmart (although that should suffice). They also allege, for example, that Energizer's retail price demands to Portable Power were pegged *specifically to Walmart's own retail prices.* DPP ¶ 70; WDPP ¶ 71; IPP ¶ 85. The price chart Energizer sent Portable Power specifically listed the pricing source in a spreadsheet as the "Walmart selling price" and asked Portable Power in an email "[i]f the items are priced to match the Walmart selling price minus 20% would that work for you?" DPP ¶ 70; WDPP ¶ 71; IPP ¶ 85.

Defendants suggest three implausible alternative explanations for their behavior, citing lines of cases involving: (1) conscious parallelism between horizontal competitors; (2) most favored nation agreements; and (3) unilateral manufacturer resale price maintenance policies. None of these alternative theories can plausibly explain Plaintiffs' allegations in the absence of an agreement.

*Conscious Parallelism.* Defendants rely on cases where plaintiffs alleged that horizontal

---

[5] *See infra* § III.C.2.a. One famous treatise explains, "As a policy matter, it can matter greatly whether manufacturer or dealer interests are being served [by an RPM agreement]. The former is more likely to seek efficient distribution, which stimulates interbrand competition; the latter is more likely to seek excess profits, which dampen interbrand competition. Accordingly, antitrust policy can be more hospitable toward manufacturer efforts to control dealer prices, customers, or territories than toward the efforts of dealers to control *their* competitors through the manufacturer." Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (2023) at ¶ 1457b2 (emphasis in original).

16

competitors engaged in parallel behavior—often called "conscious parallelism." *See, e.g.*, *Twombly*, 550 U.S. at 553; *Kendall v. Visa U.S.A, Inc.*, 518 F.3d 1042, 1047-48 (9th Cir. 2008); *Frost v. LG Elecs. Inc.*, No. 16-cv-05206, 2018 WL 6256790, at *4 (N.D. Cal. July 9, 2018); *Fonseca v. Hewlett-Packard Co.*, No. 19-cv-1748, 2020 WL 6083448, at *6-*7 (S.D. Cal. Feb. 3, 2020); *California Crane Sch., Inc. v. Google LLC*, No. 21-cv-10001, 2023 WL 2769096, at *6 (N.D. Cal. Mar. 31, 2023); *Lubic v. Fid. Nat'l Fin., Inc.*, No. 08-cv-0401, 2009 WL 2160777, at *3 (W.D. Wash. July 20, 2009).[6]

Such cases involve horizontal competitors monitoring and matching each other's prices. *See, e.g.*, *Kelsey K. v. NFL Enters., LLC*, 254 F. Supp. 3d 1140, 1142 (N.D. Cal. 2017). In that context, parallel behavior can arise from competitors mirroring each other without an agreement. *See, e.g.*, *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015) (explaining theory of conscious parallelism). However, that theory has no application here. Plaintiffs do not allege that Energizer and Walmart charged the same price *as each other* or did anything else in "parallel." Energizer and Walmart are not horizontal competitors. Their vertical agreement is asymmetric and intricate, requiring a meeting of the minds. Conscious parallelism cannot plausibly explain the course of behavior between Energizer and Walmart.

Defendants' reliance on *Musical Instruments* illustrates this point. There, plaintiffs asked the court to infer a *horizontal* agreement between guitar manufacturers based on allegations that a large retailer, Guitar Center, pressured each one to adopt similar MAP policies. *Id.* at 1189. While the court refused to infer a *horizontal* conspiracy based purely on parallel conduct, it accepted the existence of the *vertical* agreements. *Id.* at 1192 n.3. However, plaintiffs had not challenged the vertical agreements themselves. *Id.* at 1193 n.4.[7] The court noted the complaint plausibly alleged a narrative "in which Guitar Center used its substantial market power to

---

[6] *Kendall* is also distinguishable because there, even after conducing depositions, Plaintiffs did "not allege any facts to support their theory that the [defendants] agreed with each other … to restrain trade." *Kendall*, 518 F.3d at 1048.

[7] *William O. Gilley*, 588 F.3d at 665, is similarly distinguishable. The plaintiffs there failed to allege that the written bilateral contracts between defendants were anticompetitive agreements on their own, and instead asked the court to infer that they facilitated a larger horizontal conspiracy, an inference that was precluded by a separate state court holding. *Id.*

pressure each manufacturer to adopt similar policies, and each manufacturer adopted those policies as in its own interest. Such conduct *may be anticompetitive—and perhaps even violate the antitrust laws*—but it does not suggest the manufacturers illegally agreed among *themselves* to restrain competition." *Id.* at 1198 (emphases added). In contrast, Plaintiffs here allege—and challenge—Energizer and Walmart's vertical agreement.

*Most-Favored Nations Agreement.* Defendants' argument that Plaintiffs fail to plausibly allege an agreement *at all* is undermined by their admission that the Complaints plausibly allege agreement on a "most-favored nation provision" requiring Energizer to give Walmart "the best wholesale pricing." MTD at 20 ("[T]he alleged conduct effectively amounts to a complaint that Energizer and Walmart agreed to some form of most-favored nation ('MFN') provision.").[8] Of course, Plaintiffs allege much more than an agreement to give Walmart Energizer's best wholesale prices. They also allege that Energizer agreed to prevent its other customers from undercutting Walmart's *retail* prices. DPP ¶¶ 52-75; IPP ¶¶ 67-91; WDPP ¶¶ 53-76. However, even if Plaintiffs had alleged only an MFN agreement, they would still have sufficiently alleged an agreement in restraint of trade. After all, an MFN agreement *is* an agreement. And as explained below, even if Defendants were correct that the Complaints plausibly alleged only an MFN, that agreement would have had substantial anticompetitive effects and thus violate federal and state law. *See infra* § III.D.

*Unilateral Minimum Retail Price Policy.* Defendants argue that Energizer has "every right to unilaterally choose to do business only with retailers who charge a minimum price for its battery products" and to "consider[] complaints from distributors before enforcing *its* sales rules against a wayward distributor." MTD at 12-13 (quoting *Toscano v. PGA Tour, Inc.*, 70 F. Supp. 2d 1109, 1116 (E.D. Cal. 1999)) (emphasis added). However, Plaintiffs do not allege that Energizer adopted a pricing policy *unilaterally*. Plaintiffs allege that Energizer did *not* have a unilateral retail pricing policy. *See* DPP ¶¶ 110-11; IPP ¶¶ 125-26; WDPP ¶¶ 111-12 (internal Energizer

---

[8] An MFN typically refers to an agreement whereby a seller agrees to treat a buyer at least "as favorably as any of their other customers." *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995), *as amended on denial of reh'g* (Oct. 13, 1995).

email acknowledged that "Energizer did not really have a formal MAP ('minimum advertised price') policy in place" and that Energizer's pricing actions were instead "1000% about Walmart"). They further allege that Energizer policed the retail prices of Walmart's competitors in exchange for preferential treatment in Walmart's stores and protection from price competition from Duracell. DPP ¶ 35; IPP ¶ 49; WDPP ¶ 35. Plaintiffs also allege that Energizer offered pretextual reasons to justify its actions. DPP ¶¶ 106-11; IPP ¶¶ 121-26; WDPP ¶¶ 107-12. Such allegations go well beyond the "exercise of Energizer's unilateral business judgment." MTD at 11. *See Alvord-Polk v. F. Schumacher & Co.*, 37 F.3d 996, 1012 (3d Cir. 1994), *cert. denied*, 514 U.S. 1063 (1995) (evidence that manufacturer limited discount dealers' market access and increased their costs in response to complaints sufficient to deny summary judgment on agreement where manufacturer also offered "pretextual reasons for its actions").[9]

*California Law.* Defendants attempt to rewrite the Complaints, implying they allege nothing more than that Energizer successfully pressured retailers to abide by minimum retail prices. MTD at 12-13. Even if that were true, those allegations would state a claim under California law. *See Kolling v. Dow Jones & Co.*, 137 Cal. App. 3d 709 (1982). California law holds that pressured or coerced resale price maintenance suffices to establish an agreement. *Id.* at 720 ("[T]he 'conspiracy' or 'combination' necessary to support an antitrust action can be found where a supplier or producer, by coercive conduct, imposes restraints to which distributors involuntarily adhere."); *id.* ("If a 'single trader' pressures . . . dealers into adhering to resale price maintenance . . . an unlawful combination is established, irrespective of any monopoly or conspiracy, and despite the recognized right of a producer to determine with whom it will deal.").

---

[9] The Complaints allege "evidentiary" facts that Energizer was not acting pursuant to any unilateral pricing policy. That distinguishes this case from *The Jeanery*, 849 F.2d at 1150, in which it was "undisputed" that the manufacturer had a preexisting unilateral retail pricing policy, and that it "consistently explained this policy to all distributors who purchased its goods." It also distinguishes *Toscano*, 70 F. Supp. 2d at 1116, in which the defendant, PGA Tour, unilaterally set rules and regulations that allegedly excluded the plaintiff.

19

### C. Plaintiffs plausibly allege injury to competition.

Plaintiffs plausibly allege injury to competition. To the extent Defendants' vertical price fixing agreement is per se unlawful—as it is under California and Maryland law—Plaintiffs need not establish injury to competition. It is presumed and cannot be rebutted. *See Mailand*, 20 Cal.3d at 377; Md. Code Ann., Com. Law § 11-204(b).

Alternatively, the Rule of Reason entails three steps: Plaintiffs have the burden to establish substantial anticompetitive effects; Defendants may then respond by showing procompetitive effects; and, if they do, Plaintiffs must respond by offering less anticompetitive means for achieving the procompetitive effects. *PLS.Com*, 32 F.4th at 834 (citing *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) ("*Amex*")).

However, only Plaintiffs' initial burden is relevant to this motion. Defendants cannot justify their Agreement based on procompetitive effects not alleged in a complaint on a motion to dismiss. *PLS.com*, 32 F.4th at 839 ("whether the alleged procompetitive benefits of the [challenged restraint] outweigh its alleged anticompetitive effects is a factual question that the district court cannot resolve on the pleadings"); *Pac. Steel Grp. v. Com. Metals Co.*, 600 F. Supp. 3d 1056, 1077 (N.D. Cal. 2022) (same).

### 1. Plaintiffs plead a per se violation of California's antitrust law.

California's Cartwright Act, like the Sherman Act, prohibits "tampering with prices," including by price fixing. *Mailand*, 20 Cal. 3d at 377; Cal. Bus. & Prof. Code § 16720. But unlike federal law, under California law, all price-fixing agreements—horizontal and vertical—are per se unlawful.[10] *Mailand*, 20 Cal. 3d at 377. *Mailand* held that the rules treating price fixing as per se unlawful "apply whether the price-fixing scheme is horizontal or vertical; that is, whether the price is fixed among competitors . . . or businesses at different economic levels." *Id. See also Brown v. Amazon.com, Inc.*, No. 22-cv-00965, 2023 WL 5793303, at *11 (W.D. Wash. Sep. 7, 2023) ("Under both Maryland Antitrust Law and the Cartwright Act, an agreement that establishes a minimum resale price is considered a restraint of trade and, therefore, a per se

---

[10] As addressed below, Maryland's antitrust law also treats vertical price-fixing agreements, including resale price maintenance agreements, as per se unlawful.

20

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case Nos. 5:23-cv-02087-PCP; 5:23-cv-02091-PCP; 5:23-cv-02093-PCP

violation of the applicable state law.") (citing *Kolling*, 137 Cal. App. at 721).

Plaintiffs all bring claims for per se violations of the Cartwright Act. *See* DPP ¶¶ 146-152; IPP ¶¶ 174-183; WDPP ¶¶ 147-152. Defendants ignore the distinction between California and federal law on vertical price restraints. Instead, Defendants cite to federal law and then say that Cartwright Act claims are addressed the same way as Sherman Act claims. *See* MTD, App'x A at 1.[11] But "[i]nterpretations of federal antitrust law are at most instructive, not conclusive, when construing the Cartwright Act, given that the Cartwright Act was modeled not on federal antitrust statutes but instead on statutes enacted by California's sister states around the turn of the 20th century." *In re Cipro Cases I & II*, 61 Cal. 4th 116, 142 (2015) (citation omitted). Where, as here, the law differs, courts "are bound to follow the law set forth by [the California] Supreme Court applying state law." *Alsheikh v. Superior Court*, No. B249822, 2013 WL 5530508, at *3 (Cal. Ct. App. Oct. 7, 2013) (quoting *Auto Equity Sales, Inc. v. Superior Court*, 57 Cal. 2d 450, 455 (1962); *id.* at *1 ("[T]he holding in *Mailand v. Burckle* . . . that vertical price fixing is a per se violation of the Cartwright Act is the governing law of California.").[12]

---

[11] Defendants cite *Name.Space, Inc. v. Internet Corp. for Assigned Names and Numbers*, 795 F.3d 1124, 1131, n.5 (9th Cir. 2015) for the proposition that California antitrust law is identical to federal antitrust law. *Name.Space* in turn relies on *County of Tuolumne v. Sonora Community Hospital*, 236 F.3d 1148, 1160 (9th Cir. 2001). Neither case, however, involved vertical price fixing or resale price maintenance. In fact, *County of Toulumne* cites *Mailand*, which, as discussed above, holds that vertical price fixing is per se illegal under California law, unlike under federal antitrust law. 236 F.3d at 1160 (citing *Mailand*, 20 Cal.3d at 375).

[12] Indeed, just last year, a district court in this circuit (in an order Defendants cite) denied a motion to dismiss a per se Cartwright Act claim challenging a vertical price restraint, citing *Mailand*. *Frame-Wilson v. Amazon.com, Inc.*, 591 F. Supp. 3d 975, 993 (W.D. Wash. 2022), *reconsideration denied*, No. 20-cv-00424, 2022 WL 4240826, at *1 (W.D. Wash. Aug. 2, 2022); *see* MTD at 15 (citing *id.*). Another district court reached the same conclusion earlier this month. *Brown*, 2023 WL 5793303, at *11-*12. Other courts have likewise recognized that because "the unambiguous ruling of *Mailand* is as much rooted in California public policy as Sherman Act precedent," it "is . . . far from certain that the rule in *Mailand* will be changed regardless of changes in Sherman Act precedent." *Alan Darush MD APC v. Revision LP*, No. 12-cv-1210296, 2013 WL 12142621, at *1, *3 (C.D. Cal. Aug. 28, 2013). Consent decrees secured by the California Attorney General in California state courts have confirmed the same. *See State v. Bioelements, Inc.*, No. 10011659, 2011 WL 486328 (Cal. Super. Jan. 11, 2011); *State v. Dermaquest, Inc.*, No. 10497526, 2010 WL 4633565 (Cal. Super. Feb. 23, 2010).

21

2. **Plaintiffs allege anticompetitive effects directly and indirectly.**

Plaintiffs can establish substantial anticompetitive effects "directly or indirectly." *Amex*, 138 S. Ct. at 2284; *PLS.Com*, 32 F.4th at 834. Either suffice. *Id*. Plaintiffs here have done both.

a. **Plaintiffs' allegations directly establish anticompetitive effects.**

Substantial anticompetitive effects can be established directly by showing "reduced output, increased prices, or decreased quality in the relevant market." *PLS.Com*, 32 F.4th at 834 (quoting *Amex*, 138 S. Ct. at 2284). Plaintiffs allege that the Agreement impaired *both interbrand* competition at the wholesale level, as well as *intrabrand* competition at the retail level. As a result, the Agreement inflated the prices of Energizer Battery Products, harming consumers. *PLS.Com*, 32 F.4th at 832 ("The purpose of the Sherman Act is 'the promotion of consumer welfare.'") (quoting *GTE Sylvania Inc. v. Cont'l T.V., Inc.*, 537 F.2d 980, 1003 (9th Cir. 1976)); *Brown*, 2023 WL 5793303, at *8 (allegations purchasers paid more due to vertical agreements sufficiently alleges anticompetitive effects directly).

With respect to interbrand competition, the Complaints allege that the Agreement "increased Energizer's market power by reducing competition between Energizer and Duracell, augmenting Duracell's incentive to match Energizer's price increases, and reducing the risk that Energizer would lose market share if it inflated its prices above competitive levels." DPP ¶ 98; IPP ¶ 112; WDPP ¶ 99. The Agreement accomplished this by "depriv[ing] Duracell of a crucial opportunity to compete with Energizer for market share based on price. The [Agreement] thus decreased Duracell's incentive to compete with Energizer on price and increased Duracell's incentive to match Energizer's inflated prices." DPP ¶ 8; IPP ¶ 10; WDPP ¶ 8.[13]

The Supreme Court has recognized that agreements of the sort alleged here can impair interbrand competition by "discourag[ing] a manufacturer from cutting prices to retailers with the concomitant benefit of cheaper prices to consumers." *Leegin*, 551 U.S. at 892 (citing *Bus. Elecs. Corp. v. Shaper Elecs. Corp.*, 485 U.S. 717, 725 (1988)). Plaintiffs have alleged Defendants' Agreement did precisely that. As a result, the Agreement "enabled Energizer to

---

[13] As these citations indicate, Defendants' internally inconsistent claim that Plaintiffs allege the Agreement affected only "intrabrand pricing" mischaracterizes the Complaints. *See* MTD at 15.

implement a series of anticompetitive wholesale price increases" of "more than 30% since 2018" that "cannot be adequately explained by general inflation in the economy or other competitive market forces" such as cost or demand. DPP ¶¶ 72-75, 99-100; IPP ¶¶ 87-91, 113-114; WDPP ¶¶ 73-76, 100-101.[14]

Defendants argue that Duracell made "independent" pricing decisions and that it is "speculative" to credit Plaintiffs' allegations that Duracell followed Energizer's price increases. MTD at 17. But Plaintiffs do not allege and need not prove an agreement *between* Energizer and Duracell. Rather, Plaintiffs allege that Energizer's *agreement with Walmart* was anticompetitive because, among other things, it reduced Duracell's incentive to compete vigorously on price. DPP ¶ 8; IPP ¶ 10; WDPP ¶ 8.[15] *Leegin* recognized that resale price maintenance can have anticompetitive effects for just this reason. *Leegin*, 551 U.S. at 892; *see also id.* at 911 (Breyer,

---

[14] Defendants suggest that Plaintiffs' allegations that the Agreement artificially inflated prices are implausible because their price increases could be caused by "many factors—such as raw material pricing and availability, shipping and distribution costs, and changes in demand or business strategy, or macroeconomic factors like inflation…" MTD at 16. But Defendants ignore Plaintiffs' contrary allegations that the price increases cannot be explained by such competitive market forces, allegations that should be taken as true on a motion to dismiss. Defendants' suggestion of innocent explanations should not be credited at the pleadings stage. *See Caccuri v. Sony Interactive Entm't LLC*, No. 21-cv-03361, 2022 WL 2789554, at *5 (N.D. Cal. July 15, 2022) (holding plaintiffs "have pled an anticompetitive effect because, at a minimum, they have pled increased prices" notwithstanding Defendants purported "other reasons for the increased prices"). Indeed, Defendants cite no cases in which courts, at the motion to dismiss stage, discredited plaintiffs' well-pled allegations that Defendants' conduct led to supercompetitive prices because Defendants offered alternative innocent explanations for those price increases. *See Top Rank, Inc. v. Haymon*, No. 15-cv-4961, 2015 WL 9948936, at *8-*9 (C.D. Cal. Oct. 16, 2015) (plaintiffs did not allege anticompetitive effects directly because they pleaded only "conclusory allegations" related to exclusionary terms, not prices); *Bio-Rad Labs, Inc. v. 10X Genomics, Inc.*, 483 F. Supp. 3d 38, 59 (D. Mass. 2020) (plaintiffs provided no factual allegations for why the prices charged were supercompetitive nor how the anticompetitive conduct caused those price increases).

[15] For this reason, the fact that Energizer "took significant market share from Duracell during the alleged relevant period" is completely consistent with Plaintiffs' theory that the challenged restraints reduced Duracell's incentive to compete vigorously on price. MTD at 18. Defendants' citations are inapposite because they involve allegations of a *horizontal* price fixing conspiracy between competitors, not a vertical restraint that reduces the incentive of a rival manufacturer to compete vigorously by cutting prices. *See In re Citric Acid Litig.*, 996 F. Supp. 951, 961 (N.D. Cal. 1998), *aff'd*, 191 F.3d 1090 (9th Cir. 1999); *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1318 (11th Cir. 2003).

---

23

J., dissenting). Plaintiffs' allegations that the Agreement reduced interbrand competition between Energizer and Duracell, significantly increasing wholesale battery prices, are far from speculative and directly establish anticompetitive effects.[16]

Plaintiffs also allege that the Agreement reduced *intrabrand* competition at retail. It did so by preventing retailers, such as Portable Power, from competing with Walmart through low retail battery prices. DPP ¶¶ 90, 101; IPP ¶¶ 105, 116; WDPP ¶¶ 91, 102. As a result, the Agreement increased Walmart's market power, which it used to inflate retail battery prices above competitive levels. DPP ¶ 101; IPP ¶ 116; WDPP ¶ 102.

Defendants suggest that antitrust law is indifferent to restraints on intrabrand competition at retail. MTD at 16 (citing *Leegin*). But they are wrong. As *Leegin* explained, resale price maintenance can be abused by a dominant *retailer* to prevent price competition from more efficient rivals. *Leegin*, 551 U.S. at 893-94 ("[RPM] can be abused . . . . A dominant retailer, for example, might request [RPM] to forestall innovation in distribution that decreases costs."). That is what Plaintiffs allege here. Walmart, a dominant retailer, pressured Energizer to impose minimum resale prices on rival retailers, such as Portable Power, that offered cheaper prices enabled by efficient online distribution systems. DPP ¶¶ 2, 28-29; IPP ¶¶ 4, 42-43; WDPP ¶¶ 2, 28-29.

Defendants lean on judicial opinions noting vertical restraints can be necessary to promote interbrand competition when a manufacturer imposes minimum retail prices *to prevent free riding* on high-quality retail sales services to promote their brand. *See* MTD at 16 (citing *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1200 (9th Cir. 2012)) (affirming dismissal of antitrust claims because, while vertical "restraints limit intrabrand competition, they may increase interbrand competition"). But, as explained above, here the Agreement harmed *both*

---

[16] *Stearns v. Select Comfort Retail Corp.*, No. 08-cv-2746, 2009 WL 1635931, at *13 (N.D. Cal. June 5, 2009) (MTD at 17), in which the plaintiffs sued for collusion in the replacement of mold-infested beds but alleged no agreement at all, is thus inapposite because there it was "apparent that the alleged injury could have been caused only by a defective part, not by any agreement to restrain competition." *Id.* That is a far cry from the situation here, where Plaintiffs have pled an agreement and facts demonstrating that the agreement itself led to reduced interbrand competition.

interbrand and intrabrand competition.[17]

In addition, Defendants offer no explanation for how Walmart—a discount warehouse retailer—offers *any* services to promote or educate consumers about disposable battery products, let alone how the alleged restraints are necessary to prevent free riding on such efforts. *See Leegin*, 551 U.S. at 882 (noting that the manufacturer alleged to have imposed vertical price restraints wanted "the consumers to get a different experience than they get in Sam's Club or in Wal–Mart. And *you can't get that kind of experience or support or customer service from a store like Wal–Mart*.") (emphasis added).[18] The Supreme Court has explained that vertical restraints are unlikely to be justified as promoting interbrand competition where, as here, they are driven by a *retailer*, not a *manufacturer*. *Leegin*, 551 U.S. at 897-98 ("The source of the restraint may also be an important consideration. If there is evidence retailers were the impetus for a vertical price restraint, there is a greater likelihood that the restraint facilitates a retailer cartel or supports a dominant, inefficient retailer."). Nor do Defendants explain how education regarding such a simple, frequently-purchased product as disposable batteries would benefit consumers.

Plaintiffs allege that the resulting reduction in competition on the retail level also inflated retail prices for Energizer Battery Products, harming consumers as a result. DPP ¶¶ 82-84, 101; IPP ¶¶ 97-99; WDPP ¶¶ 83-85. Such allegations also establish anticompetitive effects directly.

---

[17] This distinguishes this case from *Brantley*, which involved a different vertical restraint, tying, and in which the plaintiffs failed to allege any agreement concerning price or any harm to interbrand competition, and the bundling complained of resulted in *increased* competition and consumer choice in "packaged" cable television. 675 F.3d at 1200, 1202-03, n.12. Defendants also cite *Pac. Steel Grp v. Com. Metals Co.*, No. 20-cv-07683, 2021 WL 2037961 (N.D. Cal. May 21, 2021). That case is also distinguishable because there the plaintiff failed to allege any harm to interbrand competition, *id.* at *10, and the defendant argued that the challenged restraints' "anticompetitive effects are outweighed by its legitimate justifications and procompetitive effects," *Pac. Steel*, 600 F. Supp. 3d at 1077. Nevertheless, the court ultimately found that plaintiffs had sufficiently met the first step of the Rule of Reason analysis in an amended complaint and declined to weigh the defendant's alleged procompetitive effects at the motion to dismiss phase. *Id.* at 1056, 1077.

[18] Indeed, to the extent such services are provided by *any* retailers, which seems unlikely given consumers' familiarity with disposable batteries and the Energizer brand, discounters such as Walmart are usually the types of retailers who are accused of *free riding* on such services, not providing them. *See Toys "R" Us, Inc.*, 221 F.3d at 937-38.

25

1   *See Leegin*, 551 U.S. at 893 (explaining how vertical price restraints can "give inefficient

2   retailers higher profits" by preventing "[r]etailers with better distribution systems and lower cost

3   structures… from charging lower prices… historical examples suggest this possibility is a

4   legitimate concern").

### b. Plaintiffs' allegations indirectly establish anticompetitive effects.

6   To plead substantial anticompetitive effects indirectly, Plaintiffs must plausibly allege that

7   the defendant has market power and "that the challenged restraint harms competition." *Amex*,

8   138 S. Ct. at 2284. Market power is the ability for a defendant to profitably raise prices above

9   competitive levels. *Id.* at 2288; *see also Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 983 (9th

10  Cir. 2023). Plaintiffs sufficiently plead substantial anticompetitive effects indirectly because they

11  plausibly allege a relevant market, that Energizer has power within that market, and that the

12  Agreement harmed competition.

### i. Plaintiffs adequately plead power in a relevant market.

14  Courts often infer market power indirectly from a high market share and significant barriers

15  to entry. *Epic Games*, 67 F.4th at 983 (citing *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51

16  F.3d 1421, 1434 (9th Cir. 1995)). Calculating market share requires a relevant market. A relevant

17  market comprises "'any grouping of sales whose sellers, if unified by a monopolist or a

18  hypothetical cartel' could profitably raise prices above a competitive level." *Epic Games*, 67

19  F.4th at 975 (quoting *Rebel Oil*, 51 F.3d at 1434). A complaint "survives a Rule 12(b)(6) motion

20  unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal

21  defect." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).

22  Plaintiffs plausibly plead that "disposable batteries" are the relevant product market. DPP ¶¶

23  85-88; IPP ¶¶ 100-103; WDPP ¶¶ 86-89. Specifically, Plaintiffs allege that there are no

24  reasonable substitutes for disposable batteries for the vast majority of their uses, and

25  rechargeable batteries are not reasonable substitutes as they are more expensive and do not hold

26  a charge as long. DPP ¶ 85; IPP ¶ 100; WDPP ¶ 86. Such allegations should be taken to be true.

27  Plaintiffs allege substantial barriers to manufacturing batteries, including the contending with

28  access to metals and minerals; regulations and safety considerations; and extensive advertising.

26

DPP ¶¶ 21-23; IPP ¶¶ 35-37; WDPP ¶¶ 21-23. Defendants do not challenge these allegations.

Plaintiffs also allege that Energizer has over 50% market share in the disposable battery market, which is more than sufficient for market power. DPP ¶¶ 23, 87; IPP ¶¶ 37, 102; WDPP ¶¶ 23, 88. *See Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1298, 1301 (9th Cir. 1982) (24% share suffices for market power); *Rebel Oil*, 51 F.3d at 1438 (44% share suffices for market power); *SmithKline Beecham Corp. v. Abbott Labs.*, No. 07-cv-5702, 2014 WL 6664226, at *4 (N.D. Cal. Nov. 24, 2014) (less than 50% share can suffice for market power with entry barriers).

Finally, Plaintiffs also allege that Energizer imposed numerous price increases that cannot be explained by competitive forces, and a decrease in the number of retail sellers that purchase battery products from Energizer. DPP ¶ 89; IPP ¶ 104; WDPP ¶ 90.

Defendants do not contend any of these allegations are conclusory or implausible, and thus effectively concede market power. Instead, they argue that the alleged relevant market is "disconnected from the alleged restraint" because the restraint inflated prices only for Energizer battery products rather than *all* disposable battery products, and thus suggest that Plaintiffs *should have* alleged a single-brand market for Energizer products. MTD at 15. Defendants' argument is wrong both legally and factually.

Legally, there is no support for Defendants' position and they cite none. In fact, it embodies a fundamental mistake about market power. When a seller has a sufficiently high share of a relevant market with high barriers to entry, it has power in that market *as a whole* and can profitably raise its prices *despite some competition*. *Amex*, 138 S. Ct. at 2284; *Rebel Oil*, 51 F.3d at 1437; *Epic Games*, 67 F.4th at 983. Indeed, the *purpose* of defining a relevant market is to assess whether Energizer has market power taking into account "the product at issue *as well as all economic substitutes for the product*." *Newcal Indus.*, 513 F.3d at 1045 (emphasis added). Single brand markets, in contrast, are relevant when a seller *lacks* power in the overall relevant market but can exercise market power over sales of its own brand for some other reason. *Newcal Indus.*, 513 F.3d at 1048; *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 477-78 (1992). Thus, Defendants' failure to challenge Plaintiffs' relevant market allegations means they

27

concede them.[19]

Factually, Defendants mischaracterize the Complaints as alleging inflated prices only for Energizer products. MTD at 15. In fact, the Complaints *all* allege the Agreement inflated Energizer prices *and* Duracell prices. IPP ¶¶ 94-95; DPP ¶¶ 78-79; WDPP ¶¶ 79-80 ("With Walmart stores unavailable for price competition, Duracell had incentive to charge higher prices to its direct purchasers than it would have charged in the absence of the [Agreement]."); IPP ¶ 106; DPP ¶ 91; WDPP ¶ 92 ("Energizer's agreement with Wal-Mart reduced price competition between Energizer and Duracell by encouraging Duracell to follow Energizer's price increases and reducing Duracell's incentive to attempt to compete with Energizer on wholesale pricing.").

Defendants also contend that the Complaints must allege Walmart has market power in the retail market and fails to do so. MTD at 17. Not so. Plaintiffs have plausibly alleged *Energizer's* market power. Defendants cite no authority requiring Plaintiffs to allege that *both* Energizer and Walmart have market power. Under the Rule of Reason, participants in an anticompetitive agreement must have market power collectively, and they do if any one of them does. *See Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 226 (3d Cir. 2008) (holding vertical agreement to inflate wholesale prices to dealers who engaged in disruptive price competition on retail level could have requisite anticompetitive effects without dealer market power); *Frame-Wilson v. Amazon.com, Inc.*, No. 20-cv-00424, 2023 WL 2632513, at *7 (W.D. Wash. Mar. 24, 2023) ("Amazon has not convinced this Court that Plaintiffs are required to allege that each third-party seller has market power for the specific products it sells."); *Costco Wholesale Corp. v. Johnson & Johnson Vision Care, Inc.*, No. 15-cv-734, 2015 WL 9987969, at *13 (M.D. Fla. Nov. 4, 2015) (same).

Further, Plaintiffs have alleged Walmart has market power. They allege "[a]t the retail level for Battery Products, there is a single dominant firm, Walmart" and "Walmart's dominance in

---

[19] Because the Complaints allege the relevant product market includes all brands of disposable batteries, not just *Energizer* products, Defendants' citations to the test for proving a single-brand market are inapposite. *See Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1107 (N.D. Cal. 2022); *Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 346 (E.D.N.Y. 2019).

the retail market makes it a critical relationship for battery suppliers." DPP ¶¶ 28-34; IPP ¶¶ 42-48; WDPP ¶¶ 28-34. Walmart is Energizer's "largest customer," as well as "the largest retailer of disposable batteries in the United States." DPP ¶¶ 2, 4; IPP ¶¶ 4, 6; WDPP ¶¶ 2, 4; *Stiles v. Wal-Mart Stores, Inc.*, No. 14-cv-2234, 2019 WL 1429651, at *3 (E.D. Cal. Mar. 29, 2019) (holding that "given Walmart's status as the largest retailer in the world in [the disposable styling razor market], it accordingly had the power to set prices and exclude competitors"). Defendants suggest that the allegation that Walmart represented 11.5% to 14.1% of Energizer's sales during the class period undermines the plausibility of Walmart's market power. MTD at 20. But Walmart's power arises from the large number of captive customers who shop there for a variety of products *in addition* to disposable batteries and whom disposable battery manufacturers cannot efficiently access through any other method of distribution. *See, e.g.*, *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 239-40 (2d Cir. 2003) (defendants had market power because merchants "could not refuse to accept payment by Visa or MasterCard, even if faced with significant price increases, because of customer preference").[20] For example, few retail shoppers who go to Walmart or Sam's Club to purchase a large basket of household goods are likely to leave to buy disposable batteries somewhere else. Indeed, the Complaints allege that Walmart's dominance in retail batteries—and its impact on Energizer's bottom line—enabled Walmart to pressure Energizer to enter into the Agreement in the first place. DPP ¶¶ 2, 28-29, 31-36, 95; IPP ¶¶ 4, 42-43, 45-50, 110; WDPP ¶¶ 2, 28-29, 31-36, 96. *See Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000) (Toys "R" Us had market power, despite 20% retail market share, based on its ability to pressure toy manufacturers to reduce sales of toys to rival retailers); *Musical Instruments*, 798 F.3d at 1196 (crediting allegations of Guitar Center's market power based on

---

[20] Barry C. Lynn, *The Case for Breaking Up Walmart*, Foreign Policy (Apr. 29, 2013) ("America is home to some 4,500 Walmart stores, located in every state in the union. The company sells upwards of 40 percent of many individual consumer items in America . . . Walmart had the power to compel even companies as big as Philips to reduce the quality of their manufactures, in this case its televisions."); Paul Dobson, *British Grocery Trade Lessons*, 72 Antitrust L.J. 529, 535 (2005) ("A supplier with a high market share in the supply market will still be economically dependent on a retailer that commands only a modest market share of the retail market because of the supplier's relative lack of external opportunities," such that "retail buyer power can be very significant . . . even if the retailer controls as little as 8 percent of the total market.").

29

ability to pressure guitar manufacturers to agree to adopt "minimum-advertised pricing" (MAP) policies). For the same reason, it is plausible that Walmart "controls Duracell's access" to a critical subset of retail customers, MTD at 18, and that Walmart thus has market power. MTD at 20.[21]

### ii.  Plaintiffs adequately plead harm to competition.

To satisfy step one of the Rule of Reason, a plaintiff must establish harm to competition. *Amex*, 138 S. Ct. at 2284. Examples of harm to competition include that a restraint "increases barriers to entry or reduces consumer choice by excluding would-be competitors that would offer differentiated products." *Epic Games*, 67 F.4th at 983-84.

Plaintiffs' direct allegations of anticompetitive effects also establish harm to competition. Their allegations establish directly that Defendants inflated both wholesale and retail prices, and impaired more efficient retailers who challenged Walmart's dominance in retail markets. *See supra* § III.C.2.a. Those allegations directly show diminished consumer options in addition to anticompetitively inflated prices. *See Brown*, 2023 WL 5793303, at *8 (allegations that Amazon's de facto RPM agreements "prevent[ed] more innovative online shopping marketplaces from competing" led to "diminished consumer choices" sufficient to allege harm to competition); *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 42 (2d Cir. 2018) (market power combined with a restriction that "reduce[s] consumer choice" satisfies step one of Rule of Reason); *Epic Games*, 67 F.4th at 985 (market power in addition to a showing that consumers in the market would face better options demonstrates indirect anticompetitive effects). Such allegations establish "that the challenged restraint harms competition." *Amex*, 138 S. Ct. at 2284.

---

[21] Defendants claim that "Plaintiffs' allegations about an alternative market encompassing 'disposable battery dominated lighting products' are also deficient." MTD at 21 n.11. However, the Complaints do not allege that "disposable battery dominated lighting products" are a relevant antitrust market, but rather offer direct evidence that Defendants' market power in the relevant market *for disposable batteries* gave them the power to inflate the prices for products for which disposable batteries are their largest cost component. DPP ¶¶ 88-90; IPP ¶¶ 103-105; WDPP ¶¶ 89-91. *See Arista Networks Inc. v. Cisco Sys., Inc.*, No. 16-cv-00923, 2017 WL 6102804, at *17 (N.D. Cal. Oct. 10, 2017) (a complaint "need not identify specific products that fall into the Relevant Product Markets to survive a motion to dismiss") (citing *Iqbal*, 556 U.S. 662).

30

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case Nos. 5:23-cv-02087-PCP; 5:23-cv-02091-PCP; 5:23-cv-02093-PCP

1

2

**D.  Defendants' justifications are premature and fail.**

Defendants attempt to justify their Agreement in two different ways, claiming in effect that

3 those justifications mean on the whole it does not have an "unreasonable effect" on competition.

4 MTD at 18-21. However, these arguments are irrelevant on a motion to dismiss. The test for

5 whether a restraint is "reasonable" *is* the Rule of Reason. There is no free-standing additional

6 assessment of a restraint's reasonableness. *See Epic Games*, 67 F.4th at 985-86. As explained

7 above, Plaintiffs have satisfied their burden under the first step of the Rule of Reason by

8 establishing the Agreement is anticompetitive and harms competition. On the pleadings,

9 Plaintiffs need not anticipate and debunk Defendants' attempts to offer procompetitive

10 justifications for their conduct, which are appropriate only in later stages of litigation. *See*

11 *PLS.com*, 32 F.4th at 839 ("[W]hether the alleged procompetitive benefits of the [challenged

12 restraint] outweigh its alleged anticompetitive effects is a factual question that the district court

13 cannot resolve on the pleadings."); *Brown*, 2023 WL 5793303, at *4  ("Amazon's

14 procompetitive justifications . . . may be used to rebut Plaintiffs' claims once a prima facie case

15 has been established, but the Court need not consider Amazon's justifications on a motion to

16 dismiss."); *Pac. Steel*, 600 F. Supp. 3d at 1077 (same).

17 However, even if procompetitive justifications were relevant now, Defendants proposed

18 justifications fail. A procompetitive justification is "a nonpretextual claim that . . . conduct is

19 indeed a form of competition on the merits because it involves, for example, greater efficiency or

20 enhanced consumer appeal." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020).

21 Defendants' proffered justifications do not satisfy that test.

22 *Trademark*. Defendants argue that because Energizer batteries are a "trademarked product"

23 Energizer "has the right to exclude everyone and manufacture, distribute, and retail its" products

24 by itself, and that it therefore could accomplish the same anticompetitive effects as alleged from

25 the challenged vertical restraints by acting unilaterally. MTD at 18. This argument is fatally

26 flawed. First, conduct that may be lawful when done unilaterally can be unlawful when achieved

27

28

by agreement.[22] As discussed above, that is true for conscious parallelism among horizontal competitors and for resale price maintenance by a manufacturer. *See supra* § III.B. *See also Musical Instruments*, 798 F.3d at 1193-94; *Monsanto*, 465 U.S. at 763 (observing the economic effects of unilateral and concerted vertical price-setting can be identical while the former is lawful and the latter unlawful); *United States v. Parke, Davis and Co.*, 362 U.S. 29, 44 (1960) (same).

Second, Defendants' "trademark" argument assumes that Energizer has a "natural monopoly" by reason of its trademark. But not all trademarks confer monopoly power. And the Complaints allege that although Energizer has market power it also *competes* with Duracell and that the Agreement *reduced* that competition. *See supra* §§ III.C.2.a & b.i.[23]

*Exclusive Dealing.* Defendants contend that "the antitrust laws do not prevent a manufacturer like Energizer from contracting exclusively with one retailer and terminating all other distributors" and that therefore Energizer "can agree with a single retailer to provide it the best wholesale pricing available without unreasonably harming competition either." MTD at 19-20. This is also wrong. First, as Defendants' own cases demonstrate, exclusive dealing between a manufacturer and a distributor *can* violate the antitrust laws if it harms competition. *See, e.g.*, *E & L Consulting*, 472 F.3d at 30 ("To be sure, we have never held that all exclusive arrangements are reasonable as a matter of law.").

Second, Plaintiffs allege that Energizer agreed not only to give Walmart "the best wholesale pricing," but also to police the *retail* prices of Walmart's competitors and to increase their

---

[22] That distinguishes this case from *Real Selling Grp. LLC v. ESN Grp., Inc.*, No. 20-cv-1468, 2021 WL 535748, at *5 (S.D.N.Y. Feb. 12, 2021) which involved claims of only unilateral conduct challenged under Section 2 of the Sherman Act, not an *agreement* in restraint of trade under Section 1.

[23] This distinguishes this case from *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 29-30 (2d Cir. 2006), in which the defendant manufacturer was alleged to already have a monopoly in the manufacture of its product, and *Stubhub, Inc. v. Golden State Warriors, LLC*, No. 15-cv-1436, 2015 WL 6755594, at *4 (N.D. Cal. Nov. 5, 2015), in which the court granted a motion to dismiss because Plaintiff failed to allege *any* cognizable relevant product market. *See* MTD at 19. *Trixler Brokerage Co. v. Ralston Purina Co.*, 505 F.2d 1045, 1051 (9th Cir. 1974) merely held that defendant manufacturers' exclusive distributorship was lawful because the factfinder found it "served a legitimate business purpose" at trial.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case Nos. 5:23-cv-02087-PCP; 5:23-cv-02091-PCP; 5:23-cv-02093-PCP

wholesale prices or terminate them if they undercut Walmart's prices. DPP ¶¶ 41-75; IPP ¶¶ 55-91; WDPP ¶¶ 41-76. Defendants mischaracterize the Complaints, which plausibly allege vertical price fixing of retail prices, as if they alleged only a most-favored nations agreement on *wholesale* prices. MTD at 20 ("the alleged conduct effectively amounts to … some form of most-favored nation ("MFN") provision").

Third, even if Plaintiffs had alleged only an MFN agreement, that too can be unlawful. As with other vertical agreements, at the motion to dismiss stage, courts find plaintiffs state a claim if they plausibly allege "that the MFNs produced adverse anticompetitive effects within relevant product and geographic markets." *United States v. Blue Cross Blue Shield of Michigan,* 809 F. Supp. 2d 665, 671-72 (E.D. Mich. 2011). As a result, courts have repeatedly denied motions to dismiss challenges to MFN agreements. *E.g.*, *Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 610-12 (N.D. Cal. 2020); *De Coster v. Amazon, Inc.*, No. 21-cv-693, 2023 WL 372377, *1-*2 (W.D. Wash. Jan. 24, 2023); *Blue Cross Blue Shield of Michigan*, 809 F. Supp. 2d 665 at 674; *Wolfire Games, LLC v. Valve Corp.*, No. 21-cv-0563, 2022 WL 1443744, at *4 (W.D. Wash. May 6, 2022). Plaintiffs have sufficiently alleged that the Agreement harmed competition and led to inflated wholesale and retail prices, satisfying their burden under the Rule of Reason on a motion to dismiss.[24]

Fourth, Defendants argue that "there are many recognized procompetitive benefits from" MFN provisions, including "brand protection, promotional investment, and advertising." MTD at

---

[24] Defendants argue that MFNs are "not unlawful" if the party receiving the MFN (here Walmart) lacks market power. MTD at 20. But the only case Defendants cite (MTD at 20) confirms that anticompetitive effects "can be demonstrated either directly with evidence of an actual adverse effect *or* indirectly by establishing that the arrangement created or enhanced market power which resulted in the ability either to control prices or to exclude competition." *Nat'l Recycling, Inc. v. Waste Mgmt. of Mass., Inc.*, No. 03-cv-12174, 2007 WL 9797531, at *4 (D. Mass. July 2, 2007) (emphasis added). Other cases hold that market power is not necessary. *Frame-Wilson*, 2023 WL 2632513, at *7 ("Amazon has not convinced this Court that Plaintiffs are required to allege that each third-party seller has market power for the specific products it sells"). Further, Plaintiffs' allegations of Walmart's market power would satisfy their burden on a motion to dismiss. *See supra* § III.C.2.b.i.

20.[25] But as explained above, the court should not credit such procompetitive justifications on the motion to dismiss.[26] Nor have Defendants offered reason to believe those justifications apply here. Indeed, they are implausible given Walmart's warehouse discounter business model.

**E.  All plaintiffs have standing to bring their claims.**

**1.  The *Schuman* Plaintiffs have antitrust standing.**

The *Schuman* Plaintiffs—direct purchasers from Walmart—have antitrust standing. The doctrine of antitrust standing prevents claims by plaintiffs who have an overly attenuated relationship with an antitrust violator. *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535-36 & n. 31 (1983). The Ninth Circuit has held, "When co-conspirators have jointly committed the antitrust violation, a plaintiff who is the immediate purchaser from any of the conspirators is directly injured by the violation." *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1157 (9th Cir. 2019); *see also Paper Sys. Inc. v. Nippon Paper Ind.*, 281 F.3d 629, 631 (7th Cir. 2002) ("The first buyer from a conspirator is the right party to sue.").

Defendants cite no case in which a court has held that a direct purchaser from a co-

---

[25] Defendants cite *Blue Cross & Blue Shield United of Wisconsin*, 65 F.3d at 1415, for the sweeping proposition that MFNs are standard, procompetitive devices. But the court in *Blue Cross* made no such pronouncement. In fact, the court acknowledged that "[p]erhaps . . . these clauses are misused to anticompetitive ends in some cases," but concluded that the plaintiffs had put forth "no evidence of that in *this* case." *Id.* (emphasis added). *See also United States v. Delta Dental of Rhode Island*, 943 F. Supp. 172, 189 (D.R.I. 1996) (denying motion to dismiss and explaining that a "blanket condonation of MFN clauses would . . . run counter to the Sherman Act's preference for fact-specific inquiries, implausibly reject the premise that MFN clauses produce substantial anticompetitive effects in particular circumstances and contradict the Sherman Act's animating concern for low consumer prices.").

[26] To be credited as a procompetitive justification, "the defendant must come forward with *evidence* of the restraint's procompetitive effects." *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1070 (9th Cir. 2015) (emphasis added); *Frame-Wilson*, 591 F. Supp. 3d at 992 ("procompetitive justifications may be used to *rebut* Plaintiffs' claims, [but only] once a *prima facie* case has been established . . . , the Court need not consider such rebuttals on a motion to dismiss.") (emphasis added); *De Coster v. Amazon.com*, 2023 WL 372377, at *3 (denying defendant's invitation to find an MFN policy procompetitive as a matter of law because that would require "constru[ing] the facts in an unfavorable light, [which] is contrary to Rule 12(b)(6) and premature given the undeveloped factual record").

34

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case Nos. 5:23-cv-02087-PCP; 5:23-cv-02091-PCP; 5:23-cv-02093-PCP

1   conspirator defendant lacks antitrust standing.[27] Instead, Defendants attempt to re-write the

2   *Schuman* Complaint to argue that Plaintiffs' injury is "indirect," and that "speculation" about

3   whether Plaintiffs paid supracompetitive prices to Walmart is required. MTD at 26. But no

4   speculation is necessary. Defendants agreed to police retail competitors of Walmart to ensure

5   that Walmart could inflate and maintain supracompetitive prices in its own stores. DPP ¶¶ 1, 4-6,

6   8, 38, 41-71, 83; IPP ¶¶ 3, 6-8, 10, 52, 55-86, 92; WDPP ¶¶ 1, 4-6, 8, 38, 41-72, 84. That enabled

7   Walmart to inflate its prices for both Energizer and Duracell Battery Products.  DPP ¶¶ 8, 84;

8   IPP ¶¶ 10, 99; WDPP ¶¶ 8, 85.

9       Defendants incorrectly liken the *Schuman* Plaintiffs' claims based on purchases of Duracell

10  batteries to an umbrella theory of liability. MTD at 27-28.  Umbrella liability applies when

11  purchasers from *non-conspirators* seek damages because of spillover effects of the conspirators'

12  anticompetitive conduct: "The umbrella theory hypothesizes that a successful price fixing

13  conspiracy among certain firms creates a 'price umbrella' that allows *non-conspiring competitor*

14  *firms* to raise their prices without fear of losing market share." *In re TFT-LCD (Flat Panel)*

15  *Antitrust Litig.*,  No. M 07-1821, 2012 WL 6708866, at *1 (N.D. Cal. 2012) (citing *In re*

16  *Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1339 (9th

17  Cir. 1982) (emphasis added). Plaintiffs need not rely on an umbrella theory here. They allege that

18  Walmart, a *conspirator*, inflated both Energizer and Duracell prices to the *Schuman* Plaintiffs.

19  DPP ¶¶ 8, 84; IPP ¶¶ 10, 99; WDPP ¶¶ 8, 85.

20      Further, California antitrust law permits umbrella damages. *Cnty. of San Mateo v. CSL, Ltd.*,

21  No. 10-cv-05686, 2014 WL 4100602, at *5 (N.D. Cal. Aug. 20, 2014); *In re California Gasoline*

22  *Spot Market Antitrust Litig.*, No. 20-cv-3215002, 2022 WL 3215002, at *5 (N.D. Cal. Aug. 9,

23

---

24  [27] Defendants instead cite only to *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 451 (9th
Cir. 2021), where the City of Oakland sued the NFL and its teams after the Oakland Raiders

25  declined to renew its contract with the City, alleging defendants limited the supply of NFL teams
and drove up the price of a franchise. At the time of the lawsuit, the City was priced out of the

26  market and was *not an actual purchaser of an NFL franchise*. The Court stated, "A
nonpurchaser's injury is less direct than the injuries of actual purchasers and highly speculative:

27  we cannot know whether, in the absence of Defendants' restrictions on output, the nonpurchaser
would have made a purchase and, if so, under what terms." *Id.* at 449.

28

2022). So may federal law under some circumstances. Defendants cite *Petroleum Products*, 691 F. 2d at 1340-41, where the Ninth Circuit rejected an umbrella liability theory in a case involving *a multi-tiered distribution scheme*. However, it noted umbrella liability may be appropriate in markets with single-tier distribution, like the market here. *Id.* at 1340; *see also Costco Wholesale Corp. v. AU Optronics Corp.*, No. 13-cv-1207, 2014 WL 4723880, at *4 (W.D. Wash. Sep. 23, 2014). Courts in the Ninth Circuit use the antitrust standing factors from *Associate General Contractors*, 459 U.S. 519 (1983) to assess umbrella damages, and do not categorically reject them. *See, e.g.*, *In re Online DVD Rental Antitrust Litig.*, No. M 09-2029, 2009 WL 4572070, at *4 (N.D. Cal. 2009) (no categorical bar on umbrella liability if single-tier distribution).

### 2.   The *Copeland* Plaintiffs have Article III standing for all their claims.

The *Copeland* Plaintiffs have Article III standing to bring all their state-law claims. On the pleadings, standing requires only that Plaintiffs suffered injury-in-fact, it is fairly traceable to defendants' conduct, and it can be redressed by a favorable ruling. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Defendants concede that the *Copeland* Plaintiffs have made that showing for claims arising from the laws of the states where they reside or have purchased Energizer Battery Products. MTD at 21.

Defendants nonetheless argue that the *Copeland* Plaintiffs lack standing to pursue claims under the laws of states where they do not reside and have not made purchases. *Id.* at 21-25.[28] But under Ninth Circuit law, if the named plaintiffs have a "direct and substantial interest" in the claims of the class, any "dissimilarities" between their claims and those of the unnamed class members are relevant only to class certification, not standing. *Melendres*, 784 F.3d at 1258, 1261-62. *Melendres* held that the named plaintiffs had standing to seek relief for persons whose constitutional rights were violated by crime suppression sweeps called "saturation patrols" and those whose rights were violated during stops outside those patrols, even though the named plaintiffs had been stopped only during patrols. *Id.* Rejecting the defendants' argument to the contrary, the Court explained, "representative parties who have a direct and substantial interest

---

[28] Defendants incorrectly include New Hampshire among these states. *See* Mot. at 21 nn.13 & 14. But Plaintiff Peter Costas purchased products in New Hampshire. IPP ¶ 24.

have standing; the question whether they may be allowed to present claims on behalf of others who have similar, but not identical, interests depends not on standing, but on an assessment of typicality and adequacy of representation." *Id.* at 1262 (quoting 7AA Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* §§1785.1 (3d ed.)). Applying that standard, the named plaintiffs had standing because the defendants' "practices during saturation patrols . . . d[id] not raise 'a significantly different set of concerns' from the same practices instituted during regular patrols." *Id.* at 1263 (quoting *Gratz v. Bollinger,* 539 U.S. 244, 265 (2003)).

Following that reasoning, courts in this District have held that *Melendres* "establish[es] a *per se* rule" that whether named plaintiffs who bring claims under certain state laws can also bring substantially similar claims on behalf of absent class members from other states "is relevant only to class certification, not standing." *Staley*, 446 F. Supp. 3d at 622; *see also In re Chrysler-Dodge- Jeep EcoDiesel Mktg., Sales Practices & Prods. Liability Litig.*, 295 F. Supp. 3d 927, 954-56 (N.D. Cal. 2018); *see also Murphy v. Olly Pub. Benefit Corp.*, No. 22-cv-03760, 2023 WL 210838, at *15 (N.D. Cal. Jan. 17, 2023) (explaining whether a named plaintiff can represent class members whose claims arise under the laws of different states is not a question of standing).[29] All of the appellate courts to address the issue have held that Article III standing is satisfied where, as here, representative plaintiffs in a class action seek to recover damages for the

---

[29] *See also Patterson v. RW Direct, Inc.*, No. 18-cv-00055, 2018 WL 6106379, at *1 (N.D. Cal. Nov. 21, 2018) ("[W]hether a named plaintiff can represent class members whose claims arise under the laws of different states does not appear to be a question of standing. Patterson does not himself seek to raise a claim under the laws of a different state; rather, he seeks to represent a class member who can raise such a claim."); *Sultanis v. Champion Petfoods USA Inc.*, No. 21-cv-00162, 2021 WL 3373934, at *6 (N.D. Cal. Aug. 3, 2021) ("[T]he Court today cements its conclusion—in line with Judges Chhabria and Huvelle, among others—that whether a plaintiff can bring claims on behalf of unnamed plaintiffs under the laws of states in which the named plaintiff does not reside or was injured is a matter of typicality, adequacy, and predominance under Rule 23, not Article III standing."); *In re Natera Prenatal Testing Litig.*, No. 22-cv-00985, 2023 WL 3370737, at *11 (N.D. Cal. Mar. 28, 2023) (same); *Lopez v. Zarbee's, Inc.*, No. 22-cv-04465, 2023 WL 210878, at *8-*9 (N.D. Cal. Jan. 17, 2023) (same); *Ablaza v. Sanofi-Aventis U.S. LLC*, No. 21-cv-1942, 2022 WL 19517298, at *2 (N.D. Cal. July 12, 2022); *Hrapoff v. Hisamitsu Am., Inc.*, No. 21-cv-01943, 2022 WL 2168076, at *2 (N.D. Cal. June 16, 2022) (same); *Pecanha v. The Hain Celestial Grp., Inc.*, No. 17-cv-04517, 2018 WL 534299, at *9 (N.D. Cal. Jan. 24, 2018) (same); *In re McCormick & Co.*, *Pepper Prods. Mktg. & Sales Practices Litig.*, 217 F. Supp. 3d 124, 144 (D.D.C. 2016) (same).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case Nos. 5:23-cv-02087-PCP; 5:23-cv-02091-PCP; 5:23-cv-02093-PCP

same conduct on behalf of absent class members who assert claims under different state laws. *In re Asacol*, 907 F.3d at 49-51 (holding named plaintiffs have standing to bring claims under the laws of states in which only unnamed class members made purchases because the issue "has no relevant bearing on the personal stake of the named plaintiffs in litigating the case"); *Langan v. Johnson & Johnson Consumer Cos., Inc.*, 897 F.3d 88, 93, 95 (2d Cir. 2018) ("[W]e write to make explicit [that] . . . as long as the named plaintiffs have standing to sue the named defendants, any concern about whether it is proper for a class to include out-of-state, nonparty class members with claims subject to different state laws is a question of predominance under Rule 23(b)(3)."); *Mayor of Baltimore v. Actelion Pharms Ltd.*, 995 F.3d 123, 134 (4th Cir. 2021) (named plaintiffs had standing to raise claims under the laws of states where they made no purchasers on behalf of unnamed class members).[30]

Under these cases, the named plaintiffs have Article III standing to assert claims for absent class members if the named plaintiffs (1) show defendants caused the named plaintiffs injury-in-fact that can be redressed by a favorable ruling, and (2) maintain a "direct and substantial interest" in the class action. *Melendres*, 784 F.3d at 1262. As *In re Asacol* explains, the named plaintiffs need merely show they do not have an "insufficient personal stake in the adjudication of the class members' claims." *In re Asacol*, 907 F.3d at 49-51; *see also In re Xyrem (Sodium Oxybate) Antitrust Litig.*, No. 20-md-02966, 2023 WL 3440399, at *11 (N.D. Cal. May 12, 2023) (named plaintiffs with purchases in only some of states under whose laws they brought claims had a sufficient personal stake in the absent class members' claims). Article III focuses on "the incentives of the named plaintiffs to adequately litigate issues of importance to them," so the named plaintiffs need not show that their "claims" are "identical to the claims of each class member." *In re Asacol*, 907 F.3d at 48-49 (internal quotation marks omitted). If the named

---

[30] *Cf. Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011) (holding class action claims based on other states' laws "ha[ve] nothing to do with standing, though it may affect whether a class should be certified"); *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 361 (3d Cir. 2015) ("[O]nce Article III standing 'is determined vis-a-vis the named parties . . . there remains no further separate class standing requirement in the constitutional sense.") (quoting *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 306-07 (3d Cir. 1998)); *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998) (same).

plaintiffs have a sufficient stake in the unnamed class members' claims, differences between the claims relate to class certification, not Article III standing.[31]

The *Copeland* Plaintiffs have the requisite personal stake. Their claims are predicated on the exact same conduct by the exact same defendants that caused the same type of harm to each class member, giving them a concrete stake in the claims of the absent class members and a direct and substantial interest in the action. The *Copeland* Plaintiffs "were forced to pay a higher price" because of Defendants' anticompetitive conduct that also harmed unnamed class members in other states in the exact same way. *In re Xyrem*, 2023 WL 3440399, at *11 (quoting *In re Asacol*, 907 F.3d at 49). They thus "have a substantial and shared interest in proving that the higher price was the result of [that] unlawful . . . conduct." *Id.* That is, Plaintiffs have a direct and substantial stake in all claims of the class because "success on the claim under one state's law will more or less dictate success under another state's law." *In re Asacol*, 907 F.3d at 49; *see also Patterson*, 2018 WL 6106379, at *1 (named plaintiff "has established that he has the 'necessary stake' in litigating the class's claims for purposes of standing" because "the putative class members all suffered the same injury").[32] Article III requires nothing more.

Defendants do not address any of the above, failing even to mention *Melendres* or the well-accepted standard that plaintiffs have standing if they have the required personal stake. Instead, Defendants argue that standing issues must not be "deferred for consideration in connection with class certification." MTD at 23-25 (citing *Amchem Prods, Inc. v. Windsor*, 521 U.S. 591 (1997)

---

[31] Accordingly, Defendants cannot distinguish *Melendres* on the ground that it addressed the scope of the relief plaintiffs sought as opposed the claims they brought. That distinction is "not material" to standing, *Pecanha*, 2018 WL 534299, at *9, and *Melendres* expressly states that its holding addresses whether plaintiffs may "present *claims* on behalf of others who have similar, but not identical, interests." *See Melendres*, 784 F.3d at 1262 (emphasis added). Thus, Defendants' reliance on *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 909-11 (N.D. Cal. 2019)—which attempts to distinguish *Melendres* on this ground—is misplaced.

[32] *Lewis v. Casey*, 518 U.S. 343, 357-359 (1996), to which Defendants cite, is therefore inapposite. The Court there found that the named plaintiff did not have standing to represent the class because his injury was too different from those of the unnamed class members he sought to represent. *Cf. Melendres*, 784 F.3d at 1264 ("[I]n *Lewis* the concerns of the named plaintiffs differed so significantly from the concerns of the unnamed plaintiffs that a remedy redressing the named plaintiffs' injury could not redress that of the unnamed plaintiffs . . . .").

& *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999)). But that is a non sequitur. Plaintiffs agree that the Court should find now that they have standing to raise all the class's state-law claims. The Court should defer to class certification only *other* questions about how, if at all, potential differences between Plaintiffs' state-law claims affect typicality and adequacy under Rule 23.

And even that question is immaterial here. Defendants *concede* that the *Copeland* Plaintiffs' state-law claims are functionally identical and all predicated on the same conduct, so there will be no adequacy or typicality issues to address at class certification. *See* MTD at 28-29. *Cf. Murphy*, 2023 WL 210838, at *15 (rejecting Defendants' "meager showing about other states' laws" in declining to address supposed differences between such laws under Rule 23); *Gratz*, 539 U.S. at 263-65 ("Regardless of whether the requirement is deemed one of adequacy or standing," the named plaintiff could bring claims on behalf of absent class members because the challenged conduct "d[id] not implicate a significantly different set of concerns" for different plaintiffs).

Defendants are also wrong that the *Copeland* Plaintiffs do not have standing to pursue certain causes of action because they must "'demonstrate standing for each claim,'" which Defendants suggest Plaintiffs cannot do for states where they do not reside and did not make purchases. MTD at 22 (quoting *Haro v. Sebelius*, 747 F.3d 1099, 1108 (9th Cir. 2014)). Defendants confuse Article III's requirements with the *elements* necessary to state a claim. Whether certain state laws include as an element that the plaintiff plead that they reside or have made purchases in the state has no bearing on *Article III standing*. Even if Defendants are correct that each of those laws requires an in-state purchase, that would mean only that the *Copeland* Plaintiffs "may not seek relief for their *own injuries* under those States' statutes." *Actelion*, 995 F.3d at 134 (emphasis added). That has nothing to do with whether they have standing to raise those claims on behalf of unnamed class members who satisfy the elements of those state laws. "[T]he fact that judgments for some class members will . . . enter under the laws of states other than the states under which any of the class representatives' judgments will enter, where those laws are materially the same, has no relevant bearing on the personal stake of the named plaintiffs." *In re Xyrem*, 2023 WL

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case Nos. 5:23-cv-02087-PCP; 5:23-cv-02091-PCP; 5:23-cv-02093-PCP

3440399, at *11 (quoting *In re Asacol*, 907 F.3d at 49).[33]

And because the *Copeland* Plaintiffs bring the claims for which they do not plead in-state purchases or residence on behalf of unnamed class members, those claims are not subject to dismissal under Rule 12(b)(6) for failure to plead the necessary elements. The Fourth Circuit held that named plaintiffs can proceed at the pleading stage with claims for which they "did not allege facts to show that they satisfied the statutory requirements" so long as they seek to bring those claims on behalf of "class members who sustained damages under those laws." *See Actelion*, 995 F.3d at 134. "Through Rule 23, Congress has authorized plaintiffs to bring, under limited circumstances, a suit in federal court on behalf of, not just themselves, but others who were similarly injured." *Langan*, 897 F.3d at 93. So, under Rule 23, "named plaintiffs regularly litigate . . . claims of other class members based on transactions in which the named plaintiffs played no part." *In re Asacol*, 904 F.3d at 51. That is the situation here: The *Copeland* Plaintiffs "do[] not [themselves] seek to raise a claim under the laws of a different state; rather, [they] seek[] to represent a class member who can raise such a claim." *Patterson*, 2018 WL 6106379, at *1. Because they have a sufficient personal stake in those claims, they have Article III standing to assert them on behalf of the unnamed class members and can pursue them if they meet the requirements of Rule 23. *See Langan*, 897 F.3d at 95.[34]

---

[33] For those reasons, Defendants' cases stating that plaintiffs must demonstrate standing for each claim they bring—*Haro*, 747 F.3d 1099 (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)) and *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1107 (N.D. Cal. 2007)—are inapt because Plaintiffs *have* demonstrated Article III standing to assert all of the class's claims, including those of absent class members. In fact, *Haro* actually *supports* Plaintiffs' position because the court there addressed only whether the class representatives had individual standing to bring their class claims and found that they did. *Haro*, 747 F.3d.at 1108-09.

[34] For these reasons, Defendants' cases holding that named plaintiffs categorically do not have standing for so-called out-of-state claims are wrongly decided. *See* MTD at 22-23 & n.15. All but two of those cases were decided pre-2015 before *Melendres*, and only one addresses *Melendres* at all. That case is *Jones*, which was wrongly decided for the reasons described above. *See supra* n.31. Moreover, Defendants' other cases stating that plaintiffs cannot rely on harm to others to provide standing are irrelevant because the *Copeland* Plaintiffs have demonstrated their own injury-in-fact at the hands of Defendants. *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 39-46 (1976) (named plaintiffs not harmed by defendants); *Martinez v. Newsom*, 46 F.4th

---

41

**F.  Defendants' other arguments for dismissing Plaintiffs' state-law claims are wrong.**

With only limited exceptions, Defendants do not dispute that each of the state laws under which Plaintiffs bring claims (1) permit indirect purchaser actions for damages, and (2) provide a cause of action for antitrust violations. Instead, Defendants contend that Plaintiffs' state-law claims should be dismissed because they "rely on the same underlying conduct" as Plaintiffs' federal Sherman Act claims, and thus "rise or fall" with them, and, in Defendants' view, Plaintiffs' Sherman Act claim fails. MTD at 28-29. But as explained above, that is wrong for all Plaintiffs' California claims and the *Copeland* Plaintiffs' Maryland claim because both states treat vertical price-fixing as per se illegal.[35] *See supra* § III.C.1; Md. Code Ann., Com. Law § 11-204(b) ("For purposes of subsection (a)(1) of this section, a contract, combination, or conspiracy that establishes a minimum price below which a retailer, wholesaler, or distributor may not sell a commodity or service is an unreasonable restraint of trade or commerce.").

Other than under California and Maryland law, however, the *Copeland* Plaintiffs agree that their Sherman Act claim and their state-law antitrust and consumer protection claims are uniform in all important respects, except that the federal bar on indirect-purchaser damages does not apply. *See* IPP ¶ 164 ("The above-alleged conduct, which violates the federal Sherman Antitrust Act, will, if proven, establish a claim under each of the state laws cited below."); *id.* ¶ 357 ("Defendants' above-described Scheme and conduct constitutes unfair competition, unconscionable conduct, and deceptive acts and practices in violation of the state consumer protection statutes . . . ."). [36] For the reasons explained above, the *Copeland* Plaintiffs have

---

965, 970 (9th Cir. 2022) (named plaintiffs not injured by the defendants); *In re Apple Processor Litig.*, No. 18-cv-00147, 2019 WL 3533876, at *4-*8 (N.D. Cal. Aug. 2, 2019) (named plaintiffs had not shown particularized injury); *Lee v. State of Or.*, 107 F.3d 1382, 1388-1390 (9th Cir. 1997) (named plaintiff had not shown injury-in-fact); *Hawecker v. Sorensen*, No. 10-cv-00085, 2011 WL 98757, at *3 (E.D. Cal. Jan. 12, 2011) (no injunctive relief because named plaintiffs had not shown a likelihood of future injury). However, if the Court agrees with Defendants' Article III standing argument, the *Copeland* Plaintiffs request leave to amend their complaint to add plaintiffs who reside or made purchases in additional Repealer Jurisdictions.

[35] California law also has a lower standard for establishing a vertical price-fixing agreement. *See supra* § III.B.

[36] Of course, as Defendants acknowledge, many of the state laws under which Plaintiffs bring

---

42

1    adequately pled their Sherman Act claim, and have thus adequately pled their state-law claims

2    too.

3         Defendants raise independent reasons to dismiss some of the *Copeland* Plaintiffs' state-law

4    claims in their appendices (often in parentheticals in those appendices). But arguments raised

5    only in a footnote are "generally deemed waived"; thus, Defendants have forfeited arguments

6    they raise only in *appendices*, much less only in parentheticals in those appendices. *Estate of*

7    *Saunders v. C.I.R.*, 745 F.3d 953, 962 n.8 (9th Cir. 2014). Indeed, it is difficult to tell whether

8    Defendants even intend to raise independent arguments in their appendices. *See, e.g.*, MTD,

9    App'x B at 11 (citing cases for why Plaintiffs' Vermont consumer protection claim rises and

10   falls with their Sherman Act claim, but then incorrectly citing *In re Aggrenox Antitrust Litig.*,

11   No. 14-md-2516, 2016 WL 4204478, at *9 (D. Conn. Aug. 9, 2016) for the proposition that

12   Vermont's statute does not cover antitrust claims at all).

13        Even if Defendants had properly raised these arguments, they all fail.

14        *Antitrust violations state a claim (District of Columbia, Rhode Island, South Carolina, Utah,*

15   *and Vermont).* Defendants incorrectly argue that antitrust violations alone do not state a claim

16   under the District of Columbia, Rhode Island, South Carolina, Utah, and Vermont consumer

17   protection statutes. MTD, App'x B at 10-11. That is wrong. Except for Utah's statute, those

18   statutes all prohibit antitrust violations by precluding "unfair" conduct, which is precisely the

19   language the FTC Act uses to prohibit antitrust violations. *Compare* 15 U.S.C. § 45(a)(1)

20   ("Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or

21   practices in or affecting commerce, are hereby declared unlawful.") *with* D.C. Code Ann. § 28-

22   3904 ("It shall be a violation of this chapter for any person to engage in an unfair or deceptive

23   trade practice"); R.I. Gen. Laws § 6-13.1-2 (prohibiting "[u]nfair methods of competition and

24

---

25   their claims cover conduct that is broader than that covered by the Sherman Act. *See, e.g.*, *Epic*
     *Games*, 67 F.4th at 1001-02 (9th Cir. 2023) ("[T]he California Supreme Court permitted a UCL
26   claim against a predatory-price scheme to proceed even though the plaintiff failed to prove—as
     state antitrust law requires—that the defendant intended to harm competition through the
27   scheme."); *see also* MTD, App'x B at 7. The *Copeland* Plaintiffs agree only that in this case their
28   state-law claims are coterminous with their Sherman Act claim.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case Nos. 5:23-cv-02087-PCP; 5:23-cv-02091-PCP; 5:23-cv-02093-PCP

unfair or deceptive acts or practices in the conduct of any trade or commerce"); S.C. Code § 39-5-20 (prohibiting "[u]nfair methods of competition" and instructing that the statute be read in harmony with the FTC Act); Vt. Stat. Ann. § 2453 (prohibiting "[u]nfair methods of competition" in a subsection entitled "Practices prohibited; antitrust and consumer protection"). Courts have repeatedly upheld claims under these statutes predicated solely on antitrust violations. *See, e.g.*, *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1073, 1084-85 (S.D. Cal. 2017) (holding that antitrust violations state a claim under the District of Columbia, Rhode Island, and South Carolina statutes); *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 584 (M.D. Pa. 2009) ("[T]he DCCPPA subsumes a Sherman Act claim and creates an indirect purchaser cause of action."); *In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, No. 19-md-02918, 2021 WL 4306018, at *18-*19, *23-*24 (N.D. Cal. Sept. 22, 2021) (explaining antitrust violations state a claim under Rhode Island and South Carolina laws); *Elkins v. Microsoft Corp.*, 174 Vt. 328, 341 (2002) (holding that indirect purchasers "can bring an antitrust case" under Vermont's statute). As multiple courts have held, antitrust violations are sufficient to state a claim under the Utah Consumer Sales Practices Act ("UCSPA") too. *See In re Packaged Seafood*, 242 F. Supp. 3d at 1086-87 (upholding UCSPA claims based upon antitrust conspiracy); *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, plc*, No. 15-cv-6549, 2018 WL 7197233, at *50-*51 (S.D.N.Y. Dec. 26, 2018) (same). The UCSPA prohibits "unconscionable act[s]," including antitrust violations. Utah Code Ann. § 13-11-5. That is made clear by the statute's express purpose "to make state regulation of consumer sales practices not inconsistent with the policies" of the FTC Act, which, as explained, itself covers all Sherman Act violations. *Id.* § 13-11-2(4).

Defendants' brief arguments to the contrary are all incorrect. Defendants rely on *In re Graphics Processing Units Antitrust Litigation*, 527 F. Supp. 2d 1011, 1030 (N.D. Cal. 2007) to argue that the District of Columbia's statute does not cover antitrust violations, but that case improperly focused only on "unconscionable conduct"—even though the statute prohibits *unfair* conduct, which courts have repeatedly held includes antitrust violations. *See* MTD, App'x B at 7. Defendants' Rhode Island cases fare no better: *In re Graphics Processing Units* and *In re*

*Dynamic Random Access Memory (DRAM) Antitrust Litigation*, 516 F. Supp. 2d 1072, 1116 (N.D. Cal. 2007), both fail to address the plain language of Rhode Island's statute and instead rely on "restrictive language" from *ERI Max Entertainment, Inc. v. Streisand*, 690 A.2d 1351, 1354 (R.I. 1997), that "derives from *George* [*v. George F. Berkander, Inc*., 169 A.2d 370, 371 (R.I. 1961)], which was decided approximately eight years before the enactment of the [Rhode Island consumer protection statute] and addressed a common law unfair competition claim" that was much more limited than the statutory claim the *Copeland* Plaintiffs bring here. *In re Chocolate*, 602 F. Supp. 2d at 586 n.61; *see also In re Packaged Seafood*, 242 F. Supp. 3d. at 1084-85. So too *In re Propranolol Antitrust Litigation*, 249 F. Supp. 3d 712, 729 (S.D.N.Y. 2017)—on which Defendants rely to argue that South Carolina's statute does not encompass antitrust violations, *see* MTD, App'x B at 10—is an outlier that ignores the language of South Carolina's statute prohibiting "unfair methods of competition." Defendants' Vermont case—*In re Aggrenox*, 2016 WL 4204478, at *9—dismissed the plaintiffs' Vermont consumer protection claim in part because the plaintiff failed to present any authority that the statute covered antitrust violations. *See* MTD, App'x B at 11. It does not override the Vermont high court's directly contrary decision that indirect purchasers have standing to raise antitrust challenges under the statute. *See Elkins*, 174 Vt. at 341. *In re DRAM* concluded that Utah's consumer protection statute does not cover antitrust violations only because the plaintiffs there—unlike here—did not cite to any authority as to whether antitrust violations "constitute actionable conduct" under the statute. 516 F. Supp. 2d at 1117.

*Notice requirements are satisfied (Hawaii).* Defendants argue that "failure to comply with [Hawaii Revised Statutes'] notice requirement 'warrants dismissal.'" MTD, App'x B. at 8. But Defendants fail to mention that Plaintiffs *did* comply with the notice requirement. *See* IPP ¶¶ 139-40. Even if Plaintiffs had not, dismissal would be inappropriate because the notice requirement conflicts with Rule 23, is procedural, and thus does not apply in federal court under *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393, 395 (2010). *See In re Restasis Antitrust Litig.*, 355 F. Supp. 3d 145, 155-56 (E.D.N.Y. 2018); *Sergeants Benevolent*, 2018 WL 7197233, at *25-*26; *In re Dealer Mgmt. Sys. Antitrust Litig.*, No. 18-cv-

45

864, 2023 WL 4305901, at *49-*50 (N.D. Ill. June 29, 2023). Such notice is also not a pleading requirement and is not grounds for dismissal regardless. *In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 834-35 (E.D. Pa. 2019); *In re Zetia (Ezetimibe) Antitrust Litig.*, 18-md-2836, 2019 WL 1397228, at *25 (E.D. Va. Feb. 6, 2019) ("Nothing in any of the cited provisions dictates that failure to provide notice requires dismissal.").

*Indirect purchasers can pursue damages (Puerto Rico, Idaho, Montana, Rhode Island, and Missouri).* Defendants incorrectly contend that indirect purchasers cannot bring claims under the Puerto Rican Anti-Monopoly Act, the Idaho Consumer Protection Act, the Montana Unfair Trade Practices Act, the Rhode Island Antitrust Act, and the Missouri Merchandising Practices Act. MTD, App'x A at 5 & App'x B at 8-9. As courts have recognized, however, Puerto Rico, Idaho, and Montana all permit indirect purchaser actions under their consumer protection statutes. *Rivera-Muniz v. Horizon Lines Inc.*, 737 F. Supp. 57, 61 (D.P.R. 2010) ("Puerto Rico liberally construes its standing requirements in private antitrust cases [and] it is immaterial whether Plaintiffs are direct or indirect purchasers") (citing *Pressure Vessels P.R. v. Empire Gas P.R.*, 137 D.P.R. 497, 520 (1994) (explaining that to state a claim under Puerto Rico's antitrust law "the plaintiff need not establish anything beyond a factual causal relation between the injury and the violation to meet the 'by reason of' requirement")); *Sergeants Benevolent*, 2018 WL 7197233, at *40-*41 (permitting indirect purchaser action under Idaho's statute); *In re New Motor Vehicles*, 350 F. Supp. 2d 160, 193 (D. Me. 2004) ("[T]he application of the Montana consumer protection statute is not limited to those who engage directly in consumer transactions."); *In re DRAM*, 516 F. Supp. 2d at 1112 ("[T]he only question is whether indirect purchasers may bring such a claim under the FTCA and/or MUTPA, and *In re New Motor Vehicles* provides useful guidance in answering this question in the affirmative."); Mont. Code Ann. 30-14-133(1)(a) (permitting any "consumer who suffers any ascertainable loss of money or property" to bring a claim). Rhode Island and Missouri have permitted indirect purchaser actions since 2013 and 2007, respectively. *See* R.I. Gen. Laws Ann. § 6-36-11(a) (2013) ("In any action under this section the fact that a person or public body has not dealt directly with the defendant shall not bar or otherwise limit recovery."); *In re Hard Disk Drive*, 2021 WL 4306018, at *7-*8

46

(same); *In re Packaged Seafood*, 242 F. Supp. 3d at 1079-80 (recognizing *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007) and "join[ing] the majority of our sister courts and concludes that Illinois Brick does not bar indirect-purchaser claims under the MMPA").

Defendants' arguments to the contrary are incorrect. Defendants cite to *In re Broiler Chicken Antitrust Litig.*, No. 16-cv-08637, 2020 WL 4032932 (N.D. Ill. July 25, 2020) to contend that Puerto Rico's antitrust statute does not permit indirect purchaser actions, but that case cannot overcome the Supreme Court of Puerto Rico's language in *Pressure Vessels* recognized by *Rivera-Muniz*. Defendants also rely on *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896 (N.D. Cal. 2008) to argue that Idaho's statute does not permit indirect purchaser actions. *See* MTD, App'x B at 8. But in *SRAM*, the plaintiffs conceded the point and the court incorrectly concluded that in *State ex rel. Wasden v. Daicel Chemical Industries, Ltd.*, 141 Idaho 102, 108-09 (2005), "the Idaho Supreme Court expressly held that indirect purchasers may not bring suit under the Idaho Consumer Protection Act." *In re SRAM*, 580 F. Supp. 2d at 907. *Wasden* actually held only that the statute requires that the defendants engaged in "sales conduct." *Sergeants Benevolent*, 2018 WL 7197233, at *41. That does not disturb indirect purchaser standing; Defendants do not dispute they engaged in sales conduct here. Defendants' case addressing Montana's consumer protection statute—*In re TFT-LCD (Flat Panel) Antitrust Litigation*, 599 F. Supp. 2d 1179 (N.D. Cal. 2009)—ignores the contrary case law cited above and fails to address the Montana statute's plain language permitting actions by all consumers. And Defendants cite only to overruled cases *predating* revisions to Rhode Island's and Missouri's consumer protection laws overriding *Illinois Brick* and permitting indirect purchaser claims.

*Class action bans do not apply (Montana and South Carolina).* Defendants are wrong that Plaintiffs cannot bring their claims as class actions under Montana and South Carolina's consumer protection statutes. MTD, App'x B at 9, 11. The Supreme Court held in *Shady Grove*, 559 U.S. at 398, that Rule 23 governs whether class actions can be brought in federal court, and state-law class actions bans to the contrary are preempted. Courts within this District and beyond have followed that holding to allow class actions to be brought under Montana and South

47

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case Nos. 5:23-cv-02087-PCP; 5:23-cv-02091-PCP; 5:23-cv-02093-PCP

Carolina's consumer protection statutes. *See In re Hard Disk Drive*, 2021 WL 4306018, at \*23 (both Montana and South Carolina's class action bars preempted under *Shady Grove*); *In re Packaged Seafood*, 242 F. Supp. 3d at 1085-86 (South Carolina class-action bar does not apply in federal court); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 817-18, 820-21 (N.D. Ill. 2017) (South Carolina and Montana class action bars are procedural and Rule 23 applies). Defendants' cases to the contrary—which rely on Justice Stevens' concurrence in *Shady Grove* to hold that class action bans that "define the scope of the state-created right" cannot be preempted—*see, e.g.*, *In re Target Corp. Data Sec. Breach Litig.*, 66 F. Supp. 3d 1154, 1165 (D. Minn. 2014) (quoting *Shady Grove*, 559 U.S. at 423)—elide that Justice Stevens voted in *Shady Grove* to hold that Rule 23 *did* preempt such class action bans. Courts have thus correctly held that class action bans like those at issue here are preempted under both Justice Scalia and Justice Stevens' *Shady Grove* opinions. *See Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331, 1335-36 (11th Cir. 2015); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 553 (N.D. Ill. 2019).

*Conduct has sufficient in-state nexus (New Hampshire and North Carolina).* Contrary to Defendants' alternative assertion, *see* MTD, App'x B at 10, Plaintiffs adequately plead a nexus between Defendants' conduct and New Hampshire and North Carolina under those states' consumer protection laws. A complaint alleging a nationwide antitrust violation satisfies "intrastate" pleading requirements by showing that the violation's impact was felt within each state. *See*, *e.g.*, *Generic Pharms.*, 368 F. Supp. 3d at 837, 845 n.141 (collecting cases and finding nationwide scheme "sufficient to satisfy the intrastate pleading requirements" of New Hampshire and North Carolina); *In re Liquid Aluminum Sulfate Antitrust Litig.*, No. 16-md-2867, 2017 WL 3131977, at \*25 (D.N.J. July 20, 2017) ("[P]leading . . . allegations of nationwide price-fixing satisfies the nexus requirement for asserting claims under state antitrust and/or consumer fraud statutes."). New Hampshire and North Carolina's consumer protection statutes are in accord. The New Hampshire Consumer Protection Act requirement that plaintiffs show unfair competition "within th[e] state" is satisfied if Defendants introduced the price-inflated goods "into the New Hampshire market." *In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224, 234-35

48

(M.D. Penn. 2010); *see also In re Packaged Seafood*, 242 F. Supp. 3d at 1081-82 (explaining that "[t]he New Hampshire Supreme Court's position" and the "plain meaning of the statute" support the holding that "a showing of 'indirect effects' on state consumers is sufficient to state a claim under the NHCPA"); *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 377 (D.R.I. 2019) (same). And the North Carolina Unfair and Deceptive Trade Practices Act was amended in 1977 to remove the requirement that conspiratorial conduct occur within the state. *See In re Packaged Seafood*, 242 F. Supp. 3d at 1083 (explaining the statute was amended in 1977 to delete the "geographic limitation" that previously covered only "dealings between persons 'within this state'" (citation omitted)); *In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1173-74 & n.15 (N.D. Cal. 2015) (declining to follow *In re Refrigerant Compressors Antitrust Litig.*, No. 9-md-02042, 2013 WL 1431756, at *14 (E.D. Mich. Apr. 9, 2013)), on which defendants relied, and explaining that the statute's in-state injury requirement is met so long as "defendants' products were being sold in North Carolina"). Plaintiffs have adequately pled that the price-inflated goods at issue here were introduced into New Hampshire and North Carolina and caused injury there. IPP ¶¶ 24, 266-72, 285-91, 449-58, 468-76. So they have met any in-state pleading requirements under those state's consumer protection statutes. In fact, Plaintiffs have gone further, alleging that the conspiracy was partially orchestrated within those states because Energizer and Walmart agreed to fix the prices for Energizer Battery Products within them. *Id.* ¶ 129.[37]

## IV. Conclusion

For the foregoing reasons, Defendants' motion should be denied in full.

Dated: September 21, 2023

Respectfully submitted,

**GIBBS LAW GROUP LLP**

By:    */s/ Kyla J. Gibboney*

---

[37] It is irrelevant whether a "representative plaintiff" alleges a purchase in North Carolina, *see* Mot., App'x B at 10, because unnamed class members made purchases within North Carolina— all that is required under the statute. IPP ¶¶ 285-91, 468-76; *see also In re Lidoderm*, 103 F. Supp. 3d at 1173-74 (explaining plaintiffs need only allege "in-state injury").

49

Rosemary M. Rivas (SBN 209147)
Kyla J. Gibboney (SBN 301441)
1111 Broadway, Suite 2100
Oakland, California 94607
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
rmr@classlawgroup.com
kjg@classlawgroup.com


**SCHNEIDER WALLACE COTTRELL KONECKY LLP**


By:    _/s/ Matthew S. Weiler_


Todd M. Schneider (SBN 158253)
Jason H. Kim (SBN 220279)
Matthew S. Weiler (SBN 236052)
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
TSchneider@schneiderwallace.com
JKim@schneiderwallace.com
MWeiler@schneiderwallace.com


**BERGER MONTAGUE PC**


By:    _/s/ Joshua P. Davis_


Joshua P. Davis (SBN 193254)
Julie Pollock (SBN 346081)
505 Montgomery St., Ste. 625
Telephone: (800) 424-6690
jdavis@bm.net
jpollock@bm.net


Michael Dell'Angelo (*pro hac vice*)
1818 Market St., Ste. 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
mdellangelo@bm.net


*Counsel for Plaintiffs Portable Power, Inc.,
Kimberly Schuman, Kyle Kelley, and the Proposed
Direct Purchaser Classes*

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case Nos. 5:23-cv-02087-PCP; 5:23-cv-02091-PCP; 5:23-cv-02093-PCP

1   Dated: September 21, 2023             Respectfully submitted,

2

3                                        **COHEN MILSTEIN SELLERS & TOLL PLLC**

4                                        By:    _/s/ Daniel H. Silverman_

5                                        Daniel H. Silverman (*pro hac vice*)
                                         769 Centre Street, Suite 207
6                                        Boston, MA 02130
                                         Tel: (202) 408-4600
7                                        Fax: (202) 408-4699
8                                        dsilverman@cohenmilstein.com

9                                        Alison Deich (*pro hac vice*)
                                         Richard Koffman (*pro hac vice*)
10                                       John Bracken (*pro hac vice forthcoming*)
                                         1100 New York Ave. NW, Suite 500
11                                       Washington, DC 20005
                                         Tel: (202) 408-4600
12                                       Fax: (202) 408-4699
                                         adeich@cohenmilstein.com
13                                       rkoffman@cohenmilstein.com
14                                       jbracken@cohenmilstein.com

15                                       *Counsel for Plaintiffs Don Copeland, Joseph
                                         Murray, Carol Smith, Patrick Whitney, Phillip*
16                                       *Hague, Denise Fotis, Roxann Doriott, Bruce Mims,*
                                         *Lori Ably, Timothy Brown, Peter Costas, and Mike*
17                                       *Ballard and Proposed Lead Counsel for Indirect*
18                                       *Purchaser Class*

19                                       Sarah Grossman-Swenson (SBN 259792)
20                                       Kimberley C. Weber (SBN 302894)
                                         **MCCRACKEN STEMERMAN &**
21                                       **HOLSBERRY LLP**
                                         475 14th Street, Suite 1200
22                                       Oakland, CA 94612
                                         (415) 597-7200
23                                       sgs@msh.law
24                                       kweber@msh.law

25                                       *Local Counsel for Copeland Plaintiffs*

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ECF ATTESTATION**

Pursuant to Civil Local Rule 5-1(h)(3), I attest that the concurrence in the filing of this document has been obtained from all other signatories.

Dated: September 21, 2023                                      _/s/ Kyla J. Gibboney_____