THEODORE J. BOUTROUS JR., SBN 132099
TBoutrous@gibsondunn.com
CHRISTOPHER D. DUSSEAULT, SBN 177557
CDusseault@gibsondunn.com
SAMUEL G. LIVERSIDGE, SBN 180578
SLiversidge@gibsondunn.com
COURTNEY L. SPEARS, SBN 329521
CSpears@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

RACHEL S. BRASS, SBN 219301
RBrass@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, California 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

Attorneys for Defendant
ENERGIZER HOLDINGS, INC.

CHRISTOPHER S. YATES, SBN 161273
chris.yates@lw.com
BELINDA S LEE, SBN 199635
belinda.lee@lw.com
BRENDAN A. MCSHANE, SBN 227501
brendan.mcshane@lw.com
ALICIA R. JOVAIS, SBN 296172
alicia.jovais@lw.com
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: 415.391.0600
Facsimile: 415.395.8095

LAWRENCE E. BUTERMAN (*pro hac vice*)
lawrence.buterman@lw.com
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, New York 10020
Telephone: 212.906.1747
Facsimile: 212.751.4864

Attorneys for Defendant
WALMART INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

DON COPELAND, JOSEPH MURRAY, CAROL SMITH, PATRICK WHITNEY, PHILLIP HAGUE, DENISE FOTIS, ROXANN DORIOTT, BRUCE MIMS, LORI ABLY, TIMOTHY BROWN, PETER COSTAS, AND MIKE BALLARD, on behalf of themselves and those similarly situated,

Plaintiffs,

v.

ENERGIZER HOLDINGS, INC.; AND WAL-MART, INC.,

Defendants.

CASE NO. 5:23-CV-02087-PCP

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS**

Date: December 7, 2023
Time: 10:00 a.m.
Ctrm: 8
Judge: P. Casey Pitts

*[Caption Continues on Following Page]*

| | |
|---|---|
| PORTABLE POWER, INC., on behalf of itself and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ENERGIZER HOLDINGS, INC.; AND WAL-MART, INC.,<br><br>Defendants. | CASE NO. 5:23-CV-02091-PCP |
| KIMBERLY SCHUMAN and KYLE KELLEY, on behalf of themselves and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ENERGIZER HOLDINGS, INC.; AND WAL-MART, INC.,<br><br>Defendants. | CASE NO. 5:23-CV-02093-PCP |

**Table of Complaint Citations**

This reply brief is directed at all three Complaints filed in these related actions: (1) *Copeland v. Energizer Holdings, Inc.*, No. 5:23-cv-02087, (2) *Portable Power, Inc. v. Energizer Holdings, Inc.*, No. 5:23-cv-02091, and (3) *Schuman v. Energizer Holdings, Inc.*, 5:23-cv-02093. The substantive allegations are the same. Defendants cite the *Copeland* Complaint in this reply brief; for the Court's convenience, below is a table that cross-references the cited paragraph numbers in each Complaint.

| *Copeland* Complaint | *Portable Power* Complaint | *Schuman* Complaint |
|---|---|---|
| ¶ 4 | ¶ 2 | ¶ 2 |
| ¶ 6 | ¶ 4 | ¶ 4 |
| ¶ 9 | ¶ 7 | ¶ 7 |
| ¶ 10 | ¶ 8 | ¶ 8 |
| ¶¶ 14-25 | N/A | N/A |
| ¶ 37 | ¶ 23 | ¶ 23 |
| ¶ 40 | ¶ 26 | ¶ 26 |
| ¶ 42 | ¶ 28 | ¶ 28 |
| ¶ 46 | ¶ 32 | ¶ 32 |
| ¶ 47 | ¶ 33 | ¶ 33 |
| ¶ 49 | ¶ 35 | ¶ 35 |
| ¶ 50 | ¶ 36 | ¶ 36 |
| ¶ 84 | ¶ 69 | ¶ 70 |
| ¶¶ 87-91 | ¶¶ 72-75 | ¶¶ 73-76 |
| ¶ 88 | ¶ 72 | ¶ 73 |
| ¶ 96 | ¶ 80 | ¶ 81 |
| ¶ 97 | *See* ¶ 82 | *See* ¶ 83 |
| ¶ 110 | ¶ 95 | ¶ 96 |
| ¶ 111 | ¶ 96 | ¶ 97 |
| ¶ 116 | ¶ 101 | ¶ 102 |
| ¶ 145 | ¶ 127 | ¶ 128 |
| ¶ 153 | ¶ 138 | ¶ 139 |
| ¶ 156 | ¶ 140 | ¶ 141 |

## TABLE OF CONTENTS

Page


I. INTRODUCTION ..... 1

II. ARGUMENT ..... 4

A. Plaintiffs Do Not Plausibly Allege an Agreement ..... 4

1. There Are No Evidentiary Facts Establishing a Meeting of the Minds Between Energizer and Walmart ..... 4

2. Plaintiffs' Speculative Theories of Circumstantial Evidence Do Not Provide a Basis for Inferring a Conspiratorial Agreement ..... 5

B. Plaintiffs' Speculative and Brand-New Theories of Harm to Competition Fail as a Matter of Law ..... 12

1. Plaintiffs Fail to Allege Direct Evidence of Harm to Competition ..... 13

a. Plaintiffs' Theory of Harm to *Interbrand* Competition Is Based on Implausible and Unsupported Claims About Duracell's Incentives ..... 14

b. Plaintiffs' Claims of Direct Evidence of Harm to *Intrabrand* Competition Are Also Unsupported ..... 16

2. Plaintiffs Fail to Allege Indirect Evidence of Harm to Competition ..... 17

a. Plaintiffs' Claims Hinge on Walmart Having Market Power—Which They Do Not Plead ..... 18

b. The Alleged Conduct Also Has No Unreasonable Effect on Competition ..... 21

3. The Rule of Reason—Not the *Per Se* Rule—Governs Plaintiffs' California and Maryland Antitrust Claims ..... 23

C. Certain Plaintiffs Lack Standing to Bring Their Claims ..... 26

1. The Schuman Plaintiffs' Claims Are Too Indirect and Remote ..... 26

2. The *Copeland* Plaintiffs Lack Article III Standing to Assert Claims Under the Laws of Twenty-Two Jurisdictions ..... 27

D. Plaintiffs Concede That All but Two of Their State-Law Claims Rise and Fall with Their Federal Claims ..... 30

III. CONCLUSION ..... 30

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Ablaza v. Sanofi-Aventis U.S. LLC*,
No. 21-cv-1942, 2022 WL 19517298 (N.D. Cal. July 12, 2022) .......... 29

*Ahn v. Stewart Title Guar. Co.*,
93 Cal. App. 5th 168 (2023) .......... 11

*Alan Darush MD APC v. Revision LP*,
No. 12-cv-10296, 2013 WL 1749539 (C.D. Cal. Apr. 10, 2013) .......... 11, 12

*Alsheikh v. Superior Court*,
No. B249822, 2013 WL 5530508 (Cal. Ct. App. Oct. 7, 2013) .......... 24

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
No. 21-cv-351, 2022 WL 4581903 (S.D.N.Y. Aug. 3, 2022), *report and recommendation adopted*, 2022 WL 4586209 (S.D.N.Y. Sept. 29, 2022) .......... 20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 8

*Associated General Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983) .......... 26, 27

*In re ATM Fee Antitrust Litig.*,
686 F.3d 741 (9th Cir. 2012) .......... 27

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 4, 5, 7, 21

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012) .......... 13, 22

*Brown v. Amazon.com, Inc.*,
No. 22-cv-965, 2023 WL 5793303 (W.D. Wash. Sep. 7, 2023) .......... 22, 24

*Bus. Elecs. Corp. v. Sharp Elecs. Corp*,
485 U.S. 717 (1988) .......... 17

*Carpenter v. Petsmart, Inc.*,
441 F. Supp. 3d 1028 (S.D. Cal. Mar. 2, 2020) .......... 29

*Chavez v. Whirlpool Corp.*,
93 Cal. App. 4th 363 (2001) .......... 25

*Cont'l T.V., Inc. v. G.T.E. Sylvania Inc.*,
694 F.2d 1132 (9th Cir. 1982) ........ 21

*In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*,
691 F.2d 1335 (9th Cir. 1982) ........ 27

*Costco Wholesale Corp. v. Johnson & Johnson Vision Care, Inc.*,
No. 15-cv-734, 2015 WL 9987969 (M.D. Fla. Nov. 4, 2015) ........ 19

*Crown Homes, Inc. v. Landes*,
22 Cal. App. 4th 1273 (1994) ........ 26

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) ........ 27, 29

*De Coster v. Amazon, Inc.*,
No. C21-693, 2023 WL 372377 (W.D. Wash. Jan. 24, 2023) ........ 23

*Dr. Miles Medical Co. v. Park & Sons Co.*,
220 U.S. 373 (1911) ........ 26

*Drake v. Toyota Motor Corp.*,
No. 20-cv-1421, 2020 WL 7040125 (C.D. Cal. Nov. 23, 2020) ........ 28, 29

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*,
28 F.4th 42 (9th Cir. 2022) ........ 20

*E&L Consulting v. Doman Indus.*,
472 F.3d 23 (2d Cir. 2006) ........ 21

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) ........ 23

*Fonseca v. Hewlett-Packard Co.*,
No. 19-cv-1748, 2020 WL 4596758 (S.D. Cal. Aug. 11, 2020) ........ 12

*Frame-Wilson v. Amazon.com, Inc.*,
591 F. Supp. 3d 975 (W.D. Wash. 2022) ........ 24

*Frame-Wilson v. Amazon.com*,
No. 20-cv-424, 2023 WL 2632513 (W.D. Wash. Mar. 24, 2023) ........ 19

*Frost v. LG Electronics Inc.*,
No. 16-cv-5206, 2018 WL 6256790 (N.D. Cal. July 9, 2018) ........ 11

*Goldstein v. Gen. Motors LLC*,
445 F. Supp. 3d 1000 (S.D. Cal. 2020) ........ 28

*Gorlick Distrib. Centers, LLC v. Car Sound Exhaust Sys., Inc.*,
723 F.3d 1019 (9th Cir. 2013) ........ 6

*In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*,
No. 19-md-2918, 2020 WL 6270948 (N.D. Cal. Oct. 23, 2020) .......... 28

*Hamilton v. NuWest Grp. Holdings LLC*,
No. 22-cv-1117, 2023 WL 130485 (W.D. Wash. Jan. 9, 2023) .......... 29

*Haro v. Sebelius*,
747 F.3d 1099 (9th Cir. 2014) .......... 27, 28

*Jones v. Micron Tech., Inc.*,
400 F. Supp. 3d 897 (N.D. Cal. 2019) .......... 28

*In re JUUL Labs, Inc. Marketing, Sales Practices, and Products Liability Litig.*,
533 F. Supp. 3d 858 (N.D. Cal. 2021) .......... 28

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) .......... *passim*

*Kolling v. Dow Jones & Co.*,
137 Cal. App. 3d 709 (1982) .......... 12

*Kunert v. Mission Fin. Servs. Corp.*,
110 Cal. App. 4th 242 (2003) .......... 25

*In re Late Fee & Over-Limit Fee Litig.*,
528 F. Supp. 2d 953 (N.D. Cal. 2007), *aff'd*, 741 F.3d 1022 (9th Cir. 2014) .......... 12

*Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007) .......... *passim*

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*,
884 F.2d 504 (9th Cir. 1989) .......... 13

*Loren Data Corp. v. GXS, Inc.*,
No. 10-3474, 2011 WL 3511003 (D. Md. Aug. 9, 2011) .......... 25

*Mailand v. Burckle*,
20 Cal. 3d 367 (1978) .......... 24, 25

*McDonough v. Toys R Us, Inc.*,
638 F. Supp. 2d 461 (E.D. Pa. 2009) .......... 18

*Melendres v. Arpaio*,
784 F.3d 1254 (9th Cir. 2015) .......... 28

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984) .......... 9

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186. (9th Cir. 2015) .......... 4, 5, 7, 10

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
883 F.3d 32 (2d Cir. 2018)........................................................................................ 22

*Name.Space, Inc. v. ICANN*,
795 F.3d 1124 (9th Cir. 2015)........................................................................ 5, 9, 11, 26

*Newport Beach Country Club, Inc. v. Founding Members of Newport Beach Country Club*,
140 Cal. App. 4th 1120 (2006) ........................................................................................ 26

*Ohio v. Am. Express Co.*,
138 S. Ct. 2274 (2018) ....................................................................................... 13, 17, 18

*Pac. Steel Grp. v. Com. Metals Co.*,
No. 20-cv-7683, 2021 WL 2037961 (N.D. Cal. May 21, 2021)........................................... 19

*Pecanha v. The Hain Celestial Grp., Inc.*,
No. 17-cv-4517, 2018 WL 534299 (N.D. Cal. Jan. 24, 2018)............................................... 29

*Schneider v. California Dep't of Corr.*,
151 F.3d 1194 (9th Cir. 1998)........................................................................................... 11

*Sihler v. Fulfillment Lab, Inc.*,
No. 20-cv-1528, 2020 WL 7226436 (S.D. Cal. Dec. 8, 2020) ............................................. 29

*Simon v. E. Ky. Welfare Rts. Org.*,
426 U.S. 26 (1976)............................................................................................................ 28

*Soo v. Lorex Corp.*,
No. 20-cv-1437, 2020 WL 5408117 (N.D. Cal. Sept. 9, 2020)............................................. 29

*Staley v. Gilead Scis., Inc.*,
446 F. Supp. 3d 578 (N.D. Cal. 2020) ............................................................................... 23

*State Oil Co. v. Khan*,
522 U.S. 3 (1997)............................................................................................................ 16

*Stewart v. Kodiak Cakes, LLC*,
537 F. Supp. 3d 1103 (S.D. Cal. Apr. 29, 2021).................................................................. 29

*Tan v. Quick Box, LLC*,
No. 20-cv-1082, 2020 WL 7226440 (S.D. Cal. Dec. 8, 2020) ....................................... 28, 29

*The Jeanery, Inc. v. James Jeans, Inc.*,
849 F.2d 1148 (9th Cir. 1988)...................................................................................... *passim*

*Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*,
530 F.3d 204 (3d Cir. 2008)............................................................................................. 19

*United States v. Blue Cross Blue Shield of Mich.*,
809 F. Supp. 2d 665 (E.D. Mich. 2011) .......... 23

*United States v. CalPortland Constr.*,
No. 16-cv-4479, 2018 WL 6262877 (C.D. Cal. Mar. 9, 2018) .......... 7

*United States v. Colgate & Co.*,
250 U.S. 300 (1919) .......... 25

*Walcoff v. Innofoods USA, Inc.*,
No. 22-cv-1485, 2023 WL 3262940 (S.D. Cal. May 4, 2023) .......... 29

*Westman Comm'n Co. v. Hobart Int'l, Inc.*,
796 F.2d 1216 (10th Cir. 1986) .......... 7

*Wolfire Games, LLC v. Valve Corp.*,
No. C21-0563, 2022 WL 1443744 (W.D. Wash. May 6, 2022) .......... 23

*Wong v. Am. Honda Motor Co., Inc.*,
No. 19-cv-10537, 2022 WL 3696616 (C.D. Cal. June 21, 2022) .......... 28

**STATUTES**

Md. Code Ann., Com. Law
§ 11-202(a)(2)(i) .......... 26
§ 11-204(b) .......... 24

**OTHER AUTHORITIES**

ABA Section of Antitrust Law, Antitrust Law Developments (9th ed. 2022) .......... 20

## I. INTRODUCTION

Plaintiffs' Opposition is based on a series of un-pled facts, speculative assertions, and implausible arguments. Although Plaintiffs claim an antitrust conspiracy between Energizer and Walmart, there is not a single material fact alleged about Walmart. Nor is there any basis to infer the conspiratorial agreement that Plaintiffs claim: basic economics—and legal precedent—teach that Energizer did not need an agreement with Walmart to carry out any of the alleged actions. The Complaints offer no facts establishing either the requisite agreement or harm to competition in their supposed "disposable batteries" antitrust market. Dismissal is warranted.

Plaintiffs contend that the "heart" of their Complaints is that "Energizer threatened Portable Power and other retailers with price increases and termination unless they raised their retail prices to match Walmart's." Opp. at 11. To be clear, Plaintiffs do not allege that *any* retailer actually agreed to raise its retail prices. Nor do Plaintiffs allege that Energizer and Walmart *agreed* on the prices that Walmart would charge at retail. Instead, Plaintiffs' contention is that their allegations of Energizer's attempts to influence retail prices of Energizer-branded batteries at Portable Power provide a sufficient basis to infer that Energizer and Walmart had an unlawful agreement to fix prices at non-Walmart retailers. This claim is baseless under Ninth Circuit law. Even evidence that a manufacturer requested price increases, responded to retailer complaints about price discounters, or used "coercive threats" or terminations to influence prices does *not* support an inference of an unlawful agreement. *See The Jeanery, Inc. v. James Jeans, Inc.*, 849 F.2d 1148, 1154, 1160 (9th Cir. 1988). Such unilateral conduct by a manufacturer is not proscribed under Section 1. *Id.* at 1152. Therefore, "[r]egardless of [the manufacturer's] conduct," there must be facts establishing that there was a "meeting of the minds" between the manufacturer and the retailer. *Id.* at 1160. No such facts are alleged here.

To begin, Plaintiffs fail to answer the Ninth Circuit's "basic" and requisite pleading questions in antitrust conspiracy cases: "who, did what, to whom (or with whom), where, and when?" *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008). The Complaints do not identify *anyone* from Walmart, where or how any multi-year unlawful agreement was reached, or what specific actions Walmart "agreed" to take in furtherance of the supposed conspiracy. The Opposition's reliance on alleged discussions between Energizer and Portable Power as "direct evidence" of an agreement

between *Energizer and Walmart* underscores this fatal deficiency.

Plaintiffs try to address this deficiency by claiming that Energizer's attempts to increase retail prices "were against Energizer's economic self-interest in the absence of an agreement and thus 'support a reasonable inference of conspiracy.'" Opp. at 11. In other words, Plaintiffs pivot to the theory that there must have been an agreement, because otherwise why would Energizer take these actions. But this bare conclusion appears nowhere in the Complaints, and it does not support an inference of an illegal price-fixing agreement. As the Supreme Court has found, there are numerous procompetitive reasons why a manufacturer may want to increase or maintain resale prices. *See Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 889-92 (2007). Plaintiffs cannot salvage their Complaints simply by labeling Energizer's conduct as against its economic self-interest.

Plaintiffs' other arguments fare no better. The Opposition points to vague alleged Energizer statements such as "this is 1000% about Walmart" and that Energizer "did not really have a formal MAP policy." Opp. at 5, 14. But there is no basis to infer an unlawful *agreement* from such statements. Again, even if Energizer were acting pursuant to complaints or pressure from Walmart, it does not follow that Energizer was acting pursuant to an "agreement" with Walmart. *See Jeanery*, 849 F.2d at 1154-55. Plaintiffs have not alleged a plausible agreement between Energizer and Walmart, and their Complaints should be dismissed as a result.

Further, even if Plaintiffs could plead an agreement, their Opposition confirms the absence of any resulting competitive harm. Saddled with their own allegations about a vertical "scheme" limited to pricing of Energizer's own products, Plaintiffs tie themselves in knots trying to argue harm to competition in a broader "disposable batteries market." Their solution is to pivot away from their allegations, manufacture a new (and un-pled) agreement, and speculate about non-party Duracell's pricing "incentives" to argue an effect on interbrand competition. Specifically:

- Plaintiffs for the first time in their Opposition argue the "scheme" reflects a "minimum resale price maintenance agreement," even though the Complaints contain no such words and there are *no* facts showing that any retailer (including Walmart, Portable Power, or anyone else) agreed to any particular price for its own retail sales of Energizer batteries;

- Plaintiffs speculate that the alleged scheme "incentivized" Duracell to stop competing in the marketplace, based entirely on unsupported claims that Walmart somehow "deprived" Duracell of the ability to do so, and despite Plaintiffs' own allegations rendering that speculative theory economically implausible; and
- In an effort to tie their theory together, Plaintiffs label Walmart a "dominant" retailer and the "source" of the alleged scheme, but acknowledge that Walmart made up only 11-14% of Energizer's sales (with *no* allegations regarding Walmart's share of Duracell or "disposable batteries" sales)—which means the allegations fail as a matter of law to plead market power.

Plaintiffs' reliance—again and again—on the Supreme Court's *Leegin* decision only highlights their pleading deficiencies. *Leegin* explains that vertical pricing restraints—even an agreement to set minimum resale prices—are evaluated under the rule of reason because *intrabrand* restraints may further *interbrand* competition, the "primary focus" of the antitrust laws. Plaintiffs' Opposition also omits critical language from that decision: "that a dominant . . . retailer can abuse resale price maintenance for anticompetitive purposes may not be a serious concern *unless the relevant entity has market power*." *Leegin*, 551 U.S. at 898 (emphasis added). Here, not only are allegations of a resale price maintenance agreement absent from the Complaints, but there are also no facts to support a claim that the alleged "source" of the intrabrand restraint (Walmart) has market power. Plaintiffs' state-law claims rise and fall with their federal claims, and warrant dismissal for the same reasons.

Finally, both the *Schuman* and *Copeland* Plaintiffs lack standing to bring their claims. Plaintiffs advance a convoluted and indirect chain of causation to connect the supposed agreement about what Energizer would permit *non-Walmart* retailers to charge, with the *Schuman* Plaintiffs' claimed injury from purchasing batteries—including Duracell batteries—from *Walmart*. And the *Copeland* Plaintiffs allege an array of claims that they have no Article III standing to bring, because no named Plaintiff was injured in, or has any connection to, the state whose law gives rise to the claim.

All of Energizer's alleged actions—raising its own wholesale prices, and monitoring retail prices of its distribution network—are things it can do without the aid of Walmart. Plaintiffs do not plead any facts showing how or why an agreement with Walmart is necessary for the alleged conduct, much less facts showing that such an agreement ever happened. These pleading failures make any

agreement implausible and highlight the absence of any harm to interbrand competition in Plaintiffs' alleged market. Dismissal with prejudice is warranted.

## II. ARGUMENT

### A. Plaintiffs Do Not Plausibly Allege an Agreement

The "crucial question" in an antitrust conspiracy case is whether the alleged conduct stems from an "independent decision" or from an "agreement" between the defendants. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007). Plaintiffs fail to make this threshold showing of an agreement.

#### 1. There Are No Evidentiary Facts Establishing a Meeting of the Minds Between Energizer and Walmart

The Opposition confirms that Plaintiffs do not plead answers to the "basic" pleading questions articulated by the Ninth Circuit in antitrust conspiracy cases: a plaintiff must plead "evidentiary facts: 'who, did what, to whom (or with whom), where, and when.'" *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 n.6 (9th Cir. 2015) (quoting *Kendall*, 518 F.3d at 1048). And, "claimants must plead not just ultimate facts (such as a conspiracy), but evidentiary facts." *Kendall*, 518 F.3d at 1047.

Plaintiffs contend that they have alleged the "who, what, when, and where" of the supposed agreement, but they point to no such alleged facts. Opp. at 14-15. The question here is whether there was an agreement—a "meeting of the minds"—*between Energizer and Walmart*. Plaintiffs point to alleged actions in the marketplace by Energizer, but cannot identify any evidentiary facts establishing that Energizer and Walmart had an "agreement" for Energizer to undertake those actions.

The Complaints do not identify a single meeting or communication between Energizer and Walmart. Nor do they identify a single Walmart representative. The only material allegation related to Walmart's participation in the alleged scheme is a vague claim that it agreed to "give Energizer preferential treatment in Walmart's stores." Compl. ¶ 49. Setting aside that this is typical (and entirely lawful) conduct by a retailer, Plaintiffs do not explain how this allegation supports an inference of an illegal agreement—or when this supposed agreement was in place. Nor do they offer any evidentiary facts to support it. Instead, Plaintiffs contend that there are "other specific allegations from identified witnesses implicating Walmart," which suggest a "meeting of the minds." Opp. at 14 n.3. But

Plaintiffs never identify these allegations. At most, Plaintiffs point to vague communications between Energizer and Portable Power, which do not plausibly suggest that Energizer was acting pursuant to an agreement with Walmart, or indeed say anything at all about Walmart's supposed agreement to be part of a conspiracy. This failure requires dismissal of their Complaints.

**2. Plaintiffs' Speculative Theories of Circumstantial Evidence Do Not Provide a Basis for Inferring a Conspiratorial Agreement**

Without the necessary evidentiary facts, Plaintiffs try to back into an agreement through supposition about the motivations behind various Energizer actions. But a court cannot infer a conspiracy based on "speculation" about why certain conduct took place. *Name.Space, Inc. v. ICANN*, 795 F.3d 1124, 1131 (9th Cir. 2015). Instead, Plaintiffs "must allege facts 'plausibly suggesting (not merely consistent with)' a conspiracy." *Id.* at 1129 (quoting *Twombly*, 550 U.S. at 557). "'Allegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy' are insufficient to plead a § 1 violation." *In re Musical Instruments*, 798 F.3d at 1194 (quoting *Kendall*, 518 F.3d at 1049).

***Alleged Actions Against Self-Interest.*** The bulk of Plaintiffs' Opposition argues that it was against Energizer's economic self-interest to have higher retail prices, and so allegations that Energizer took steps to increase retail prices cannot be explained "in the absence of an agreement." Opp. at 1, 11-13. This un-pled argument, supported by nothing other than Plaintiffs' own conclusion, reflects pricing conduct that could just as easily suggest rational, legal business behavior.

To begin, the Complaints do not even allege that Energizer's pricing behavior was against its economic self-interest, let alone any facts that would support that contention. The Complaints allege that batteries "are not specialized products" requiring explanation or "skilled sales staff,"[1] Compl. ¶ 156, but those allegations do not explain how Energizer's supposed attempts to increase retail prices amount to the type of "extreme action against self-interest [that] may suggest prior agreement." *In re Musical Instruments*, 798 F.3d at 1195 (describing action against self-interest that may suggest prior

[1] Plaintiffs assert that "Walmart is a low-price seller with low-quality sales services. So Energizer's independent interest was to encourage Portable Power and other retail sellers to undercut Walmart's prices." Opp. at 1. This assertion is un-pled and irrelevant—and also contradicts Plaintiffs' allegations that Walmart agreed to provide Energizer "preferential treatment" (a "service") in its stores.

agreement as action "so perilous in the absence of advance agreement that no reasonable firm would make the challenged move without such an agreement").

Moreover, Plaintiffs' assertion ignores the myriad legitimate reasons why a manufacturer may want to maintain higher retail prices. The Supreme Court detailed these reasons in *Leegin*, explaining that "there is a widespread consensus that permitting a manufacturer to control the price at which its goods are sold may promote *inter*brand competition and consumer welfare in a variety of ways." 551 U.S. at 889-91 (quoting Brief for United States as Amicus Curiae at 9). The Court found, for example, that maintaining resale prices "may be beneficial to motivate retailers to stock adequate inventories of a manufacturer's good in the face of uncertain consumer demand." *Id.* at 892 (citation omitted). That is consistent with Plaintiffs' allegation here that consumer demand for disposable battery products has "dampened" in recent years. Compl. ¶ 40. In addition, "[a] single manufacturer's use of vertical price restraints tends to eliminate intrabrand price competition; this in turn encourages retailers to invest in tangible or intangible services." *Leegin*, 551 U.S. at 890; *see also id.* ("Offering the retailer a guaranteed margin" may be "the most efficient way to expand the manufacturer's market share by inducing the retailer's performance and allowing it to use its own initiative and experience in providing valuable services."); *Gorlick Distrib. Centers v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1026 (9th Cir. 2013) ("A manufacturer might wish retailers to advertise its products, [but . . . in] the absence of a price restraint, a discounting retailer that provides no such services might undercut a competitor that has spent resources generating demand for the manufacturer's product." (citations omitted)).

Nor would alleged threats of dealer terminations suggest "extreme" action against Energizer's self-interest. The Complaints do not allege that even a single retailer *was terminated*, but regardless there are many justifications for a manufacturer's decision to terminate dealers who do not comply with its pricing policies. *See Jeanery*, 849 F.2d at 1159. As the Ninth Circuit has explained, "[i]f any business justification is needed for such a termination, it is supplied by the manufacturer's business judgment that it is important to its marketing strategy and the maintenance of its dealer network not to have its goods sold at less than the suggested retail price." *Id.* Courts recognize that restricting distribution can be *procompetitive* because it "can reduce transaction[] costs by permitting a manufacturer to deal only with distributors with whom it believes it can develop an efficient working

relationship" and by "allowing each distributor to achieve economies of scale and to spread out fixed costs over a large amount of products." *Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1227 (10th Cir. 1986); *see also United States v. CalPortland Constr.*, No. 16-cv-4479, 2018 WL 6262877, at *4 (C.D. Cal. Mar. 9, 2018) (declining to infer a conspiracy from customer terminations given the numerous and obvious alternative explanations).

The important point here is that Plaintiffs ask the Court to assume away all other possible explanations and to infer a conspiracy based on their rote assertion that Energizer's alleged attempts to increase retail prices make no economic sense in the absence of an "agreement." This cannot possibly suffice. Actions designed to raise retail prices are hardly "so perilous in the absence of advance agreement that no reasonable firm would make the challenged move without such an agreement." *In re Musical Instruments*, 798 F.3d at 1195. No facts have been offered to suggest otherwise.

***Project Atlas.*** Plaintiffs contend that their allegations about an Energizer team known as "Project Atlas," which was supposedly created to "police Energizer's customers' retail prices," support their claim of a conspiracy. Opp. at 13. But even accepting these allegations as true, the fact that Energizer had an internal team that monitored channel pricing and acted against price disrupters says nothing about whether such actions were undertaken pursuant to an unlawful agreement *with Walmart*. A manufacturer "has every right to set the price at which it wants its goods resold and to terminate a dealer who undercuts that price." *Jeanery*, 849 F.2d at 1159. There are no allegations that Project Atlas was created in concert with Walmart, or that Walmart had anything at all to do with—let alone direct—the work of this internal Energizer team. Nor is there any allegation that any retailer agreed to set or raise retail prices as a result of the work of Project Atlas. The alleged actions "could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy" and thus "are insufficient to plead a violation of the antitrust laws." *Kendall*, 518 F.3d at 1049 (citing *Twombly*, 550 U.S. at 553-57 n. 5).

***Alleged Pretextual MAP Policy.*** Plaintiffs claim that their allegations of conflicting messaging from Energizer employees about whether Energizer had a formal minimum advertised price ("MAP") policy tend to exclude that Energizer was acting unilaterally. Opp. at 13. But employees' supposed confusion over the labels put on pricing policies or decisions does not diminish Energizer's unilateral

entitlement to "exercise its *Colgate* right to refuse to deal with retailers that do not follow its suggested prices." *Leegin*, 551 U.S. at 902. Plaintiffs suggest that Energizer's reference to a "MAP policy" was pretextual because Energizer did not have a "formal MAP policy" or did not "consistently enforce it." Opp. at 13. But, again, Plaintiffs do not explain why it matters if Energizer's pricing actions were pursuant to a formal MAP policy, some other pricing policy, or simply in response to complaints from other retailers.[2] None of these allegations provides a basis for "the court to draw the reasonable inference that" Energizer and Walmart had an agreement. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

***Allegations Related to Portable Power.*** Plaintiffs say the "heart" of their Complaints is that "Energizer threatened Portable Power and other retailers with price increases and termination unless they raised their retail prices to match Walmart's." Opp. at 11. But even if true, alleging that a manufacturer attempted to get a retailer to raise its retail prices is not a basis to infer an unlawful agreement. Plaintiffs do not contend that Energizer reached an agreement with any retailer to set retail prices; they do not even identify any other retailers besides Portable Power. Instead, they argue that Energizer's supposed efforts to influence retail prices at Portable Power provide a basis for inferring an agreement *with Walmart* to raise prices at non-Walmart retailers. The required leap is too great; it does not cross the threshold to plausible.

The Ninth Circuit has discussed the type of evidence required to establish a price-fixing agreement in the context of manufacturer-retailer relationships. *See Jeanery,* 849 F.2d at 1157-60. In *Jeanery*, there was evidence that the manufacturer requested price increases by its retailer customers, responded to certain retailer complaints about other price discounting retailers, and used "coercive threats" and terminations to try to increase retail prices. *Id.* The Ninth Circuit found that such evidence did *not* support a finding of an agreement. *Id.* at 1160. As the court explained, unilateral conduct is not proscribed under Section 1. *Id.* at 1152. Thus, "[r]egardless of [the manufacturer's] conduct, to establish an agreement it takes two to tango." *Id.* at 1160. There must be facts establishing that there

[2] Plaintiffs point to nothing in the case law to suggest that a "formal MAP policy" or other "formal" pricing policy is required in order to terminate a distributor. In *Jeanery*, for example, the defendants' "policy" was "announced" insofar as its sales representatives repeatedly relayed it to distributors. *See* 849 F.2d at 1150-51. The conduct alleged here—that Energizer sales representatives relayed certain minimum prices to Portable Power—is no different.

was a "meeting of the minds" between the manufacturer and the retailer. *Id.*

Plaintiffs point to their allegations that Energizer contacted Portable Power because of "Walmart's complaints" and that Energizer's actions were "1000% about Walmart and wanting the best price." Opp. at 11, 14. But even if Energizer were acting pursuant to complaints or pressure from Walmart, it does not follow that Energizer was acting pursuant to a conspiratorial "agreement" with Walmart. "A plaintiff does not establish an illegal price-fixing agreement solely by proof of complaints by competitors of the terminated dealer, or that the dealer's termination followed or was 'in response to' these complaints, or that the termination of a price-cutter was pursuant to an agreement with the complaining dealer." *Jeanery*, 849 F.2d at 1154 (citation omitted).[3] "[S]o long as the manufacturer makes an independent business decision to terminate a price cutter, the fact that a complaint preceded or precipitated the termination is of no moment." *Id.* at 1156 (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763-64 (1984)).[4]

Moreover, as the Ninth Circuit further explained, taking action to advance the interests of an important customer is an exercise of rational independent business judgment. *See id.* at 1160 (holding that terminating a dealer whose price cutting "created problems between [the defendant] and some of its other distributors," including "one of [the defendant]'s best customers," was an "exercise [of] its business judgment"). At base, Plaintiffs offer only characterizations about Energizer's unilateral business conduct. Their attempts to tie this conduct to a conspiratorial agreement depend on their mere declaration that these actions were "the result of a conspiracy." The Ninth Circuit holds that this cannot survive a motion to dismiss. *See Name.Space*, 795 F.3d at 1129.

---

[3] Plaintiffs state that because Portable Power allegedly refused to raise its retail prices, Energizer "cut them off entirely." Opp. at 2. This allegation is not in the Complaints.

[4] In *Monsanto*, the Supreme Court held that the plaintiff had established the requisite "something more than evidence of complaints" through evidence that the defendant worked with a non-complying dealer's parent company to force the dealer to agree to the manufacturer's pricing request. As the Court found, "[t]here was evidence that the parent company instructed the subsidiary to comply, *and the distributor informed Monsanto that it would charge the suggested price*." 465 U.S. at 765 (emphasis added). In other words, there was evidence of a "meeting of the minds" as to the specific price to be charged. *Id.* And there was evidence of a distributor's newsletter to its customers that explained how Monsanto would make "every effort . . . to maintain a minimum market price level." 465 U.S. at 765-66. Nothing remotely similar is alleged here.

***Alleged Price Increases.*** Plaintiffs' reliance on allegations of price increases by Energizer to support a conspiratorial agreement is just as baseless. Opp. at 3, 14. They contend that "[t]he only plausible economic explanation for Energizer's pricing is the Agreement." *Id.* at 14. But as the Ninth Circuit has held, a defendant's price increases, even in the face of declining sales, "is no more suggestive of collusion than it is of any other potential cause." *In re Musical Instruments*, 798 F.3d at 1197. Where, as here, "[p]laintiffs do not allege any facts connecting the purported price increase to an illegal agreement among competitors […], there is simply no basis from which we can infer an agreement." *Id*.

In their Complaints, Plaintiffs offer vague and conclusory allegations that Energizer's price increases cannot be explained by market forces like the cost of inputs, product demand, or inflation. Compl. ¶¶ 87-91. Plaintiffs allege, for example, that "the price of lithium was flat or declining for the period before and after the announced price increases. The cost of the four other commodities that make up 90% of the inputs to disposable batteries—steel, graphite, manganese, and zinc—also do not explain Energizer's price increases." *Id.* ¶ 88. These allegations do not remotely suggest that conspiracy is the only plausible explanation for the alleged price increases. And they disregard other plausible explanations, such as increased costs associated with labor, importing, distribution, or marketing. *See, e.g.*, *id.* ¶ 37 ("Energizer spends an estimated $70-80 million a year in advertising, principally to distinguish itself from Duracell."). As the Ninth Circuit held in *Musical Instruments*, "allegations that are merely consistent with conspiracy are not enough. Any manner of economic variables may have contributed to these fluctuations in prices and sales, from external market pressures to permissible conscious parallelism." 798 F.3d at 1197 n.13 (citation omitted).[5]

***Alleged Most-Favored Nations Agreement.*** Plaintiffs bizarrely seek to support their claim of an agreement by relying on Defendants' characterization of the Complaints' allegations as amounting to nothing more than a complaint about "some form of most-favored nation ('MFN') provision." Opp.

---

[5] Plaintiffs attempt to distinguish *Musical Instruments* and other cases Defendants cite in their Motion on the ground that those cases involved alleged horizontal agreements, rather than vertical agreements. Opp. at 16-18. But Defendants rely on those cases to illustrate the type of facts that can (or cannot) support an inference of an agreement or "meeting of the minds." Plaintiffs cite nothing to suggest that these holdings are diminished where the alleged agreement is vertical in nature.

at 18 ("After all, an MFN agreement *is* an agreement."). If Plaintiffs intended to bring suit based on an MFN agreement between Energizer and Walmart, then they should have pled such an agreement. But they did not even attempt to do so, as they seem to acknowledge. *See id.* at 33. Nor do Plaintiffs even attempt to allege how such an MFN provision would have harmed, or could harm, competition. *See infra* Section II.B.2.b. Plaintiffs' new and un-pled theory of conspiracy based on a supposedly unlawful MFN provision should be disregarded. *See Schneider v. California Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) ("In determining the propriety of a Rule 12(b)(6) dismissal, a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss." (citation omitted)).

***California Law.*** Finally, Plaintiffs argue that even if they have alleged "nothing more than that Energizer successfully pressured retailers to abide by minimum retail prices," those allegations would state a claim under California law. Opp. at 19. Their implied argument is that the standard for alleging an agreement under California law is different than under federal law. Plaintiffs are wrong.

As a preliminary matter, Plaintiffs do not allege that *any* retailer agreed to "abide by" retail prices in response to Energizer's supposed "pressure." That allegation does not appear in the Complaints. Plaintiffs' argument that Energizer "successfully pressured" retailers is a gross mischaracterization of the allegations in the Complaints. Their argument fails on this basis alone.

Moreover, whether under the Sherman Act or California's Cartwright Act, to plead a conspiracy, Plaintiffs must "provide sufficient facts to plausibly establish the terms and conditions of the purported conspiratorial agreement." *Alan Darush MD APC v. Revision LP*, No. 12-cv-10296, 2013 WL 1749539, at *5 (C.D. Cal. Apr. 10, 2013) (dismissing Cartwright Act claim because plaintiff failed to allege an agreement); *see also Name.Space*, 795 F.3d at 1131 n.5 (9th Cir. 2015) ("[T]he analysis under the Cartwright Act is identical to that under the Sherman Act" (citations omitted)); *Ahn v. Stewart Title Guar. Co.*, 93 Cal. App. 5th 168, 179-80 (2023) (Cartwright Act elements include an agreement). Thus, federal courts dismissing Sherman Act claims consistently also dismiss Cartwright Act claims premised on the same (failed) allegations of an unlawful agreement—because the claims "rise and fall together." *Frost v. LG Electronics Inc.*, No. 16-cv-5206, 2018 WL 6256790, at *3 (N.D. Cal. July 9, 2018) (dismissing both Sherman Act and Cartwright Act claims for failure to plead a

conspiracy); *see also, e.g.*, *Fonseca v. Hewlett-Packard Co.*, No. 19-cv-1748, 2020 WL 4596758, at *8 (S.D. Cal. Aug. 11, 2020) (same); *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 965 (N.D. Cal. 2007) (same), *aff'd*, 741 F.3d 1022 (9th Cir. 2014).

Plaintiffs argue that under California law, "pressured or coerced resale price maintenance suffices to establish an agreement." Opp. at 19. Of course, the alleged unlawful agreement here is with Walmart, and there are no allegations that Walmart was "pressured or coerced," or that it even agreed with Energizer to set or maintain its retail prices. Regardless, the key point is there must be evidence of a coerced "agreement" or coerced "involuntary acquiescence" in the supplier's terms. *See Kolling v. Dow Jones & Co.*, 137 Cal. App. 3d 709, 720-21 (1982). "The Ninth Circuit has referred to this as a 'coercive' refusal to deal claim' and has indicated it requires a showing that the retailer 'was coerced into adhering to [the supplier's] policy or that [it] acquiesced in it.'" *Alan Darush*, 2013 WL 1749539, at *4 ("'No violation is made out unless plaintiff can show that the supplier's conduct rose to the level of coercion sufficient to deprive the dealers of their free choice.'" (citations omitted)). Here, Plaintiffs do not allege that a single retailer agreed to or acquiesced in Energizer's alleged pricing terms—whether by coercion or otherwise.

Plaintiffs fail to allege an agreement under both federal law and California law, and their Sherman Act and Cartwright Act claims should fall together as a result.

### B. Plaintiffs' Speculative and Brand-New Theories of Harm to Competition Fail as a Matter of Law

None of Plaintiffs' claims survives without an underlying agreement. But even if an agreement were properly pled with facts, Plaintiffs also fail to allege the requisite injury to competition from any vertical restraint related to Energizer's own battery products. Plaintiffs now admit that the supposed "scheme" is vertical, which means they must plead harm to competition under the rule of reason. *Compare* Compl. ¶ 145 ("Defendants' violation[s] of . . . the Sherman Act were *per se* illegal because they are horizontal competitors."), *with* Opp. at 5 ("Walmart and Energizer are not horizontal competitors."). Recognizing that they have not pled cognizable harm to competition, Plaintiffs pivot away from their own allegations, try to construct a new (and un-pled) agreement, and double down on their unsupported speculation about Duracell's pricing "incentives." Opp. at 20-34. The Complaints

fail to plausibly allege direct or indirect evidence of harm to competition, and can be dismissed for this reason too.

**1. Plaintiffs Fail to Allege Direct Evidence of Harm to Competition**

Plaintiffs' Opposition confirms their inability to plead the requisite harm to competition under a rule of reason analysis. As Plaintiffs acknowledge, for an alleged agreement to be held unreasonable under the rule of reason, they must plausibly allege that "the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018); *see* Opp. at 20. That requires facts showing either *direct* or *indirect* anticompetitive effects. *See Am. Express Co.*, 138 S. Ct. at 2284.

A direct showing of substantial anticompetitive effects requires Plaintiffs to plead facts demonstrating "actual detrimental effects [on competition], such as reduced output, increased prices, or decreased quality in the relevant market." *See id*. (alteration in original) (citation omitted). It is not enough to "merely recite the bare legal conclusion that competition has been restrained unreasonably." *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 507-08 (9th Cir. 1989). Further, "allegations that an agreement has the effect of reducing consumers' choices or increasing prices to consumers does not sufficiently allege an injury to competition." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012). Instead, "at a minimum," Plaintiffs must "sketch the outline of [the injury to competition] with allegations of supporting factual detail," *Les Shockley Racing*, 884 F.2d at 508, such as by alleging with evidentiary facts that an agreement facilitated horizontal collusion or foreclosed competitors from entering into or competing in a market. *See Brantley*, 675 F.3d at 1198.

Defendants' Motion pointed out the disconnect between the pleaded market and the alleged restraint: Plaintiffs allege a "market for disposable battery products," but an alleged agreement limited to pricing for *Energizer* brand products only. Mot. at 15-16; Compl. ¶¶ 111, 116 (alleging that the scheme "inflated wholesale prices *for Energizer Battery Products*," and "reduced competition on the retail level by reducing price competition among retailers *who sell Energizer Battery Products*") (emphases added). Plaintiffs try to bridge that gap by arguing that the alleged scheme (1) harmed interbrand competition because non-party Duracell was incentivized to raise its own prices, and (2) increased Walmart's market power, which it used to reduce intrabrand competition at retail. Opp.

at 22-26. Neither argument has factual support or provides "direct evidence" of substantial harm to competition in the pleaded market.

### a. Plaintiffs' Theory of Harm to *Interbrand* Competition Is Based on Implausible and Unsupported Claims About Duracell's Incentives

Plaintiffs' theory of harm to interbrand competition in a "disposable batteries market" hinges on their claim that the scheme "incentivize[d]" Duracell to inflate its own wholesale prices. Opp. at 22-24. This Duracell "incentives" theory is factually unsupported and economically implausible.

To begin, Plaintiffs concede that they do not allege any agreement involving Duracell. Opp. at 23. Instead, they argue that "Energizer's *agreement with Walmart* was anticompetitive because, among other things, it reduced *Duracell's incentive* to compete vigorously on price." *Id.* (citing Compl. ¶ 10) (second emphasis added). Plaintiffs' support for this argument is the following paragraph from the Complaints:

> To support the Scheme, Walmart offered Duracell Battery Products at prices that would not undermine its inflated prices for Energizer Battery Products. That deprived Duracell of a crucial opportunity to compete with Energizer for market share based on price. The Scheme thus decreased Duracell's incentive to compete with Energizer on price and increased Duracell's incentive to match Energizer's inflated prices.

Compl. ¶ 10. None of the three allegations in this paragraph is supported by *facts*. Specifically:

- ***"Walmart [allegedly] offered Duracell Battery Products at prices that would not undermine its inflated [Energizer] prices":*** The Complaints do not identify *anyone* from Walmart, nor allege *any* facts about Walmart's retail pricing of Duracell branded batteries or Duracell's pricing to Walmart—either before or during the alleged conspiracy period. Nor do the Complaints compare Walmart's retail prices for Energizer versus Duracell batteries during that period. There is also no allegation that Walmart agreed with Energizer as to how it would price Duracell batteries. Plaintiffs' claim that Walmart priced Duracell batteries to "not undermine" the alleged scheme is based entirely on Plaintiffs' conclusions and speculation.
- ***Walmart's pricing of Duracell batteries allegedly "deprived Duracell of a crucial opportunity to compete with Energizer":*** The Complaints do not explain *how* Walmart's

retail pricing supposedly deprived Duracell of the ability to compete with Energizer. Nor do they identify what portion of Duracell's sales Walmart made up, or why Walmart's retail pricing of Duracell's batteries precluded Duracell from competing with Energizer by, e.g., reducing its prices to its other retailer-customers (e.g., Home Depot, Lowe's, Amazon, Target, etc.). Only if Walmart had market power in the retail market for disposable battery sales could its pricing actions conceivably impact prices to and by other retailers—but Plaintiffs do not allege such power. Indeed, they do not even allege a separate market for retail sales of disposable batteries, let alone Walmart's share of any such market. *See infra* Section II.B.2.a.

- ***The "[s]cheme thus [allegedly] decreased Duracell's incentive to compete":*** This statement is plainly conclusory. No facts support the claim that Duracell's "incentives" changed (let alone that they did so because of Walmart's retail pricing), or that Walmart's retail pricing in any way changed Duracell's wholesale pricing to the rest of its retailer distribution network. Plaintiffs' theory of harm to interbrand competition in a "disposable batteries market" is entirely hypothetical and unsubstantiated by any facts.

By contrast, the facts that Plaintiffs *do* plead undermine the economic plausibility of their Duracell "incentives" theory. Figure 3 in the Complaints shows that Energizer and Duracell battled for market share—with their shares shifting throughout the relevant period. *See* Compl. ¶ 96 (showing the lead changing hands several times during the first few years of the alleged conspiracy period, and then Energizer's share ultimately growing from roughly 38% in late 2019 (two years *after* the alleged conspiracy began) to 52.4% by 2022, while Duracell's share went down from roughly 48% to 33.9% during that same period). Plaintiffs claim in a footnote, with no factual support, that Figure 3 is "completely consistent with Plaintiffs' theory that the challenged restraints reduced Duracell's incentive to compete vigorously on price." Opp. at 23 n.15. But it makes no economic sense for Duracell to align its incentives with a pricing strategy that has it losing market share to its competitor. That would drive it out of the market.

Likewise, Plaintiffs miss the import of Defendants' cases holding that shifts in market share undermine alleged coordination among competitors. Mot. at 18. Plaintiffs dismiss those cases as

"inapposite because they involve allegations of a *horizontal* price fixing conspiracy between competitors, not a vertical restraint that reduces the incentive of a rival manufacturer to compete." Opp. at 23 n.15. But the point of those cases is that pricing coordination—whether due to conspiracy or supposedly aligned incentives—is implausible where one company is losing material market share to the other. Losing 14% share in two years is not part of any company's rational business strategy. To the contrary, it is consistent with *interbrand* competition among competing battery brands that is the "primary focus" of antitrust law—and also suggests that Energizer or other competitors were pricing *more* aggressively than Duracell. *See* Compl. ¶ 37 ("Energizer spends an estimated $70-80 million a year in advertising, principally to distinguish itself from Duracell.").

**b. Plaintiffs' Claims of Direct Evidence of Harm to *Intrabrand* Competition Are Also Unsupported**

Plaintiffs' alternative argument for "direct evidence" of harm to competition in a disposable batteries market is just as meritless. They claim the alleged Energizer-Walmart "[a]greement reduced *intrabrand* competition at retail," and then rely on *Leegin* to argue that vertical resale price maintenance harms competition when a dominant retailer is the source of that restraint. Opp. at 24-25. This theory of direct evidence of competitive harm fails for multiple reasons.

As an initial matter, Plaintiffs' reliance on *Leegin* is misplaced. There, the Supreme Court overruled its prior precedent and held that application of the *per se* rule is not warranted for vertical agreements to fix minimum resale prices. *Leegin*, 551 U.S. at 882. In calling for the rule of reason standard, the Court pointed out that "[m]inimum resale price maintenance can stimulate interbrand competition—the competition among manufacturers selling different brands of the same type of product—by reducing intrabrand competition—the competition among retailers selling the same brand." *Id.* at 890. It made this point as part of emphasizing that "[t]he promotion of interbrand competition is . . . 'the primary purpose of the antitrust laws.'" *Id.* (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 15 (1997)). The Court then explained that, "[w]hile vertical agreements setting minimum resale prices can have procompetitive justifications, they may have anticompetitive effects in other cases," which makes rule of reason analysis appropriate. *Id*. at 892. Plaintiffs' attempt to weaponize this latter language misses the mark.

Seeking to stave off dismissal, Plaintiffs now recast the alleged "scheme" as resale price maintenance and argue that Walmart is a dominant retailer that was the source of that restraint. They argue that Energizer and Walmart entered into a "resale price maintenance" agreement, and that, "[a]s *Leegin* explained, resale price maintenance can be abused by a dominant *retailer* to prevent price competition from more efficient rivals." Opp. at 24 (emphasis in original). But that argument is at odds with the Complaints, and is not direct evidence of anything. As explained below (Section II.B.3), there is no resale price maintenance agreement alleged. Nor have Plaintiffs alleged facts to support the assertion that Walmart is a "dominant retailer." Plaintiffs' own allegations state that Walmart made up only 11-14% of Energizer's sales. Compl. ¶ 47. And there are no allegations about Walmart's market share in the alleged disposable batteries market at all. *See infra* Section II.B.2.a. There are scores of retailers that sell disposable batteries that the Complaints never address, including big box retailers (e.g., Costco, Home Depot, Lowe's), online marketplaces (e.g., Amazon), and grocery, convenience, and pharmacy stores. *See Bus. Elecs. Corp. v. Sharp Elecs. Corp*, 485 U.S. 717, 727 n.2 (1988) ("Retail market power is rare, because of the usual presence of interbrand competition and other dealers.").

Further, Plaintiffs' argument that the alleged scheme "increased Walmart's market power, which it used to inflate retail battery prices above competitive levels," is similarly unsupported and does not provide direct evidence of harm to competition. Opp. at 24. Once again, there are no allegations regarding Walmart's share in any "disposable batteries market." *See infra* Section II.B.2.a. Further, with respect to Walmart's alleged share of Energizer's sales, Plaintiffs' own allegations show that number was flat between 2019 through 2021 (i.e., three of the four years of the supposed conspiracy period). *See* Compl. ¶ 47. Plaintiffs tie themselves in knots trying to argue un-pled facts to fit inapposite case law. None of their arguments or characterizations of Walmart as "dominant" provide direct evidence of anticompetitive effects in the alleged disposable batteries market.

**2. Plaintiffs Fail to Allege Indirect Evidence of Harm to Competition**

To plead substantial anticompetitive effects *indirectly*, Plaintiffs must plausibly allege (1) market power in a well-defined antitrust market, and (2) harm to competition in that market. *See Am. Express Co.*, 138 S. Ct. at 2284 ("Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition."). Plaintiffs fail both requirements.

**a. Plaintiffs' Claims Hinge on Walmart Having Market Power—Which They Do Not Plead**

Plaintiffs argue that they need only allege that Energizer has market power, and Walmart's market power is irrelevant. *See* Opp. at 27-28. This argument contradicts both the facts Plaintiffs allege and the legal arguments they make.

Plaintiffs' Complaints and Opposition assume that Walmart is the "source" of the alleged restraint, and that Walmart wielded its supposed market power to "pressure" Energizer into an agreement. *See, e.g.*, Compl. ¶ 4 ("The Scheme had two components, to which Energizer agreed under pressure from Walmart."); *id.* ¶ 50 ("Under pressure from Walmart, Energizer agreed to the Scheme.""); Opp. at 15-16 ("Walmart was the source of the vertical price-fixing agreement, not Energizer."); *id.* at 25 (arguing that the alleged restraint was "driven by a *retailer*, not a *manufacturer*.") (emphases in original); *id.* (citing *Leegin* and arguing that "[t]he source of the restraint may also be an important consideration" in determining whether a vertical pricing restraint may lead to anticompetitive effects); *id.* at 24 (citing *Leegin* and arguing that "what Plaintiffs allege here" is that "Walmart, a dominant retailer, pressured Energizer to impose minimum resale prices on rival retailers").

This theory of harm requires Plaintiffs to plead and ultimately prove Walmart's market power. Despite citing *Leegin* almost twenty times in their Opposition, Plaintiffs omit critical language from the Supreme Court's decision: "[T]hat a dominant . . . retailer can abuse resale price maintenance for anticompetitive purposes may not be a serious concern *unless the relevant entity has market power*." *Leegin*, 551 U.S. at 898 (emphasis added). This is because "[v]ertical restraints often pose no risk to competition *unless the entity imposing them has market power*." *Am. Express Co.*, 138 S. Ct. at 2285 n.7 (emphasis added); *see also, e.g.*, *McDonough v. Toys R Us, Inc.*, 638 F. Supp. 2d 461, 482 (E.D. Pa. 2009) (under *Leegin*, "courts must consider whether the restraint-instigator has market power"). Plaintiffs' claims of competitive harm are premised on allegations that a "dominant" retailer (Walmart) "pressured" a supplier (Energizer) to agree to the alleged scheme, and their failure to plead Walmart's market power is fatal.

Plaintiffs' cases (*see* Opp. at 28) do not support a different result. Two of the three (*Toledo* and *Costco*) did not address which entity's market power was relevant, and all three involved theories of competitive harm far different from what Plaintiffs allege here. *Toledo* and *Costco* involved allegations

that a supplier implemented certain pricing policies in response to *multiple* retailers or dealers urging the supplier to do so, therefore implicating the concern in *Leegin* of a retailer or dealer cartel. *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 226 (3d Cir. 2008) ("[Plaintiff] has alleged that [the defendant supplier] agreed to support *the horizontal agreement among the dealers to control prices*," and "[i]n *Leegin*, the Supreme Court expressly condemned such agreements.") (emphasis added); *Costco Wholesale Corp. v. Johnson & Johnson Vision Care, Inc.*, No. 15-cv-734, 2015 WL 9987969, at *2, *15-16 (M.D. Fla. Nov. 4, 2015) (in the contact lens industry, alleged to be "unusually susceptible to anti-competitive behavior and effects," plaintiff alleged that contact lens supplier implemented pricing policies in response to "anti-discounting requests" of various eye care professionals who served a dual role as retailers); *see also Leegin*, 551 U.S. at 893 ("A group of retailers might collude to fix prices to consumers and then compel a manufacturer to aid the unlawful arrangement with resale price maintenance."). Here, no other retailer is alleged to be involved in the "scheme"; indeed, the Complaints are silent about the many other retailers that sell disposable battery products (Home Depot, grocery stores, pharmacies, etc.).

*Frame-Wilson v. Amazon.com* involved claims that Amazon, an alleged monopolist, effectively required third-party sellers to raise their prices across all non-Amazon distribution outlets. No. 20-cv-424, 2023 WL 2632513, at *7 (W.D. Wash. Mar. 24, 2023). The court held that, in that context, the plaintiffs did not need to plead that every single third-party seller on Amazon had market power, and could instead rely on "the overall effects of Amazon's conduct in the market." *Id.* Here, there are no allegations that Walmart is a monopolist or that Energizer and any retailer (including Walmart) agreed to raise retail prices. And requiring Plaintiffs to allege the market power of one entity (Walmart), the supposed "source" of the alleged restraint, is a far cry from requiring a plaintiff to plead the market power of millions of third-party sellers on Amazon.

Plaintiffs' alternative argument—that they do sufficiently allege Walmart's market power—is equally baseless and contradicted by their own allegations. *See* Opp. at 28-30. ***First***, with respect to a wholesale market for disposable batteries, Plaintiffs themselves allege that Walmart had only 11-14% share of Energizer's sales during the alleged conspiracy period (*see* Compl. ¶ 47), which is insufficient as a matter of law to plead market power. *See, e.g.*, *Pac. Steel Grp. v. Com. Metals Co.*, No. 20-cv-

7683, 2021 WL 2037961, at *6 (N.D. Cal. May 21, 2021) ("[A] market share of somewhere between 15% and 30% does not appear to be enough to establish market power."); *In re Amazon.com, Inc. eBook Antitrust Litig.*, No. 21-cv-351, 2022 WL 4581903, at *24 (S.D.N.Y. Aug. 3, 2022), *report and recommendation adopted*, 2022 WL 4586209 (S.D.N.Y. Sept. 29, 2022) (dismissing Section 1 claim where vertical MFN agreements "would on average affect only 14.4% of the [product] market," a share "far too small to suggest an ability to cause an adverse effect on competition market-wide"); ABA Section of Antitrust Law, Antitrust Law Developments § 1D-2-a-(1)-(c) (9th ed. 2022) ("Since [the Supreme Court's 1984 decision in] *Jefferson Parish*, no court has inferred the requisite market power from a market share below 30 percent.").

***Second***, with respect to a retail market for disposable batteries, Plaintiffs do not come close to pleading that Walmart has market power. They do not allege Walmart's share of retail sales of disposable batteries, despite alleging that purchases from *other* retailers (Home Depot, Amazon, Target, etc.) are the basis for their damages claims. Compl. ¶¶ 14-25. Instead, Plaintiffs just label Walmart a "dominant retailer." *See id.* ¶¶ 9, 42, 46, 110, 153; Opp. at 28-29. But those allegations are "only ultimate facts . . . and legal conclusions" unsupported by any of "the necessary evidentiary facts." *Kendall*, 518 F.3d at 1047-48. Recognizing this problem, Plaintiffs pivot and argue a brand-new "captive customers" theory of market power. *See* Opp. at 29-30. Plaintiffs claim that "Walmart's power arises from the large number of captive customers who shop there for a variety of products *in addition* to disposable batteries," because "few retail shoppers who go to Walmart or Sam's Club to purchase a large basket of household goods are likely to leave to buy disposable batteries somewhere else." Opp. at 29. None of this is alleged in the Complaints. But even if it were, Walmart's alleged share of Energizer battery sales is still only 14%, regardless of what else consumers buy at Walmart. And "[m]ere speculation" about consumer behavior "is not enough to move Plaintiffs' theory … from conceivable to plausible." *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 52 (9th Cir. 2022). Likewise, it is pure speculation that "Walmart 'controls Duracell's access' to a critical subset of retail customers." Opp. at 30. Plaintiffs do not even allege what share of Duracell batteries are sold at Walmart. Plaintiffs offer mere "labels and conclusions," and fail to plead market power. *Twombly*, 550 U.S. at 1964-65.

**b. The Alleged Conduct Also Has No Unreasonable Effect on Competition**

Plaintiffs also fail the second prong of the "indirect effects" analysis: they do not plausibly allege that the "scheme" harmed competition. Whether alleged conduct harms competition depends on the nature of the restraint. *See, e.g.*, *Cont'l T.V., Inc. v. G.T.E. Sylvania Inc.*, 694 F.2d 1132, 1136 (9th Cir. 1982) (to assess the impact of vertical restraints, courts consider, among other things, "the nature of the restraint and its effect, actual or probable" (citation omitted)). Here, two aspects of the alleged scheme are particularly important. First, Plaintiffs fundamentally allege an intrabrand restraint: they claim that the scheme "inflated wholesale prices *for Energizer Battery Products*," and "reduced competition on the retail level by reducing price competition among retailers *who sell Energizer Battery Products*." Compl. ¶¶ 111, 116 (emphases added). And second, Energizer's alleged actions—raising wholesale prices and monitoring retail prices of its distribution network—are things Energizer can do on its own, without the aid of Walmart; Plaintiffs do not plead any facts showing how (or why) an agreement with Walmart is necessary for any of the conduct they allege.

With the nature of the alleged scheme in mind, *E&L Consulting* explains why that scheme could not harm competition. In *E&L Consulting*, a manufacturer (Doman) with a large market share (allegedly 95%) entered into an exclusivity agreement with a distributor, thereby barring all other distributors from selling Doman's products. *E&L Consulting v. Doman Indus.*, 472 F.3d 23, 29-30 (2d Cir. 2006). The Second Circuit affirmed the dismissal of the plaintiff's (a terminated distributor) Section 1 claim, holding that the alleged agreement would not cause any effect on competition beyond what the antitrust laws already allow Doman to "achieve without the aid of a distributor." *Id.* ("[Plaintiffs'] hypothesizing of an unreasonable effect on competition fails because such a vertical arrangement provides no monopolistic benefit to Doman that it does not already enjoy and would not continue to enjoy if the [restraint] were enjoined."). Likewise here, even if Energizer's share approached that of Doman, it would not need the alleged scheme (or any aid or encouragement from Walmart) to take the same actions that it is alleged to have taken here—i.e., raising wholesale prices to its customers and monitoring those customers' retail prices. In other words, there is no incremental restraint on competition from the alleged scheme that goes beyond what Energizer can lawfully do on its own. *See id.*

Plaintiffs argue that *E&L Consulting* is distinguishable because, there, "the defendant manufacturer was alleged to already have a monopoly in the manufacture of its product," whereas here, "Energizer has market power but also *competes* with Duracell," and the alleged scheme "*reduced* that competition." Opp. at 32 & n.23 (emphases in original). This argument fails. First, as explained above, the claim that the alleged scheme decreased competition with Duracell is entirely speculative, and also contradicted by Plaintiffs' own allegations. *See supra* Section II.B.1.a. Further, Energizer (like any manufacturer) also controls "the manufacture of its product." And, if anything, Doman's exclusivity agreement presented a far greater risk of "reduced . . . competition" (Opp. at 32) than the conduct alleged here: Doman had 95% market share (versus Energizer's alleged 50%), and exclusivity for one distributor is a more substantial restraint than Energizer supposedly agreeing to raise its own wholesale prices and monitor its customers' retail prices.

Plaintiffs' remaining efforts to dismiss Defendants' arguments as "procompetitive justifications" also fail. Plaintiffs conflate harm to competition—a required element of their rule of reason claim—with procompetitive justifications. *See Brantley*, 675 F.3d at 1197 ("[T]o state a Section 1 claim under the rule of reason, plaintiffs must plead . . . a contract, combination[,] or conspiracy . . . which actually injures competition." (citation omitted)). Plaintiffs argue that conduct that is lawful if done unilaterally can still harm competition if done pursuant to agreement. *See* Opp. at 31-32. True enough, but Plaintiffs miss the point: their Complaints allege a vertical restraint on Energizer's own products, where the alleged "source" of the restraint (Walmart) is not alleged to have market power. Such a restraint does not harm interbrand competition. *See Leegin*, 551 U.S. at 898 ("If a retailer lacks market power, manufacturers likely can sell their goods through rival retailers."). Plaintiffs' cases (Opp. at 30) are not to the contrary; in each of them, the source of the restraint was alleged to have market power, and there were plausible allegations of harm to competition. *See Brown v. Amazon.com, Inc.*, No. 22-cv-965, 2023 WL 5793303, at *10 (W.D. Wash. Sep. 7, 2023) (given allegations that Amazon had 90% share of U.S. online marketplace sales and over 50% share of certain submarkets, plaintiffs plausibly alleged that Amazon's use of minimum margin agreements required third-party sellers to increase the prices they charged on other retail outlets); *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 42-43 (2d Cir. 2018) (governing body for soccer in the

U.S. had market power because it controlled the requirements that a league must meet to gain divisional designation for a season of play); *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 984-85 (9th Cir. 2023) (affirming district court's finding that "Apple had a mobile-games market share of 52 to 57%" and "wielded that market power to foreclose would-be competitors like Epic from offering app-distribution and payment-processing alternatives"). Once again, Plaintiffs' failure to plead Walmart's market power forecloses their claims.

Finally, Plaintiffs' discussion of MFNs cannot save their claims. *See* Opp. at 33-34. As explained above (Section II.A.2), all parties agree that Plaintiffs have *not* alleged an MFN. But even if they had, Plaintiffs have not alleged how any supposed MFN harms competition—in particular because the party receiving it (Walmart) is not alleged to have market power. None of Plaintiffs' cases stands for the sweeping proposition that courts generally "den[y] motions to dismiss challenges to MFN agreements." Opp. at 33. Rather, each of Plaintiffs' cases involved some horizontal component that Plaintiffs concede is absent here, or a market share far larger than the 11-14% share of Energizer's sales that Walmart is alleged to have here. *See Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 589-90 (N.D. Cal. 2020) (analyzing horizontal "Most Favored Entry" and "Most Favored Entry Plus" clauses in reverse payment settlements between defendant and generic drug maker); *De Coster v. Amazon, Inc.*, No. C21-693, 2023 WL 372377, at *1, *4 (W.D. Wash. Jan. 24, 2023) (declining to dismiss challenge to Amazon's agreements with third-party sellers in part given Amazon's ecommerce dominance, and because the agreements "affect[] horizontal competitors in a unique way"); *United States v. Blue Cross Blue Shield of Mich.*, 809 F. Supp. 2d 665, 673-74 (E.D. Mich. 2011) (recipient of MFN was alleged to have 40-80% market share); *Wolfire Games, LLC v. Valve Corp.*, No. C21-0563, 2022 WL 1443744, at *4 (W.D. Wash. May 6, 2022) (plaintiff alleged that "Defendant acquired [another] gaming platform in 2001 and shut it down a few years later, forcing gamers onto the Steam Platform, making Steam 'instantly ... a must-have platform'").

### 3. The Rule of Reason—Not the *Per Se* Rule—Governs Plaintiffs' California and Maryland Antitrust Claims

Plaintiffs concede that the rule of reason governs their vertical claims under the Sherman Act and the antitrust laws of twenty-five states, but they argue that the *per se* rule nonetheless governs their

claims under California's and Maryland's antitrust laws. Opp. at 20-21. Plaintiffs are incorrect for several reasons.

To begin, Plaintiffs cite factually inapposite cases that involve *per se* treatment of written agreements regarding the minimum price a retailer must offer. *See Mailand v. Burckle*, 20 Cal. 3d 367, 372, 377 (1978) (pre-*Leegin* decision applying *per se* rule to written agreement granting franchisors "the power to set the price at which [franchisees] sold gasoline and requiring [franchisees] to purchase gasoline from [one supplier]" at a price set by franchisors); *Brown*, 2023 WL 5793303, at *1, *5, *11 (at pleading stage, applying *per se* rule under California and Maryland law to Amazon's written agreements with third-party sellers because the combination of most-favored-nation and minimum margin commitments for Amazon allegedly established minimum prices for sales via other outlets); *Frame-Wilson v. Amazon.com, Inc.*, 591 F. Supp. 3d 975, 991-93 (W.D. Wash. 2022) (analyzing similar written Amazon pricing agreements at pleading stage).[6] This case law is consistent with the statutory language adopted by Maryland's legislature following *Leegin*, which makes clear that the *per se* standard under that state's law applies to agreements that establish a minimum resale price. *See* Md. Code Ann., Com. Law § 11-204(b) ("[A] contract, combination, or conspiracy that establishes a minimum price below which a retailer, wholesaler, or distributor may not sell a commodity or service is an unreasonable restraint of trade or commerce.").

By contrast, even accepting the conclusory two-part "scheme" the Complaints purport to allege, there are no factual allegations that Energizer and any retailer agreed on the price at which the retailer would sell Energizer batteries. *See supra* Section II.A.1. There are no allegations that Walmart agreed with Energizer on the price at which Walmart would sell Energizer batteries. There are no allegations that Plaintiff Portable Power agreed on the price at which Portable Power would sell Energizer batteries. Nor are there allegations identifying *any* other retailer at all—let alone one who supposedly agreed with Energizer on the prices that retailer would set. *See Kunert v. Mission Fin. Servs. Corp.*,

[6] Plaintiffs also rely on *Alsheikh v. Superior Court*, No. B249822, 2013 WL 5530508 (Cal. Ct. App. Oct. 7, 2013), an unpublished (and non-citable in California state court) opinion in which the court held that the plaintiff did not plausibly allege a Cartwright Act violation. At issue was a written distribution agreement between a manufacturer and an independent contractor-distributor that did not preclude the distributor from negotiating prices of the baked goods it resold to retail stores. *Id.* at *1-3.

110 Cal. App. 4th 242, 263 (2003) (rejecting application of *per se* rule under California law because plaintiffs' allegations "omit[ted] critical elements essential to a resale price maintenance agreement").

At most, the Complaints allege, in conclusory fashion, that Energizer "require[d] its direct purchasers to charge their retail customers no less than the price Walmart charged for Energizer Battery Products or risk additional wholesale price increases or be cut off as retailers of Energizer Battery Products." Compl. ¶ 6. But there are no allegations—even conclusory ones—that any such retailer *agreed* with Energizer to do so. Also, to the extent Energizer "required" its customers to charge particular prices by unilaterally choosing not to deal with those that charge different prices, that is entirely legal and within its rights to do so. Similarly, Plaintiffs' claim that "Energizer inflated its wholesale prices for Energizer Battery Products to Portable Power and other direct purchasers to force them to sell at or above Walmart's retail prices" is not an agreement at all. *Id.* ¶ 84. Nor do Plaintiffs plead an agreement by claiming that "[o]nce Energizer raised its wholesale prices to Portable Power and other retailers, they could no longer offer disposable batteries for sale at prices lower than Walmart's." *Id.* ¶ 97. These allegations describe Energizer's *unilateral* pricing decisions.

The lack of facts plausibly alleging an agreement between Energizer and any retailer is fatal to Plaintiffs' argument for *per se* treatment under California and Maryland law. "California courts have adopted the *Colgate* doctrine for purposes of applying the Cartwright Act." *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 370 (2001). Thus, "the manufacturer can announce its resale prices in advance and refuse to deal with those who fail to comply. And a distributor is free to acquiesce in the manufacturer's demand in order to avoid termination." *Id.* (citation omitted). The same is true under Maryland law. *See Loren Data Corp. v. GXS, Inc.*, No. 10-3474, 2011 WL 3511003, at *8, *12 (D. Md. Aug. 9, 2011) (dismissing antitrust claims, including under Maryland law, because "as a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing") (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)).

Moreover, even with respect to an agreement to set minimum prices (which, again, is not alleged here), the case law Plaintiffs cite to support application of the *per se* rule has been questioned—if not implicitly overruled. *Mailand*'s application of the *per se* rule to a vertical price restraint was based on pre-*Leegin* (and now outdated) federal case law. *See Mailand*, 20 Cal. 3d at 377 (relying on

*Dr. Miles Medical Co. v. Park & Sons Co.*, 220 U.S. 373 (1911), which was overruled by *Leegin*, 551 U.S. at 882). California courts hold that authority from the state's Supreme Court loses its binding effect if the case law underlying that authority has changed. *See Newport Beach Country Club, Inc. v. Founding Members of Newport Beach Country Club*, 140 Cal. App. 4th 1120, 1131 (2006) (later developments in the law "draw the viability of [prior California Supreme Court authority] into question and dissipate whatever strength that case once had"); *Crown Homes, Inc. v. Landes*, 22 Cal. App. 4th 1273, 1276 (1994) (declining to follow prior California Court of Appeal authority "not because it was wrongly decided in 1982, but the [federal] authority it relied upon is no longer viable and persuasive by reason of subsequent United States Supreme Court decisions"). Such is the case here: *Mailand* does not support application of the *per se* rule to vertical price restraints post-*Leegin*.[7]

### C. Certain Plaintiffs Lack Standing to Bring Their Claims

#### 1. The Schuman Plaintiffs' Claims Are Too Indirect and Remote

Plaintiffs' efforts to address their threshold standing problems are also meritless. Plaintiffs do not even argue that their allegations that the *Schuman* Plaintiffs—particularly those who purchased only Duracell batteries—suffered an injury that satisfies the Supreme Court's requirements for antitrust injury set forth in *Associated General Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"). Instead, Plaintiffs urge that they need not even meet that test because being a direct purchaser is alone *sufficient* to confer antitrust standing.[8] Opp. at 34-35.

[7] Plaintiffs' argument for the *per se* rule also disregards California's and Maryland's harmonization doctrines. *See Name.Space, Inc.*, 795 F.3d at 1131 n.5 (affirming dismissal of Cartwright Act claim "[b]ecause the analysis under the Cartwright Act . . . is identical to that under the Sherman Act"); Md. Code Ann., Com. Law § 11-202(a)(2)(i) ("It is the intent of the General Assembly that, in construing this subtitle, the courts be guided by the interpretation given by the federal courts to the various federal statutes dealing with the same or similar matters, including: (i) [Section 1 of the Sherman Act].").

[8] The *Schuman* Plaintiffs allegedly purchased Duracell- and Energizer-branded batteries from Walmart. However, there are no allegations that the retail prices set by Walmart were fixed as part of any alleged agreement with Energizer. In other words, Plaintiffs do not "allege[] a conspiracy to fix the price paid by the plaintiffs," and so the *Schuman* Plaintiffs' claim is not a direct purchaser claim. *See In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 750-51 (9th Cir. 2012) (co-conspirator exception applies "when the direct purchaser conspires horizontally or vertically *to fix the price paid by the plaintiffs*" (emphasis added)).

Plaintiffs are incorrect that direct purchasers need not satisfy the *AGC* test. In *AGC* itself, the Court held that its requirement that an antitrust plaintiff have a sufficiently direct injury was motivated by the "same concerns" as the indirect purchaser rule of *Illinois Brick*—not that it was the same rule as *Illinois Brick*. While *Illinois Brick* sets a general rule that indirect purchaser claims for damages are not allowed under federal law, *AGC* adopts a more functional, case-specific test to evaluate whether claims are too remote to be actionable under the antitrust laws. *See AGC*, 459 U.S. at 544-45.

Here, the required case-specific analysis yields the conclusion that the *Schuman* Plaintiffs do not adequately plead antitrust standing under *AGC*, especially as to purchasers of Duracell batteries. *See* Opp. at 25-28. As noted above, Plaintiffs do not allege that Duracell was part of any agreement, and their conclusory allegations about Duracell's incentives to raise prices are not sufficiently direct to satisfy *AGC*. That is because they depend on speculation about the actions and motivations of a non-party that do not have any factual support in the Complaints.

Finally, Plaintiffs' efforts to dismiss cases analyzing an "umbrella" theory of liability as addressing purchases only from non-conspirators miss the mark. *See* Opp. at 35-36. Those cases make clear that, to be remediable under the federal antitrust laws, claimed injuries must be provable without embroiling the Court in "complex judicial inquiry into the pricing decisions of sellers remote from plaintiffs." *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*, 691 F.2d 1335, 1338-41 (9th Cir. 1982); *AGC*, 459 U.S. at 543-44 (noting the Court's "strong interest" of "keeping the scope of complex antitrust trials within judicially manageable limits"). The *Schuman* Plaintiffs cannot possibly survive the case-specific analysis that *AGC* requires, and do not even contend otherwise, instead depending entirely on their proposed bright-line rule that they are exempt from it simply because they purchased from a Defendant directly. Their claims should be dismissed.

### 2. The *Copeland* Plaintiffs Lack Article III Standing to Assert Claims Under the Laws of Twenty-Two Jurisdictions

The *Copeland* Plaintiffs acknowledge that they have no connection to twenty-two of the jurisdictions whose laws they seek to invoke. They also accept that they "'must demonstrate standing for each claim' and 'for each form of relief sought.'" *Haro v. Sebelius*, 747 F.3d 1099, 1108 (9th Cir. 2014) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). Likewise, they tacitly

admit that, in a class action, the named plaintiffs must "'allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 n.20 (1976) (citation omitted).

Nevertheless, Plaintiffs cite the Ninth Circuit's decision in *Melendres v. Arpaio*, 784 F.3d 1254 (9th Cir. 2015), to argue that they have "standing to pursue claims under the laws of states where they do not reside and have not made purchases." Opp. at 36. But the *Melendres* court was addressing a different question. In *Melendres*, "all plaintiffs alleged that they suffered the same constitutional injury, only in different factual circumstances." *Jones v. Micron Tech., Inc.*, 400 F. Supp. 3d 897, 909 (N.D. Cal. 2019). In particular, both named and unnamed class members claimed that their constitutional rights were violated by police discrimination against Latinos, but during different types of patrol. *Melendres*, 784 F.3d at 1258-59. There was no dispute in *Melendres* that there was a named plaintiff with standing for each claim, and so the court did not address the requirement that a plaintiff "demonstrate standing for each claim." *Haro*, 747 F.3d at 1108; *see In re JUUL Labs, Inc. Marketing, Sales Practices, and Products Liability Litig.*, 533 F. Supp. 3d 858, 881 (N.D. Cal. 2021) (*Melendres* was "addressing a different question": namely, "the ability of named plaintiffs to represent absent class members who were subjected to different types of unconstitutional searches."). For that reason, *Melendres* "has little bearing" where, as here, named plaintiffs seek to bring different *claims* on behalf of unnamed parties than the claims they have standing to raise. *Drake v. Toyota Motor Corp.*, No. 20-cv-1421, 2020 WL 7040125, at *3 (C.D. Cal. Nov. 23, 2020); *see also Goldstein v. Gen. Motors LLC*, 445 F. Supp. 3d 1000, 1020-21 (S.D. Cal. 2020) ("The question here is whether the named Plaintiffs have standing to bring certain claims, not standing 'to obtain relief for unnamed class members' for the same injury as was the case in *Melendres*.") (quoting *Melendres*, 784 F.3d at 1261)).[9]

[9] *See also Tan v. Quick Box, LLC*, No. 20-cv-1082, 2020 WL 7226440, at *18 (S.D. Cal. Dec. 8, 2020) ("*Melendres* does not stand for the broad proposition Plaintiffs asserts . . . it 'did not confront a situation where named plaintiffs brought claims under the laws of multiple states where they did not reside and where they were not injured.'") (quoting *Jones*, 400 F. Supp. 3d at 909)); *Wong v. Am. Honda Motor Co., Inc.*, No. 19-cv-10537, 2022 WL 3696616, at *4 (C.D. Cal. June 21, 2022) ("[T]he majority of courts . . . have concluded that when a representative plaintiff is lacking for a particular state, all claims based on that state's laws are subject to dismissal."); *In re Hard Disk Drive Suspension Assemblies*

The cases on which Plaintiffs rely that reject this approach ignore the key distinction between individual plaintiffs having factual differences in their claims and individual plaintiffs having different claims altogether in favor of a cursory conclusion that this distinction is "not material." *See, e.g.*, *Pecanha v. The Hain Celestial Grp., Inc.*, No. 17-cv-4517, 2018 WL 534299, at *9 (N.D. Cal. Jan. 24, 2018); *Ablaza v. Sanofi-Aventis U.S. LLC*, No. 21-cv-1942, 2022 WL 19517298, at *2 (N.D. Cal. July 12, 2022). But the Supreme Court *requires* Plaintiffs to demonstrate standing for each different claim brought. *DaimlerChrysler*, 547 U.S. at 352. Accordingly, courts in this Circuit have continued to adhere to binding principles of Article III standing, including after the decisions Plaintiffs cite. As recently as May 2023, the Southern District of California acknowledged "the growing trend that courts can 'address the issue of Article III standing at the pleadings stage and dismiss claims under the laws of states in which no plaintiff resides or has purchased products.'" *Walcoff v. Innofoods USA, Inc.*, No. 22-cv-1485, 2023 WL 3262940, at *5 (S.D. Cal. May 4, 2023) (citation omitted); *see also Drake*, 2020 WL 7040125, at *3 ("Courts in this circuit have overwhelmingly ruled that plaintiffs 'do not have standing to assert claims from states in which they do not reside' and that it is 'appropriate . . . to address standing in advance of class certification.'") (alteration in original) (citation omitted)).

In short, where Plaintiffs fail to allege "a named Plaintiff who has purchased a product within the relevant state—even if there are sufficient allegations of injury under other States' or federal law—there can be no determination that an interest was harmed that was legally protected under the relevant state's laws." *Tan*, 2020 WL 7226440, at *18 (citation omitted). As a result, the *Copeland* Plaintiffs' claims under the laws of 22 states in which the named Plaintiffs neither reside nor made purchases should be dismissed.

---

*Antitrust Litig.*, No. 19-md-2918, 2020 WL 6270948, at *3 (N.D. Cal. Oct. 23, 2020) (declining to extend *Melendres* when class members raise state-law claims in states where class members were not injured); *Hamilton v. NuWest Grp. Holdings LLC*, No. 22-cv-1117, 2023 WL 130485, at *3-4 (W.D. Wash. Jan. 9, 2023) (same); *Stewart v. Kodiak Cakes, LLC*, 537 F. Supp. 3d 1103, 1124-25 (S.D. Cal. Apr. 29, 2021) (same); *Sihler v. Fulfillment Lab, Inc.*, No. 20-cv-1528, 2020 WL 7226436, at *16 (S.D. Cal. Dec. 8, 2020) (same); *Soo v. Lorex Corp.*, No. 20-cv-1437, 2020 WL 5408117, at *11 (N.D. Cal. Sept. 9, 2020) (same); *Carpenter v. Petsmart, Inc.*, 441 F. Supp. 3d 1028, 1040-41 (S.D. Cal. Mar. 2, 2020) (same).

### D. Plaintiffs Concede That All but Two of Their State-Law Claims Rise and Fall with Their Federal Claims

Plaintiffs agree that, aside from their California and Maryland antitrust claims (which fail for the reasons explained above), "their Sherman Act claim and their state-law antitrust and consumer protection claims are uniform in all important respects." *See* Opp. at 42-43. Accordingly, those claims rise and fall together, and the Court should dismiss each of the state-law antitrust and consumer protection claims for the same reasons Plaintiffs' Sherman Act claim fails.

## III. CONCLUSION

For these reasons, Defendants respectfully request that the Court grant their Motion and dismiss Plaintiffs' Complaints with prejudice.

*[Signatures on following page]*

Dated: October 26, 2023

Respectfully submitted,

LATHAM & WATKINS LLP

By: */s/ Christopher S. Yates*

Christopher S. Yates (Bar No. 161273)
*chris.yates@lw.com*
Belinda S Lee (Bar No. 199635)
*belinda.lee@lw.com*
Brendan A. McShane (Bar No. 227501)
*brendan.mcshane@lw.com*
Alicia R. Jovais (Bar No. 296172)
*alicia.jovais@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: +1.415.391.0600

Lawrence E. Buterman (*pro hac vice*)
*lawrence.buterman@lw.com*
1271 Avenue of the Americas
New York, New York 10020
Telephone: +1.212.906.1747

*Attorneys for Defendant Walmart Inc.*

Dated: October 26, 2023

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Samuel G. Liversidge*

Theodore J. Boutrous Jr., Bar No. (132099)
*tboutrous@gibsondunn.com*
Christopher D. Dusseault (Bar No. 177557)
*cdusseault@gibsondunn.com*
Samuel G. Liversidge (Bar No. 180578)
*sliversidge@gibsondunn.com*
Courtney L. Spears (Bar No. 329521)
*cspears@gibsondunn.com*
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone: +1.213.229.7000

Rachel S. Brass (Bar No. 219301)
*rbrass@gibsondunn.com*
555 Mission Street, Suite 3000
San Francisco, California 94105-0921
Telephone: +1.415.393.8200

*Attorneys for Defendant Energizer Holdings, Inc.*

**SIGNATURE ATTESTATION**

I am the ECF User whose identification and password are being used to file the foregoing Reply in Support of Motion to Dismiss. Pursuant to L.R. 5-1(i)(3) regarding signatures, I, Christopher S. Yates, attest that concurrence in the filing of this document has been obtained.

Dated: October 26, 2023

*<u>/s/ Christopher S. Yates</u>*
Christopher S. Yates